UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

CHRISTOPHER ORTEGA,

Defendant.

Criminal Action No. 5:25-cr-04750-MIS-4

---

BEFORE THE HONORABLE MARGARET I. STRICKLAND, DISTRICT JUDGE

BENCH TRIAL - DAY 1

Wednesday, August 19, 2026
1:33 p.m.

United States Courthouse
Guadalupe Courtroom
100 North Church Street
Las Cruces, New Mexico

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE - NEW MEXICO
BY: JAMES ANDREW DICKENS AND BENJAMIN TURNER SUSLAVICH
200 North Church Street
Las Cruces, New Mexico 88001
(575) 522-2304
james.dickens@usdoj.gov

On behalf of the Defendant:

LAW OFFICES OF ANDREW OTTAWAY
BY: ANDREW OTTAWAY
11 Bogie Lane
Suite 1C
Ruidoso, New Mexico 88345
(817) 559-0466
ottaway9@swbell.net

# **TABLE OF CONTENTS**

## TRIAL WITNESSES


| On behalf of the Government: | Page |
| --- | --- |
| WILSON PUTNAM | |
| By Mr. Dickens | 22 |
| By Mr. Ottaway | 39 |
| By Mr. Dickens | 39 |
| OBED LOPEZ | |
| By Mr. Dickens | 40 |
| By Mr. Ottaway | 55 |
| By Mr. Dickens | 55 |
| GERMAN ORTIZ | |
| By Mr. Suslavich | 56 |
| By Mr. Ottaway | 65 |
| KYE HARRIS | |
| By Mr. Suslavich | 66 |
| COBY HEWITT | |
| By Mr. Suslavich | 83 |

**EXHIBITS**


| | Admitted |
|---|---|
| Numbers 1 through 79 | 21 |


**MISCELLANEOUS**


| | Page |
|---|---|
| Opening Statements by Counsel for Plaintiff | 7 |
| Opening Statements by Counsel for Defendant | 18 |

**P R O C E E D I N G S**

(In open court.)

THE COURT: Good afternoon, everyone.

We're here in United States of America versus Christopher Ortega, 25-cr-4750.

May I have entries of appearance, please.

MR. DICKENS: Good afternoon, Your Honor, James Dickens and Ben Suslavich on behalf of the United States.

THE COURT: Good afternoon, counsel.

MR. OTTAWAY: Andrew Ottaway for Mr. Ortega.

THE COURT: Good afternoon.

We're here to start a bench trial. I have a waiver of the defendant's right to a jury trial. I'm just going to go over that with Mr. Ortega.

Mr. Ortega, I'm going to ask you some questions. You can stay seated there.

I have a waiver of a right to a jury trial in front of me. Did you sign this document?

MR. ORTEGA: Yes, Judge.

THE COURT: Did you sign this after you spoke with your lawyer about waiving a jury trial?

MR. ORTEGA: Yes, Judge.

THE COURT: You understand that you have a constitutional right to have a jury trial in this matter?

MR. ORTEGA: Yes, Judge.

THE COURT: And you understand that, at a jury trial, it would be the jury that decided whether you were guilty or innocent, rather than the Court?

MR. ORTEGA: Yes, Judge.

THE COURT: In a jury trial, in order to find you guilty, all 12 members of the jury would have to agree that you were guilty, or they could also all agree that you were not guilty.

Do you understand that?

MR. ORTEGA: Yes, Judge.

THE COURT: When you waive a right to a jury trial, you waive a right to have 12 people decide whether you are guilty or innocent, and that decision would be only based on my determination of the evidence.

Do you understand that?

MR. ORTEGA: Yes, Judge.

THE COURT: Your attorney asked -- answered all of the questions that you asked before you signed this form?

MR. ORTEGA: Yes.

THE COURT: Did you sign it freely and voluntarily?

MR. ORTEGA: Yes, Judge.

THE COURT: All right. Anything else that I should go over, from the government's point of view, regarding the waiver of the right to a jury trial?

MR. DICKENS: No, Your Honor. Thank you.

THE COURT: Mr. Ottaway, from you?

MR. OTTAWAY: No.

THE COURT: All right. Then we can begin the jury trial.

Do the parties anticipate giving any opening statements? From the government?

MR. DICKENS: Thank you, Your Honor.

THE COURT: Go ahead.

**OPENING STATEMENTS BY COUNSEL FOR PLAINTIFF**

MR. DICKENS: Your Honor, the case the Court is about to hear is just a simple, old fashioned theft ring, albeit it a very successful theft ring. After all, in just two-month time period, from the end of June of 2025 to the end of August of 2025, this theft ring was able to steal thousands of barrels of pure crude oil and received over $350,000 worth of proceeds from this oil.

But to understand this business, we must first understand the oil business in general. So we're going to bring out an expert to talk to the Court about the oil business. Some of the things are probably rather obvious. Pure crude oil is significantly more valuable than what's called dirty oil or slop oil or waste oil. Oil can be contaminated simply by being mixed with water, by being mixed with gas, or other type of sediment, and, therefore, is

considered slop oil or waste oil. Companies work very hard to keep these contaminants out of their oil and also to keep them away from them during the shipping process.

But even slop oil is significantly valuable. That's because businesses are all set up to attempt to remove all of those contaminants and get every last drop of oil out of the slop oil; therefore, the big oil businesses contract with reclamation yards to ship this slop oil to them so that these reclamation yards can use various methods to try and clean the oil. They'll use heat, chemicals, even centrifuges to try to get out every last drop of oil.

But the important thing to note about this is that even slop oil is controlled by the companies. It is a valuable resource, and they sell it through contracts to other companies, meaning no single employee has the ability, the authority to sell, give away, or transfer, in any way, any of this oil outside of the company's control. It is still a valuable commodity.

We'll also talk to the Court about the different vehicles involved in this oil business, specifically oil haulers and vacuum trucks, sometimes called water trucks. To the inexperienced eyes, these vehicles look remarkably similar, but they serve a very different function in the business.

Oil haulers, well, they pretty much do what their

title tells you: They haul oil. They haul the pure crude oil. These are, in fact, the only vehicles that are licensed and authorized to carry pure crude oil on the roadways in our state, as well as Texas. And this is because crude oil is a very volatile substance, a very flammable substance. So they have to have special equipment in order to protect themselves and to the public with this load of pure crude oil.

Vacuum trucks, however, are meant to go out there and suck up the contaminated oil, the oil that is mostly water, that slop oil that we talked about. They are not licensed, are not meant to transport pure crude oil.

Next, I want to talk to the Court about load tickets. Every time a load of oil is picked up from one location or delivered to another location, load tickets have to be created. Load tickets document things such as the date, the amount of oil being delivered, the purity of the oil, and probably most importantly, the source of the oil. These are the way the industry attempts to circumvent or prevent thefts, that each load has these load tickets, and you can determine where it came from.

But as with every piece of paper, if there is a person willing to forge it, to neglect to put information on it, or simply to ignore it, then whole loads of oil can simply disappear.

With this background information about the oil

business, let's turn to the specifics about this theft ring. You're going to hear from two former Plains All American employees. They will tell you that Plains All American doesn't pump the oil out of the ground. It does exactly what its title tells you. It provides the pipelines to move pure crude oil. Plains All American Pipeline works very hard to make sure that the only thing they have in their pipelines is, in fact, pure oil, none of the slop oil they will allow into the pipelines.

These two employees were approached around March or April of 2025, by somebody who wanted to commit thefts from the pipelines themselves. These men agreed to participate in those lefts.

And the thefts happened basically the same way every single time. These same vacuum truck, water truck, showed up at a prearranged location, was escorted out to the Plains All American Pipeline, was allowed to hookup to the pipeline, and draw out barrels upon barrels of pure crude oil.

A single load in a vacuum truck can be up to 130 to 140 barrels of pure crude oil. And you'll hear that that is roughly $10,000 or more in value in just one load.

You will hear from these witnesses that they don't even know how many loads were done, because it happened so often. They will tell you that the loads happened multiple

times in a single day, and multiple times in a single week. But it will be clear that thousands of barrels of oil were taken from Plains All American Pipeline.

And that's the subtotal of what those employees know. They don't know any of the rest of the conspirators; they don't know where the vacuum truck went. It just drove off. They didn't care. They had done their part. They had received their payment.

But because law enforcement got involved in this case, we will be able to prove to the Court that that vacuum truck, the same truck that went to there every single time, went back to the same location after every load and that location was at Seven Rivers, Carlsbad, Eddy County, New Mexico.

The frac yard there -- it's called a frac yard, but, in fact, it had sum total of three frac tanks, three holding tanks. No offices. No facilities to spin out the oil to clean it, to heat it, anything. A sum total of three tanks.

This yard was operated by a business called "Hound Dog Energy." Hound Dog Energy had one single manager, or owner, and that was Thomas Rees. Through the evidence you're going to hear, there was a shadow owner, as well, an investor by the name of Max Jensen.

The agents watched that same vacuum truck arrive at

that location, hook up its pipes to those frac tanks, empty itself out. And within mere hours, or, at most, days, they also witnessed oil haulers arrive, oil haulers from a company mostly of 9G, also known as Caribou. The oil was then sucked out of those exact same tanks. The same stolen oil that came from the pipelines into those tanks, went into those oil haulers, and was shipped across state lines from New Mexico into Texas for sale.

Now that we've talked about the conspiracy in broad terms, let's talk specifically about the defendant who's on trial today, Mr. Christopher Ortega. Mr. Ortega was hired by both Max Jensen and Thomas Rees around June 22nd of 2025. He came to them through the -- with the experience of the oil field. He had been a pumper for years in the oil field; as such, he knew good oil from slop oil. He knew the going rate for oil. He knew the proper use and capacity of vacuum trucks and oil haulers, and he knew that pumpers could not simply give away slop oil.

In fact, after a short training period by Thomas Rees, the defendant, Mr. Ortega, was left there as the sole employee, the sole person working and operating that facility. As the sole employee, person there, he watched every single load of oil come in to that facility at Seven Rivers.

If we can bring up Exhibit 9-1.

And Your Honor, as we show this, I did talk to defense counsel before, and he knows that these are part of the presentation.

In the paragraph, we see the white truck that's going to become so integral to this case, hooking up to one of those three frac tanks.

If we could go to 2, please.

We see Mr. Ortega standing there, as, in fact, the white truck empties its oil into those frac tanks.

And if we can go to 3.

In this one, we see Mr. Ortega on the top of -- at the top of that ladder of the red frac tank, having just finished gauging it, which is determining how much oil was in there before and how much oil is being added to it as that vacuum truck dumps a full load of pure oil into that frac tank.

Mr. Ortega was also the person who wrote all of the Hound Dog load tickets. So every load of oil that came in was actually filled out by Mr. Ortega. He attested to the amounts, the purity, the source, and the date. Although, the Court will see, the source was simply Carlos of MIC, LLC.

He was also there as the sole employee every time oil was picked up and taken from the facility. He was there every time an oil hauler came, and he watched the oil haulers test it to see how pure the oil was; therefore, he knew that

that white vacuum truck was delivering pure oil, because that's exactly what was getting picked up. He saw them spin it out, he knew the amount, the date, everything from those load tickets provided by the oil haulers.

As the sole person at the facility, he became very familiar with that white vacuum truck and the people who operated it. And through his records, he knew that that white vacuum truck accounted for over 90 percent of all the oil that came into that facility. In other words, there would be no Hound Dog Energy, there would be no Seven Rivers yard without that white frac truck -- white vacuum truck that went out to Plains and stole the oil.

He could tell the agents that that white vacuum truck delivered hundreds of barrels a day. In fact, he estimated between 550 and 600 barrels of pure oil per day. He knew that amounted to thousands of barrels of oil. In fact, he reported to Thomas Rees, at one point, that the white vac truck, in and of itself, delivered over 2,500 barrels of oil that week.

He knew the yard was paying approximately $35 per barrel for that oil, which is substantially under, in fact it was about half, of the market rate at that time for oil.

He knew that the yard would almost immediately turn around that oil, sell it to the oil haulers, and make a substantial profit.

And finally, he knew that the yard did nothing to purify the oil. It simply stored it for a short period of time, turned it around, and sold it.

In the government's case, the Court is going to hear two recordings from Christopher Ortega. The first recording is from a confidential informant. Now, this confidential informant comes into this case through a rather circuitous route. He was actually hired by Max Jensen to run a very similar operation down in the Odessa area. This is the same Max Jensen that was involved in the hiring of Christopher Ortega for Hound Dog Energy.

The difference is, when this person, Stuart Dollar, learned that he was being asked to commit something that would be illegal, he didn't keep doing it. He went to law enforcement and offered to be a confidential informant.

As such, he told Jensen that he had a source of oil -- and you'll hear some of the phone calls between these two. It's clear that they were talking about a source of oil that would be illegal, illicit. He told them that he the source of oil, that he named as Hugo, that wanted to deliver oil, wanted to sell it, but didn't want to deliver it to Jensen's yard in Odessa because everybody knows that Max Jensen had been arrested for oil thefts in Texas. Everybody knew that the yard was connected to him, and the yard was hot and nobody wanted to get busted doing business

with Max Jensen down in Odessa.

It was Max Jensen who suggested that the confidential source take Hugo and introduce him to his good buddy, Tom, over at Seven Rivers, over in Carlsbad. In fact, he suggested that Hugo should meet Chris, Chris Ortega, so that Chris and Tom could convince him that this was a good, quite yet place to do their business.

So on August 21st of 2025, that's exactly what happened. The three men met over at the Seven Rivers yard to discuss a load being delivered by Hugo that day. And in that conversation, which was recorded, you'll hear them discuss the source of the oil that Hugo was going to bring.

If we could play 34.

(Audio plays.)

MR. DICKENS: Your Honor, in this one clip, Ortega is told that the source of 180 barrels of good oil, being delivered that day, is from a pumper employed by a large company.

As we discussed, pumpers don't have the authority to sell off slop oil, much less 180 barrels of good oil.

Ortega then went on to talk about Max Jensen's connection to the Odessa yard and why this Hugo did not want to deliver the oil to the Odessa yard.

If we could play 34-2.

(Audio plays.)

MR. DICKENS: In this clip, it's obvious that Ortega knows that Jensen is known for at least being investigated for oil thefts, making a lot of money, and that it's connected to the West Texas Odessa yard.

Within minutes of making these statements, he was arrested by law enforcement and submitted to an interview post *Miranda*. In his statement, he makes a very different statement about his understanding of Max's legal problems and as they related to the Texas business in -- I'm sorry, the oil business in Texas.

(Video plays.)

MR. DICKENS: When pressed by the investigators as to what he thought the Seven Rivers was doing, he kept telling them that he believed that they were purchasing slop oil, that it was being thrown away by the businesses, by the companies, and that people were simply allowed to bring that oil wherever they wanted.

But when he was pressed by the agents about the quality and amount of the oil, he admitted that this would not, in fact, be consistent with slop oil.

Exhibit 14.

(Video plays.)

MR. DICKENS: Just play 3 now, please.

(Video plays.)

MR. DICKENS: Your Honor, at the end of the

government's case, we're going to ask the Court to find Mr. Ortega guilty of all counts, because he knew what he was dealing with was, in fact, stolen oil.

Thank you very much.

THE COURT: All right. Thank you.

Defense, do you want to make an opening?

**OPENING STATEMENTS BY COUNSEL FOR DEFENDANT**

MR. OTTAWAY: Mr. Ortega went to work as a yard hand. He worked there about six weeks before everybody got busted. Toward the end, he's kinda starting to figure things out, and he's asking Tom, the man who trained him, employed him, and he worked for, what was going on. And Tom says, "Oh, don't worry about it. He's good for it. Just get the tickets signed." So there we are, late August, and everybody gets arrested.

Now, in his opening, Mr. Dickens reminded me that the CI used to have the job that Mr. Ortega had. But he finally figured out what was going on, and he went to law enforcement. So I'm just going to be interested to see how long the CI worked for Tom and Max before he figured out something was going on.

Now, I have a slide show. Could I show the Court?

THE COURT: Sure.

MR. OTTAWAY: This is not new. People have been stealing oil for 100 years. But the technology of doing it

and the technology of catching people is modern. So that's most of this slide show.

THE COURT: Okay.

MR. OTTAWAY: This is self-explanatory, so I'm not going to go too fast.

THE COURT: That's fine. If you want to stay seated, you can talk into the microphone, too, while you go through it.

MR. OTTAWAY: Where this came from is from that videotape that he showed portions of. I had that videotape transcript on the screen of Adobe, and it said, "Create presentation," so I pushed the button "yes," and it created this presentation. And this is what officers and pipeline people need to be looking for.

There's lots of oil field theft going on, and they disguise it on purpose so they don't get caught. Everything that you can possibly do to make it look normal, they try and do.

Brokers arrange for the oil to be delivered by phones, mostly burner phones, so nobody can track it. And then when it gets to the yard, you hire somebody to receive the oil and to create a paper trail. And you mix up what you have.

The yard operators are just there to receive the oil. Sophisticated thieves have multiple yards, like you

heard in opening statement, that Mr. Jensen had more than one yard, and that it was not his first radio. He had done this before, and he had got arrested for it. But this is a distributed operation.

So here's what you look for. These are red flags: Burner phones, pay by cash. There are no checks in any of this. Get some paperwork to cover you. Be careful, and make people afraid of talking.

And where do you get this stolen oil? Well, there are several ways that legitimate people do it, and there are several ways that illegitimate people do it. The illegitimate people have to have a cover story. And you can tell your cover story to the public, and you can tell the cover story to your yard man.

They learn from getting caught, so they try not to.

In these investigations, it's very important, match up the paper trail, follow the money. I think the easy part now with drones is tracking the movements. And then work with your fellow jurisdictions, like Texas, to make the case.

And this operation can look, to somebody who doesn't know, like a normal, legitimate operation. I think the evidence is going to show, at the end of this thing, that Mr. Ortega thought that he'd really been hired in a legitimate job, for a legitimate paycheck, to perform this function. So listen to these things as we proceed.

Thank you.

THE COURT: All right. Thank you, counsel.

The government can call its first witness.

MR. DICKENS: Thank you, Your Honor. The United States will call Wilson Putnam.

THE COURT: While we wait for that witness, counsel, does government have Exhibits 1 through 79? Are those all of your exhibits?

MR. DICKENS: Yes, Your Honor.

THE COURT: All right. It seems like maybe they've been stipulated to? Is there a stipulation to these exhibits from the defense?

MR. OTTAWAY: Yes.

THE COURT: Do you want me to then just admit, Mr. Dickens, Exhibits 1 through 79?

MR. DICKENS: Why don't we go ahead and do that, Your Honor.

THE COURT: From defense?

MR. OTTAWAY: Every page of it, yes.

THE COURT: 1 through 79 are admitted.

(Exhibit Nos. 1 through 79 admitted into evidence.)

(The witness was duly sworn.)

**WILSON PUTNAM**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:
**Q.** Sir, can you please introduce yourself today by telling us your name and spelling your last name?
**A.** First name is Wilson, last name is Putnam, P-u-t-n-a-m.
**Q.** Sir, how are you currently employed?
**A.** I'm currently an investigator, Texas commissioned peace officer through the 143rd district attorney's office.
**Q.** Let's talk, sir, about your experience in law enforcement. How many years have you worked, and what agencies have you worked for?
**A.** Total of four years, three years being with the Reeves County Sheriff's Office, a time between with reserve Loving County Sheriff's Office, and now, currently, with the 143rd district attorney's office.
**Q.** What other type of jobs have you held as an adult?
**A.** As an assault, my beginning stage of adulthood, I primarily worked in the oil and natural gas industry.
**Q.** What sort of jobs did you have in that industry?
**A.** I worked as a roustabout, which is basically kind of your maintenance. I worked roustabout, worked my way up to a production tech, production tech one, production tech two, and up to -- I was almost to the point of a production field analyst.
**Q.** Okay. Let's talk about the last one, the protection field analyst. What does that do? Can you give us an idea?

**A.** That is starting to look into the down-hole problems that could be going on, so say, for instance, like rod pumps, things like that, parts, starting to learn more on the engineering and structural design down-hole side and trying to help solve those.
**Q.** What companies did you work?
**A.** I worked for Clayton Williams, BTS. I also worked for Occidental Petroleum, Centennial Development. And then the time in between, I worked for Bayer energy services.
**Q.** Through these years of experience, did you become familiar with how oil is pumped out of the ground, how it was processed or separated, and how it was distributed?
**A.** Yes.
**Q.** Can you run us through just a general idea of when oil is pumped out of the ground, is it generally pure oil? Is it contaminated oil? What's your experience?
**A.** It's contaminated at that point, as it comes out of the ground from the wellhead. It's then pumped from the well -- or not pumped. I'm sorry. Sometimes it's just naturally pushed. But it is plumbed to a production facility.
As it reaches that production facility, you now have oil, water, and gas that has to be separated out, that goes into a separator. From there, you have your gas go out the top, and then you have oil go next, and then water out the bottom, as oil floats.

**Q.** And are you familiar with this process through those years of experience in the oil business?
**A.** Yes.
**Q.** Let's talk about the oil once it is gone through that separation process. Do the oil companies attempt to keep the oil separated from further contamination?
**A.** As much as possible.
**Q.** And what sort of things do they do in order to keep it separated?
**A.** So the first stage is going to be that separator. And from the separator, your oil will go to an oil battery, water to a water tank, and then gas is usually sold or flared off if there's excess gas. But to -- if there is a contamination, you can circulate the bottoms of your water tank, you can circulate the whole water tank and run everything back through that separator.
**Q.** Again, from your years of experience, is that something that you are personally familiar with?
**A.** Yes, sir.
**Q.** Would you have give the Court an idea of what a reclamation yard is or a disposal yard?
**A.** So a disposal in itself is a place where you would take a non-sellable product, basically your high BS&W basic sediment and weight. You would take that, it's to be disposed of, like saltwater brine, to be pumped back down-hole.

**Q.** Literally pumped back into the earth.
**A.** Correct. You can't really do anything with it. It's put back down-hole.
A reclamation facility, if you have a very high contaminated oil, maybe like sludge bottoms from the tank, you can then take it to a reclamation facility where they'll produce chemicals or different method and try to salvage that little bit of oil from that waste material.
**Q.** And again, through your training, experience in the oil business, are you familiar with that process?
**A.** Yes.
MR. DICKENS: Your Honor, with his years of experience and knowledge about the oil field business, at this time the government proffers him as an expert in the oil field.
THE COURT: From defense?
MR. OTTAWAY: I agree.
THE COURT: The Court recognizes him as such.
Go ahead, counsel.
BY MR. DICKENS:
**Q.** Okay. Let's talk about the type of oil that's pumped back down into the ground, the type of product that is pumped back into the ground. Is there any amount of that where the companies believe they can still draw oil from that product, from that mixture?

**A.** Can you repeat the question?
**Q.** Certainly.
Are the businesses going to simply pump back into the ground product that they believe they can get oil back from it?
**A.** No. They're going to try to salvage as much as possible, and then they'll pump away the water.
**Q.** Okay. And so do all the oil businesses continue to work on this -- this mixture in order to get oil out of it, or do they ship it off to other businesses?
**A.** A little bit of mix. Bigger businesses, organizations have the means to do it themselves, at their own disposals; whereas other ones are going to contract out, get rid of that sludge, and send it to a reclamation facility to do it there. Like I said, with the disposal, that's just purely for waste product to be put back down-hole.
**Q.** When you talked about the oil coming out of the ground, you talked about one of the contaminants being water; is that right?
**A.** Correct.
**Q.** What is done with that water that comes out of the ground with the oil and is placed into those batteries?
**A.** Once it's placed into the battery, a lot of facilities that you will see, they'll have their own type of injection well. If they don't have an injection well, they'll either

have to haul that water off with water haulers or vacuum trucks and get rid of it that way, to be taken to a disposal to be put down-hole.

**Q.** And is -- again, are the companies contracting to take away this waste product?

**A.** They can.

**Q.** If they're going to a disposal, rather than doing it themselves, right?

**A.** Correct.

**Q.** So are -- and the employees themselves allowed to sell or give away any of the things that we've talked about, the waste oil, the water, the sediment, anything of that nature?

**A.** No.

**Q.** Why is that?

**A.** That is where you would start stepping into the part of -- this is a whole, broad deal, but with oil, you're allowed to call it in to the designated oil hauler or send it down a LACT, pipeline LACT, if that's what your company is advising you to do. But usually those selected groups are passed down to your production techs, like, "Hey, these are the people that you can call," and that's it.

**Q.** Okay. So they're not allowed to simply call their buddy to come pick up product?

**A.** No.

**Q.** And would they ever be allowed to come pick up any sort

of mixture that had a significant amount of oil in it?
**A.** No.
**Q.** What would the companies want their employees to do with any mixture that had a significant amount of oil in it?
**A.** Run it back through their separator, roll the tanks. And all I mean by that is basically roll the fluids, and then send it back to the separator; fix the issue with the separator, whatever is going on, and salvage all their oil.
**Q.** You talked about vacuum trucks are water trucks. Can you explain to the Court what a vacuum truck or water truck does?
**A.** Yes. So a vacuum truck, their sole purpose is to transport fluids, such as waste products, brine, salt water, things of that nature.
**Q.** Are they allowed, by the regulations, to transport pure crude oil?
**A.** No, sir.
**Q.** Why is that?
**A.** It is a federally regulated deal. They're not placard. So they're hauling now a flammable, hazardous material.
**Q.** I was going to say, is pure crude oil a highly flammable material?
**A.** Correct.
**Q.** So if somebody has a load of pure crude oil, what are they supposed to do with it if they can't stick it into a pipeline?

**A.** You would then reach out to whoever your company has provided you as far as an oil hauler company or oil transport company.

**Q.** And, again, what sort of vehicles come out for that?

**A.** Those are actually a different style tank. They are a little bit bigger in capacity. There's a lot of different measures with it, but that is a different style of truck that comes out.

**Q.** And are these, again, regulated so that they can transport, safely, a pure crude oil?

**A.** Correct.

**Q.** Would they ever be putting water or contaminants in these oil haulers?

**A.** No.

**Q.** And why is that?

**A.** They would reject it immediately, because they're taking that less than one percent oil, good, sellable oil to wherever their midstream or facility is to store it, so they can't contaminate their storage facility, also.

**Q.** So the whole idea, through this whole process, is to keep the pure oil pure, and, again, keep working on the contaminants or the particulates to get out those contaminants so you, again, can get every drop of pure oil; is that right?

**A.** Correct.

**Q.** The -- the reclamation yards, you talked about they would use various methods in order to retrieve the oil. Can you run us through those various methods?

**A.** Some of the methods could be simply putting all of your sludge into a tank to try and separate it, and then mixing in different types of chemicals. The chemicals, I'm not too familiar with what types they're using now, but they will mix in certain types of chemicals to basically break those -- break the oil from the water.

They'll also roll the bottoms of the tanks, things of that nature like I said earlier, or just simply wait it out and see if anything will break out.

**Q.** Okay. And waiting it out, obviously, takes time, right?

**A.** Correct.

**Q.** And you couldn't simply turn right around and sell that same product into a pipeline or an oil hauler with pure product, because you would have to wait for the separation to occur?

**A.** Correct.

**Q.** Is the reclamation yard, again, a highly regulated business?

**A.** Correct.

**Q.** Does it require, usually, substantial equipment in order to do the chemicals or the flipping of the -- of the tanks, and so forth?

**A.** Yes, sir.
**Q.** Are you familiar with the term of pigging a line, or something of that nature?
**A.** Yes, sir.
**Q.** Can you explain that to the Court?
**A.** Yes. So a PIG is a specifically designed device, usually made out of a foam material. They have some that are made out of steal. Its sole purpose is to clean or inspect pipelines.
**Q.** And is there any sort of output of either oil or contaminants based on performing that process?
**A.** Yes, there can be.
**Q.** Can you talk to the Court about how much would come out?
**A.** In my experience, in the oil pipelines that we pigged at Occidental, we would have a contaminated mixture of maybe five to ten barrels, but that does depend on the diameter of the pipe and length.
**Q.** So five or ten barrels, depending on the source of where the pigging is done?
**A.** Correct. But it would be contaminated.
**Q.** And what would happen with that oil?
**A.** It would be taken back to the battery, to the facility.
**Q.** What sort of vehicle would be used to do that?
**A.** We would utilize vacuum haulers for that, since they were not getting on the pavement, they're not getting on the

highways.
**Q.** And again, considering there is, obviously, a high amount of oil in these items, would this be amounts where people -- where employees would be authorized to simply give away or sell them out?
**A.** No.
**Q.** Are you familiar with load tickets?
**A.** Correct. I am.
**Q.** What are load tickets?
**A.** So you have different styles. Vacuum truck have their own style of load tickets. And then oil haulers have their own, oil haulers being very more intricate and detailed and where they're getting that oil, if they're picking up oil.
Same for vacuum trucks, it's just not as in detail. But they basically keep track.
**Q.** When are the load tickets created?
**A.** Immediately.
**Q.** Immediately on what action? In other words, what prompts them to create the ticket?
**A.** Okay. As soon as they arrive on scene, say, if it's an oil haulers, we'll go with that one, as soon as they arrive at the facility and they test what they're about to load up with and it clears, it's less than one percent BS&W, they will then start working on a ticket that shows the amount of oil in total barrels that was pulled, from what facility,

what company, what company it was pulled for, who called it in. It was very detailed.

**Q.** Okay. I think I'm asking the question in a difficult fashion. What prompts the companies to ask that a load tickets be created? What are they doing with the oil to cause the load ticket to be created?

**A.** You would have your production tech call it in. But I guess I'm --

**Q.** But are they transporting? Are they transporting oil?

**A.** Yes. Sorry.

**Q.** In other words, is it a pickup or a drop-off of oil?

**A.** Correct. Sorry.

**Q.** I'll just ask it bluntly:

Okay. So load tickets are supposed to be created every time a load of oil is either picked up or dropped off by one of these vehicles?

**A.** Correct.

**Q.** Okay. And you said the load tickets for oil haulers are much more detailed; is that right?

**A.** Yes.

**Q.** Because they're dealing with a much more valuable commodity?

**A.** Correct.

**Q.** Can you describe to the Court what a vacuum truck's load tickets generally look like?

**A.** Usually theirs are very simple. You'll have the driver's signature, their company header or logo on there. It will say who did you pull for or what was the job done for, description of work, and total barrels that was pulled.
**Q.** So why is it that there's these -- these tickets done, be it for oil haulers or vacuum trucks? What are they tracking?
**A.** Everything from employee's hours, where they actually did the work. I know for oil, it's a huge part. They have to have that documentation, or else you're sidestepping the whole process. Like, because if you're not documenting it and you're pulling it, you're now taking from investors and everybody that has a part to play with that location. So it's a crucial role. It has to be documented.
**Q.** Considering one tank of oil looks like every other tank of oil, is this one of the ways that the business, the oil business has of tracking crude oil?
**A.** Correct.
**Q.** Is this also a way that they use to combat thefts of crude oil?
**A.** Correct.
**Q.** But that's only as good as the piece of paper, right?
**A.** Correct.
**Q.** Are you familiar with LACT stations?
**A.** I am.
**Q.** Can you explain to the Court what a LACT station is?

**A.** Yes. So a LACT is a lease automatic custody transfer system. And what that allows to happen is where if you had a battery where you did not have a LACT, you would have to call in oil haulers to pick up that oil.

Where a LACT comes into play is it's automatic. Once your tank reaches a certain level, your oil tank, it sends a transmission to a little radar inside, or however you have it set up, to that LACT to basically start pumping the oil from that designated tank. But it will not allow anything over one percent to be pumped. It has to stay good, solid crude oil.

**Q.** There's a lot of information there, so let's break it down a little bit.

Let's talk more about a LACT station where a oil hauler would pull up to it.

**A.** Okay.

**Q.** The oil hauler pulls up to a station. Can you just give us an idea of what the station looks like? Does it look like a big battery? Does it look like just pipes into the ground in general?

**A.** Okay. Usually, it's going to be out front of the facility, so you're going to have all your oil and water tanks. And then you'll have a pump machine, usually like 250-horse, 150-horsepower motor sitting there. It will have two to four different connection points, and then a solid

eight inch, maybe, line, that's coming straight across, that pushes on down.

**Q.** Okay. And when a truck hooks up to that LACT station and starts putting oil into it, is that LACT station, I think you said, verifying the purity of the oil, as well?

**A.** So if you have an active LACT station, and you're having to use a truck, the truck would have to pull on the downstream side of that LACT, so the LACT could calculate the total and then be compared.

In my experience, whenever our LACT would go down or have an issue with the -- electrically, we would call in trucks, and they would hook up before the LACT. But that is where your daily records of production, and all that, and then the oil haulers' run ticket is where you could verify how much oil was pulled.

**Q.** Okay. So it's actually the run tickets that would control in that situation?

**A.** Correct.

**Q.** Will LACT stations generally take contaminated oil?

**A.** No. They have kills.

**Q.** I think one of the terms you kept using was BS&W. Can you tell us what that means?

**A.** That's the basic sediment and weight. So it's the contaminants that are in the oil, that settle down to the bottom, pretty much.

**Q.** Okay.
**A.** Of waste product, I guess would be a better way of saying it.
**Q.** So is pure oil a higher number or a lower number on that scale?
**A.** Lower than one percent. Anything lower than one percent is good, solid.
**Q.** Okay. Let's ask some final questions here. Is there a way of determining the value, the going rate, the market rate for oil at any given time?
**A.** Yes.
**Q.** Do you happen to know the value of crude oil back in the summer months of 2025?
**A.** Yes, sir. I believe it was around $67 to $68 a barrel.
**Q.** The -- we talked about sending the waste oil, the slop oil, the water mixed with oil to the reclamation yards. For every barrel of this type of mixture that went into a reclamation yard, any idea how much they would expect to get out of that, of pure crude oil?
**A.** By its design, not -- I do not know the actual number. But by its design, is not meant to have overloads of oil. It's something that you're taking that you have to work and then try to recover. So out of 100 barrels, I would say maybe two, three barrels of oil, maybe, out of that, and the rest be waste.

**Q.** So when somebody is dealing with this slop oil, this waist oil, they should be expected to see hundreds of barrels going into a yard, and very few barrels coming out of the yard?

**A.** Correct.

MR. DICKENS: Thank you.

One second, Your Honor.

THE COURT: All right.

(Counsel confers.)

MR. DICKENS: Thank you. I have no further questions.

THE COURT: You said the value of crude oil in the summer of 2025 was $67 to $68 a value. Is the value -- is that correct?

THE WITNESS: From what I recall, yes.

THE COURT: Is the value of oil at any given time something that's widely known out in the oil country here?

THE WITNESS: Yes. There's actually a public -- you can go on the West Texas Intermediate, and you can search up, at any given time, what the price is, because it varies so much.

THE COURT: But is it also something that people just, that are working out there, know? It's about 67, and then it goes up or down. People just know in the industry?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Okay.

Go ahead. Cross-exam.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:

**Q.** When you started working in the oil field, how long did it take you before you figured out pretty much what was going on?

**A.** I would say it took me a good year to two years. I was very fortunate to have mentors that taught me along the way.

**Q.** So it took you a couple of years to learn the whole business?

**A.** To get to the -- learn all the aspects, correct, sir.

**Q.** And you had really good, honest teachers?

**A.** Correct.

MR. OTTAWAY: I'll pass the witness.

THE COURT: Redirect?

**REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Sir, how long did it take you to realize that you couldn't sell product that belonged to your company?

**A.** Immediately. That was pretty much told to me immediately.

MR. DICKENS: Thank you, sir.

THE COURT: All right. Thank you for your testimony. You can step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Government can call its next witness.

MR. DICKENS: Thank you, Your Honor. The government will call Obed Lopez.

I'm sorry, I'm probably not facing the right microphone.

THE COURT: That's okay.

MR. DICKENS: I apologize, ma'am. I'll try to hold myself to the microphone.

THE COURT: We'll just let the court reporter deal with you.

MR. DICKENS: Yes.

THE COURT: All right. Come forward to the stand here, and I'm going to swear you in.

(The witness was duly sworn.)

**OBED LOPEZ**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Sir, can you please introduce yourself by telling us your full name and spelling your last name?

**A.** Yes. My name is Obed Lopez, last name L-o-p-e-z.

**Q.** Are you currently employed at this time?

**A.** Yes, sir.

**Q.** Where are you employed?

**A.** I started -- I opened a trash Dumpster, roll-off trash Dumpster business.
**Q.** Okay. In the past, did you ever work for a company called "Plains All American"?
**A.** Yes, sir.
**Q.** How long did you work for Plains All American?
**A.** I was going to be ten years in February of this year.
**Q.** What sort of different positions did you hold in Plains All American Pipeline over those years?
**A.** I started from a pigger, to an operator, to maintenance, and then I became an operations supervisor.
**Q.** So you worked your way up through the company?
**A.** Yes, sir.
**Q.** Let's start about the first thing you talked about. What is a pigger?
**A.** Sorry?
**Q.** What is a pigger?
**A.** Pigger, what you do is we launch PIGs through the lines to maintain the lines clean. Pretty much, over time, the lines get -- called paraffins, it's like solids. So what the PIG does, it kind of scrapes the walls and keeps them clean.
**Q.** Okay. What was the next job that you said you did?
**A.** An operator.
**Q.** What does an operator do?
**A.** So an operator, it's like a pumper. You have like

different sites that you go over there and get numbers, get readings, temperatures from each location.

**Q.** Does Plains All American actually pump the oil, or does it just transport the oil after somebody else pumps it?

**A.** They transport it after somebody else pumps it out.

**Q.** So literally does what it says in the title? It's literally a pipeline company?

**A.** Yes, sir. Yes, sir.

**Q.** The last job you held for Plains All American, what was that?

**A.** Plains --

**Q.** I'm sorry. It was Plains All American Pipeline. What was your last job that you had with them?

**A.** Like title, you mean?

**Q.** I'm sorry?

**A.** Like title?

**Q.** Sure, title.

**A.** Oh. Operations supervisor.

**Q.** And what does an operations supervisor do?

**A.** So I was in charge of an area, and I had operators under me. And we pretty much secure the lines, PIG them, make sure we were part of, like, pre-startups, new sites. We would commission them and pretty much operate the pipeline.

**Q.** In that position, did you generally go out to the sites, or did you generally work in an office?

**A.** 90 percent of the time, I was in the office.
**Q.** And where was that office?
**A.** In Loving, New Mexico, there next to Carlsbad.
**Q.** Did Plains All American Pipeline, back when you worked for them, were they primarily in the State of New Mexico?
**A.** New Mexico and Texas.
**Q.** Did some of the lines from Plains All American actually go over the border from New Mexico into Texas?
**A.** Yes, sir.
**Q.** Have you ever worked with vacuum trucks?
**A.** Yes, sir.
**Q.** Tell us about that. What's your experience with vacuum trucks?
**A.** Before Plains Pipeline, I worked for a company called "Standard Energy." And I used to haul production water with a vacuum truck, and another, I also used to haul frac tanks with a wench truck.
**Q.** And when you did that, did you ever use that vacuum truck to haul pure oil?
**A.** No, sir, we were not allowed to.
**Q.** And why is that?
**A.** Because I don't have a hazmat endorsement on my license, and the trucks were not -- they're not placard for flammable liquids.
**Q.** So when you were transporting this water mixture with

oil, where did you take it?
**A.** Different disposals, whichever, the nearest disposal.
**Q.** And when you were doing this -- actually, I'll back up.
Did you ever work with oil haulers?
**A.** No, sir.
**Q.** Do you have any idea how many barrels a vacuum truck can carry of some sort of liquid?
**A.** Between 120 and 130. 130 max.
**Q.** Are you familiar with what a LACT station is?
**A.** Yes, sir.
**Q.** And what is a LACT station?
**A.** A LACT unit is basically -- for us, we used to call it like a cash register. It register -- it keeps track of the barrels that go through the LACT. It monitors pressures, gravity, temperature, and also the quality of the oil. If it detects water, the valve that goes to our pipeline shuts down, and then another valve -- another valve that goes to the producers' tanks opens up. And then once it take detects clean oil, then it reverses back up.
**Q.** So basically, that's the point of sale for Plains All American Pipeline?
**A.** Yes, sir, that's correct.
**Q.** Are you familiar with the term "BS&W"?
**A.** Yes, sir.
**Q.** What does BS&W mean?

**A.** BS&W, that's pretty much like the bad oil. It can contain water, chemical. That's the -- it's called -- it's not -- nonmerchantable oil. It's bad oil.
**Q.** We talked earlier about pigging a line, if that causes any oil to come out of the line. Is that true?
**A.** Yes, sir.
**Q.** Should that be a fairly small amount, or could that be a significant amount of oil coming out?
**A.** It should be a small amount.
**Q.** I'm going to go ahead and show you what's already admitted as Government's Exhibit 40. It should come up on that screen right there.
Do you recognize what we're looking at there, sir?
**A.** Yes, sir.
**Q.** And what are we looking at?
**A.** That's -- it's either a launcher or a receiver. It's an aboveground.
**Q.** So when the pipes come aboveground, that's where you would either launch or retrieve the pigging device, the cleaning device?
**A.** Yes, sir.
**Q.** What is that white container at the end of the line there?
**A.** That's a catch pan. So, basically, they isolate that little section of line, and then they drain that into that

catch pan. And then once it's drained, they're able to open up that door, that front latch door, and retrieve or insert a PIG.

**Q.** Are you allowed simply to allow the oil to fall onto the ground?

**A.** No, sir.

**Q.** So that's what that catch basin is for?

**A.** Yes, sir.

**Q.** Okay. Does Plains All American contract with disposals?

**A.** No, sir.

**Q.** Do they -- what do they do if they end up with the waste oil?

**A.** So pretty much, like, the contractors of vacuum truck companies, they haul it out to their -- to disposals, yes.

**Q.** So they contract with the vacuum truck driver?

**A.** Yes, sir.

**Q.** Would they be allowed to simply divert hundreds of gallons of pure crude oil to any vacuum truck driver they chose to send it to?

**A.** No, sir.

**Q.** Was Plains All American Pipeline, back when you worked with them, concerned about oil thefts?

**A.** No. I never really heard about that much when I was there.

**Q.** Do you know of any efforts they made to protect against

oil thefts?
**A.** Yes. Well, so the company has a control center in Midland, and they pretty much monitor, like, line pressures, flow -- flow rates and all that. So that's used to monitor like mostly -- I wouldn't say for theft of oil. It's mostly for like a release. Like we would have a release on the ground, that's how they detect it, by pressures, flow rates, and --
**Q.** Sir, did anybody ever approach you and ask if they could steal oil from Plains All American Pipeline?
**A.** Yes, sir.
**Q.** Can you please tell the Court about that?
**A.** Yes. So my son, he used to be on a soft -- soccer travel team. And one of the other kid's dad, he approached me, and he started asks me about like what I did. And I thought he was -- I thought he was going to ask me for a job. He started asking me general questions about what we do and how we work. And I explained to him how much we pay and all of that.
And then he eventually started asking, "Hey how do you guys detect if there's a leak or a release?"
So same thing, I told him we have a control center that monitors line pressures and all that.
And he asked me if it's hard to pull oil.
I told him, yes, it's hard because they'll detect

it, the line pressure flow rates.

And that's it. That's where it stayed.

And then like a couple weeks later, he asked me, again, "Hey, I have a question. I have a guy that buys the oil. I have a guy that has a vacuum truck, and he said he can pull it. It's easy, it's really easy to do."

And I said no.

And then another week passed, and he -- same. And I guess I felt comfortable with him, and I pretty much agreed. And I told him that I would have to talk to one of the guys to see -- one of my co-workers to see if he would be willing to do it, because I'm never in the field. So that's pretty much how it started.

**Q.** How much was he willing to offer every time they pulled oil out of the pipeline?

**A.** $720 every time.

**Q.** Was that 700 just for you, or $700 for everybody involved?

**A.** No, half was going to be for me, and half for the -- my co-worker.

**Q.** And who was that?

**A.** Samuel Cardona, and sometimes German Ortiz would do it.

**Q.** So did you go to Samuel, or did this other person go to Samuel?

**A.** I did. I reached out to him.

**Q.** How about to Mr. Ortiz?
**A.** Samuel reached out to him. They've known each other for, I guess, for years. They used to work together before.
**Q.** How would this person contact you or your co-workers about these oil thefts?
**A.** So through text message or sometimes like calls or text message. Mostly WhatsApp messages.
**Q.** And how was the -- what was the arrangements of -- would they contact you, or would they contact one of your co-workers?
**A.** So this guy, Abraham, he would contact me, and then I would tell my co-work or co-workers.
**Q.** Okay. And how was it that there was an agreement on where to meet?
**A.** So my guy would tell my -- I guess the guy, Abraham, he would tell me, "Hey, the truck is -- the driver is ready. Where do you want him to meet?"
And they would -- my guys would tell me, "Hey, tell him to meet me at the corner of," blah, blah, blah.
And then I would tell him, "They're going to meet him at this location," in an hour or two hours.
And then that's pretty much how they would go about it.
**Q.** And then would your co-workers then direct them to some place on the line where they could take the oil?

**A.** Yes, sir.
**Q.** Did you ever go out there and meet with the vacuum truck?
**A.** No, sir.
**Q.** Did you ever talk to your co-workers about what they saw, or was it just something that happened?
**A.** Yes, they would just, pretty much, just basically like they would connect and pull.
**Q.** And it was always a vacuum truck that did this?
**A.** Yes, sir.
**Q.** How were you paid?
**A.** I'm sorry?
**Q.** How were you paid?
**A.** Cash.
**Q.** And so you would meet with this person that you met through the soccer team, and he would pay you cash?
**A.** Yes, sir.
**Q.** Do you have any idea how often this occurred?
**A.** It was, honestly, multiple times a week. I don't remember exactly how many times.
**Q.** And each time, was it just one time in a day, or would there be multiple times where they would make trips in a day?
**A.** Sometimes it would be once, sometimes twice.
**Q.** Do you have any idea when this started?
**A.** I want to say, I think, back in March -- March/April, March/April.

**Q.** Of what year?
**A.** Of 2025.
**Q.** And how did it end? Or let me back up and say when did it end?
**A.** So I was at the office, and then my boss came in. And he said that -- I guess he shows a picture of me and the other supervisor of a truck. It had a -- on the back window, it had an emblem of New Mexico, the Zia sign, and he asked us if we knew whose truck that belonged to. And I knew it was German's truck. That's what we --
**Q.** Did your supervisor say why he was asking about this truck?
**A.** No. He --
**Q.** He did not?
**A.** No. He just mentioned something about, I guess, something -- he said something about theft, but he didn't know what it was, what kind of theft, or anything like that.
**Q.** And so seeing that truck, you knew that potentially people were watching your co-workers who were committing the thefts?
**A.** Yes, sir.
**Q.** I'm going to go ahead and show you what's been admitted as Government's Exhibit 35.
Do you recognize that truck in that photograph?
**A.** Yes. Yes, sir.

**Q.** And whose truck is that?
**A.** That is German's.
**Q.** How do you know that, sir?
**A.** Because of that pink Zia sign on the back of that window.

MR. DICKENS: Can you Zoom in, if possible, on the back window?

I apologize, I faced away again.

BY MR. DICKENS:

**Q.** Is that the Zia sign that you were talking about?
**A.** Yes, sir.

MR. DICKENS: If we could also, Ms. Sanchez, focus down on the passenger door.

BY MR. DICKENS:

**Q.** Is that the logo for Plains All American there?
**A.** Yes, sir.
**Q.** Is that, in fact, the photo that you were shown, or was it a different photo, if you remember?
**A.** I think, if I remember correct, it was a picture of the -- it was zoomed in on the Zia sign.
**Q.** Oh, I see. I see.
**A.** Yes.
**Q.** Do you remember approximately when it was that your supervisor showed you this picture?
**A.** It was towards the end of August.
**Q.** Of 2025, again?

**A.** Yes, sir.
**Q.** Do you have -- do you know how the locations where the thefts were to occur was picked?
**A.** No, not really. They just -- I know it was -- it was an area that like the -- I guess like the security threshold was not as tight as other areas.
**Q.** Okay. And were all these sites in New Mexico, the State of New Mexico, or were any of them in Texas?
**A.** Yes, sir, they were all in New Mexico.
**Q.** I know you say you don't know how often this happened, but if we have somebody coming out for April to August, multiple times in a week, and potentially multiple times in a day, do you have any idea how much oil was taken illegally out of Plains All American Pipeline?
**A.** No, sir. I know a lot of times their truck would breakdown, so I wouldn't -- I wouldn't know how much.
**Q.** Are we talking potentially thousands of barrels of oil?
**A.** I would think so, yes, sir.
**Q.** Do you have any idea where the oil was going after that vacuum truck picked it up?
**A.** No, sir.
**Q.** Do you know a Carlos Contreras?
**A.** No, sir.
**Q.** Do you know a Christian Contreras?
**A.** No, sir.

**Q.** Do you know a Tom Rees?
**A.** No, sir.
**Q.** Do you know a Christopher Ortega?
**A.** No, sir.
**Q.** Do you know a Max Jensen?
**A.** No, sir.
**Q.** When were you arrested for these thefts?
**A.** February, I think, 12th, of 2026, this year.
**Q.** Okay. And as you sit here today, have you pled guilty to any charges?
**A.** Yes, sir.
**Q.** Do you remember what charges you pled guilty to?
**A.** Yes. First one was conspiracy, and the second was transportation of stolen property across states.
**Q.** And as part of that agreement, have you agreed to testify truthfully here today?
**A.** Yes, sir.
**Q.** Has anybody in the government told you what to say?
**A.** I was just told to say the truth.
MR. DICKENS: Okay. Thank you, sir.
THE WITNESS: Yes, sir.
MR. DICKENS: One second, please, Your Honor.
(Counsel confers.)
MR. DICKENS: Thank you, Your Honor. No further questions.

THE COURT: Cross-exam?

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:

**Q.** It is possible to load oil in a vacuum truck, correct?
**A.** Yes, sir.
**Q.** And there's a placard on the truck?
**A.** There's supposed to be a placard, yes.
**Q.** And if you don't want to follow the law, you can just leave the placard and haul the oil, correct?
**A.** Yes.

MR. OTTAWAY: Pass the witness.

THE COURT: Redirect based on that?

**REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** I apologize, Mr. Lopez, I didn't even hear that last question. Do you know what the last question was?
**A.** It was, if you don't have a placard, you can just load oil? I think that's what he -- yes.
**Q.** Okay. I guess we'll ask the question this way. Again, you've driven a vacuum truck. It was a job that you've held before; is that correct?
**A.** Yes, sir.
**Q.** So is it legal to load a full load of pure crude oil into a vacuum truck and drive it?
**A.** No, sir, not without -- if you have placards, and if

you're not endorsed to, you cannot.

MR. DICKENS: Okay. Thank you, sir.

No further questions.

THE COURT: Thank you for your testimony, sir. You're excused.

THE WITNESS: Thank you.

THE COURT: The government can call its next witness.

MR. SUSLAVICH: Yes, Your Honor. The United States calls Mr. German Ortiz.

THE COURT: Does German Ortiz need an interpreter?

MR. SUSLAVICH: He will, Your Honor. And we have an interpreter here present.

THE COURT: All right.

(The witness was duly sworn.)

THE COURT: You can sit up here.

Go ahead, counsel.

**GERMAN ORTIZ**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. SUSLAVICH:

**Q.** Good afternoon, Mr. Ortiz. Can you please state your name for the record.

**A.** Yes, my name is German Ortiz.

**Q.** And are you employed, sir?

**A.** Yes.
**Q.** And where are you currently employed?
**A.** Azteca Energy.
**Q.** Did you work for Plains All American Pipeline?
**A.** Yes, I did work there.
**Q.** How long did you work there?
**A.** About three years.
**Q.** What positions did you hold at Plains All American Pipeline?
**A.** I was an operator, and later I was a pipeliner.
**Q.** What were your duties as an operator?
**A.** To maintain the locations that I was assigned to.
**Q.** And what do you mean by maintained?
**A.** To give maintenance, basically to take care of them.
**Q.** Did you say to take care of the pump?
**A.** Yes.
**Q.** And what was your responsibilities in the second position that you held at Plains All American?
**A.** Well, in my second position as a pipeliner, I have to give maintenance to all the locations and also to overview the people that are working there.
**Q.** Sir, as a pipeliner or an operator, did you regularly travel at Plains All American to different Plains All American positions -- or locations, including pipelines, pigging stations, or transfer locations?

**A.** Yes.
**Q.** Are you familiar with Plains All American vehicles, including their trucks?
**A.** Yes.
**Q.** And were you ever assigned or did you ever regularly operate a Plains All American truck?
**A.** I was given a Plains truck.
MR. SUSLAVICH: At this time, can we show you what's already been admitted as Government's Exhibit 35.
BY MR. SUSLAVICH:
**Q.** Mr. Ortiz, do you recognize this?
**A.** Yes.
**Q.** And what is it?
**A.** It's the truck that was assigned to me for my work.
**Q.** And how do you know it's the truck that you were assigned for your work?
**A.** I recognize it because of the sign on the corner.
MR. SUSLAVICH: All right. Can we zoom into the back window of that truck?
BY MR. SUSLAVICH:
**Q.** Is that the sign that you were referring to?
**A.** Yes.
MR. SUSLAVICH: And can we zoom into the rear door of the truck.
BY MR. SUSLAVICH:

**Q.** Mr. Ortiz, is that the Plains All American logo on that truck?
**A.** That's correct.
**Q.** Mr. Ortiz, did anyone else use your truck regularly?
**A.** No.
**Q.** So it's fair to assume then, if this is a photo of your truck, that you were in that truck?
**A.** Correct.
**Q.** I would like to skip to what has -- well, actually, before I do --
Mr. Ortiz, are you familiar with vacuum trucks, sometimes called "water haulers"?
**A.** Yes.
**Q.** And are you familiar with what vacuum trucks ordinarily are used for?
**A.** Correct.
**Q.** Are vacuum trucks usually used to haul large quantities of clean, pure, crude oil?
**A.** Correct.
**Q.** Are vacuum trucks used -- sorry.
Are you familiar with oil haulers?
**A.** No.
**Q.** All right. I want to skip to Government's Exhibit 4.
Mr. Ortiz, do you see a vacuum truck, or do you recognize a vacuum truck in this picture?

**A.** Yes.
**Q.** And Mr. Ortiz, are you familiar with what is commonly known as pigging stations?
**A.** Yes.
**Q.** And do you recognize a pigging station in what has been already admitted as Government's Exhibit 4?
**A.** Correct.
**Q.** And can you point it out to us in this picture?
**A.** On the left side?
**Q.** So it's the pipes on the left side?
**A.** That's correct.
**Q.** Do you see a white pickup truck in Government Exhibit 4?
**A.** Yes.
**Q.** Is it on the left-hand side?
**A.** Yes.
**Q.** And does that truck appear to be similar to a truck used by Plains All American facilities?
**A.** Would you repeat the question?
**Q.** Yes.
Does that look like a Plains All American truck to you?
**A.** Correct.
**Q.** Mr. Ortiz, when would a vacuum truck be used in a pigging operation?
**A.** All the time, every month, every time the line is

cleaned.
**Q.** So it would be used to help clean out the line; is that correct?
**A.** That's correct.
**Q.** And approximately how much waste would you generate when you cleaned out a line? Approximately how many barrels would that be?
**A.** At the most, five barrels.
**Q.** All right. That's enough of Exhibit 4. Thank you.
Mr. Ortiz, were you involved in removing oil from Plains All American facilities, without Plains All American authorization?
**A.** That's correct.
**Q.** And when did you become first involved?
**A.** I don't recall.
**Q.** Okay. Were you eventually arrested for removing, without permission, oil from Plains All American facilities?
**A.** That is correct.
**Q.** Do you recall when you were arrested for that?
**A.** August 28th? I don't remember.
**Q.** When you -- did you make an agreement with other employees at Plains All American Pipeline to remove oil without permission?
**A.** Would you repeat the question. I did not hear.
**Q.** I'll rephrase.

Who approached you or asked you to participate in the theft of oil from Plains All American?

**A.** Samuel Cardona.

**Q.** And what did you agree to do?

**A.** Help him.

**Q.** And who were you helping?

**A.** The people that arrive in the vac truck.

**Q.** And how were you helping them?

**A.** So I would only just move the log, and I was keeping an eye for people not to notice what -- when they were removing the oil.

**Q.** And you said what they were removing was oil?

**A.** Correct.

**Q.** And was that oil from the Plains All American Pipeline?

**A.** Correct.

**Q.** Was that pure oil?

**A.** Correct.

**Q.** Approximately how many times did you participate?

**A.** I don't recall, but in a week it could have been approximately four or five times.

**Q.** And would every time be with the vacuum truck?

**A.** I don't know what they did with the truck. They would just come and go.

**Q.** Got it. But every time you participated, was the vacuum truck there?

**A.** Oh. Yes.
**Q.** And every time you participated, was the vacuum truck filled with pure oil from the line?
**A.** That's correct.
**Q.** Were you paid for your participation?
**A.** Correct.
**Q.** And how much were you paid?
**A.** 360.
**Q.** Do you know Obed Lopez?
**A.** Yes.
**Q.** And did you say you knew who Samuel Cardona-Quezia (phonetic spelling) is?
**A.** Yes.
**Q.** Do you know who Carlos Contreras is?
**A.** No.
**Q.** Do you know who Christian Contreras is?
**A.** No.
**Q.** Do you know who Tom Rees is?
**A.** No.
**Q.** Do you know who Chris Ortega is?
**A.** No.
**Q.** And do you know who Max Jensen is?
**A.** No.
**Q.** You said you were arrested for -- for your participation in the scheme. What were you charged with? Do you recall?

**A.** Yes.
**Q.** Yes, but -- well, what were you charged with? Do you recall?
**A.** Yes. I'm sorry, mis- something is a felony. I don't know how to say it.
**Q.** That's okay.
But did you enter into a plea agreement with the government?
**A.** That is correct.
**Q.** And as part of this plea agreement, did you agree to testify?
**A.** That's right.
**Q.** And has anyone from the government told you what your testimony needs to be today?
**A.** No.
(Counsel confers.)
BY MR. SUSLAVICH:
**Q.** I just have a couple of follow-ups, if that's okay.
When you were participating and letting the vacuum truck in, was it always the same vacuum truck?
**A.** That is correct.
**Q.** And every time that vacuum truck came, did it take pure oil from that pipeline?
**A.** That is correct.
**Q.** So when you say vacuum trucks can haul pure oil, do you

mean that it hauled pure oil in this instance?
**A.** That's correct.
(Counsel confers.)
MR. SUSLAVICH: All right. I pass the witness.
THE COURT: Cross-exam?

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:
**Q.** Were you paid in cash?
**A.** That is correct.
MR. OTTAWAY: Nothing further.
THE COURT: Redirect on the payment issue?
MR. SUSLAVICH: No redirect, Your Honor.
THE COURT: Thank you for your testimony, sir. You're excused.
The government can call its next witness.
MR. DICKENS: Thank you, Your Honor.
Before I do that, I neglected to ask if all the witnesses previously called could be released at this time.
THE COURT: Any objection?
MR. DICKENS: The government doesn't plan on recalling them.
MR. OTTAWAY: No objection.
THE COURT: You can release all of these witnesses, including this gentleman.
You're excused, sir.

THE WITNESS: Thank you.

THE COURT: You can call your next witness, counsel.

MR. DICKENS: Thank you, Your Honor. The government will call John Sneathen.

THE COURT: All right, sir --

MR. DICKENS: I apologize, Your Honor, that is not the person that I thought, but that is our next witness. I apologize. I'm stepping out of the way.

THE COURT: That's okay.

MR. SUSLAVICH: Your Honor, can the government -- the government calls Kyle Harris to the stand.

THE COURT: Kyle Harris?

MR. SUSLAVICH: Correct.

THE COURT: Mr. Harris, come forward here, and I'm going to swear you in.

(The witness was duly sworn.)

**KYE HARRIS**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. SUSLAVICH:

**Q.** Good afternoon.

**A.** Hello.

**Q.** Please state your name.

**A.** My name is Sergeant Investigator Kye Harris.

**Q.** And you mentioned you're a sergeant investigator. What is your current position, and which law enforcement agency do you work for?
**A.** I work for the Reeves County Sheriff's Office SIS division. I'm one of the sergeant investigators assigned to that division. I primarily investigate oil and gas theft.
**Q.** It might have been a little bit of a microphone issue there.
You said you work for the Reeves County Sheriff's Office?
**A.** Reeves County Sheriff's Office, yes.
**Q.** And you work in --
(The courtroom deputy adjusts the microphone.)
THE WITNESS: Yes.
MR. SUSLAVICH: You can lean in, too. Yeah.
THE WITNESS: Okay.
BY MR. SUSLAVICH:
**Q.** And you investigate oil and natural gas theft?
**A.** Yes.
**Q.** What are your general duties as a sergeant investigator for Reeves County Sheriff's Office in the oil and natural gas division?
**A.** Okay. Yeah, so I follow-up on complaints involving oil and gas theft; copper theft; operate UAS, unmanned aerial systems, things like that. I'll go do verification of, you

know, strapping tanks, gating tanks, to see if there's hydrocarbons in them, things like that.

**Q.** And we'll get into what a UAS is in just a bit, but how long have you been assigned to this role?

**A.** Specifically this role, two years.

**Q.** And have you had any other role in law enforcement?

**A.** Prior to being an investigator, I was a patrol deputy.

**Q.** And where was that?

**A.** At the same agency, Reeves County Sheriff's Office.

**Q.** Did you hold any other jobs in your adult life?

**A.** I was in the military before that.

**Q.** You mentioned that you were in the oil and natural gas division. What kind of specific oil and natural gas training have you had?

**A.** So I've gone through ten gauging courses through American Safety, $H_2S$ safety, and some other industry standard training that you would need to be on oil field locations.

**Q.** And during this training, did you get certifications?

**A.** I did.

**Q.** And are those certifications the same as the list that you just mentioned?

**A.** Yes.

**Q.** And as part of your investigative work, have you ever handled oil and gas cases involving pipelines and oil field facilities?

**A.** I have.
**Q.** Are you familiar with what is commonly known as a pigging station?
**A.** Intimately familiar, yes, sir.
**Q.** Are you familiar with vacuum trucks, sometimes called "water trucks"?
**A.** Yes.
**Q.** And are you familiar with oil hauling trucks?
**A.** Yes.
**Q.** You mentioned you're a "UAS" operator. What is a UAS?
**A.** So UAS, the common terminology would be a drone. So it's an unmanned aerial vehicle that can be remotely piloted by an operator.
**Q.** So in simple speak, you are a drone pilot; is that correct?
**A.** Correct.
**Q.** And are you a drone pilot with the law enforcement agency that you work for?
**A.** I am.
**Q.** How were you approached to become a drone pilot in this particular case?
**A.** I was reached out to by Trent Boone, special agent, requesting assistance on an operation they were doing in New Mexico, and we offered our services. We have a high-end drone that we were able to provide to their operation.

**Q.** Now, what does this high-end drone do?
**A.** So it's what's called an eVTOL. So it's electric vertical takeoff and landing drone. It's fixed wing, and it can operate longer distances than your typical quadcops or your style drones.
**Q.** So besides flying, what does this drone do?
**A.** It has a camera. It can record, transmit video.
**Q.** And did you -- did you use this drone to record video in this particular case?
**A.** I did.
**Q.** Do you remember when and where you conducted video recordings using that drone?
**A.** It was July 30th. It was near Artesia. I believe one of the roads, cross-section, was in the vicinity of Angel Road.
**Q.** And is Artesia in New Mexico?
**A.** It is.
**Q.** And from your understanding, were you surveilling a particular -- whose facility were you surveilling at that time?
**A.** It was going to be All American Plains.
**Q.** All right. When you're flying the drone, are you able to see in realtime what you're looking at?
**A.** Yes.
**Q.** And are you able to see through the camera?
**A.** Yes.

MR. SUSLAVICH: I am going to pull up what has been previously admitted as Government's Exhibit 70.

Can we play this starting at approximately 2:17? All right. And press play.

(Video plays.)

MR. SUSLAVICH: All right. Pause it there at 2:30, 2:31, as an -- under the time stamp of the video.

BY MR. SUSLAVICH:

**Q.** Do you recognize this video?

**A.** I do.

**Q.** And what is it?

**A.** So this is a wide-angle shot of me flying the fixed wing aircraft over the location, which appears to be a pigging location for a pipeline line.

MR. SUSLAVICH: All right. Let's fast forward in this video to four minutes and 55 seconds. And press play.

(Video plays.)

MR. SUSLAVICH: All right. We'll pause it there at 5:13.

BY MR. SUSLAVICH:

**Q.** All right. Is there another view of the same site?

**A.** It is.

**Q.** And based on your training and experience, what are we looking at in this particular view?

**A.** So what you can see is there's a passenger vehicle,

pickup truck, and what appears to be a waste hauler connected to the pipeline.

**Q.** All right. Where is it -- that connected from?

**A.** It's going to be connected from the back, where the vacuum hoses connect.

**Q.** All right. Where is the -- when you say "the vacuum," do you mean the vacuum truck?

**A.** The vacuum truck, yes.

**Q.** And where is -- just for the record, where is that vacuum truck in this particular still?

**A.** It's going to be the vehicle, if you're looking at it, on the right.

**Q.** Is it the long, tank-looking vehicle?

**A.** Yes.

**Q.** And you mentioned what it was connected to, but --

Well, what is it -- what is the vacuum truck connected to?

**A.** It appears to be connected to either a PIG launcher or receiving location.

MR. SUSLAVICH: Let's pull up Government's Exhibit -- Government's Exhibit 71.

BY MR. SUSLAVICH:

**Q.** And I'm showing you what has been previously admitted as Government's Exhibit 71. Is there a continuation of that same video in Government's Exhibit 70?

**A.** Yes.
**Q.** Now, why is it broken up into two -- multiple videos?
**A.** Several considerations: One, memory space when you're transferring videos, it's very large, so we try to keep it condensed down into snippets. And then for this particular day, we only had so much memory on the drone, so saving that.
**Q.** Suffice it to say it's for the convenience of viewing?
**A.** Correct.
MR. SUSLAVICH: I would like to fast forward Government's Exhibit 71 to time stamp 338. All right. Play from there.
(Video plays.)
MR. SUSLAVICH: And pause it right about there.
BY MR. SUSLAVICH:
**Q.** I've played for you from 3:38 to 3:46.
Is this another view of that same facility?
**A.** Yes.
**Q.** And in this clip, can you see a hose connected to the vacuum truck?
**A.** I can.
**Q.** And is that hose connected to the riser?
**A.** It is.
MR. SUSLAVICH: I'm going to show -- well, we'll bring up Government's Exhibit 72, and play a few seconds there.

(Video plays.)

MR. SUSLAVICH: All right. Stop there, about five seconds in, four seconds in.

BY MR. SUSLAVICH:

**Q.** Are we looking at a continuation of the previous video again?

**A.** Yes.

MR. SUSLAVICH: Fast forward to one minute and 40 seconds. And we'll play here.

(Video plays.)

MR. SUSLAVICH: And we'll stop it here at two minutes. All right.

BY MR. SUSLAVICH:

**Q.** How many people do you observe out there in this particular still?

**A.** It appears to be three subjects.

**Q.** And where are those subjects located?

**A.** One of the subjects is located on the catwalk on the vacuum trailer. One subject is near the rear of the vacuum trailer on the ground, and the other subject looks to be -- appears to be between the pigging station of several of the pipelines.

**Q.** All right. Starting from the left, what does -- in your experience, what does the individual on the catwalk appear to be doing?

**A.** It appears that he's looking down into the tank to see the level of the fluids going to --

**Q.** Basically -- sorry.

What does the person in the middle, so the second person in -- appear to be doing?

**A.** It appears he's manipulating valves. So there's big wheels that they turn to open and close the valves. It appears that he's manipulating those.

**Q.** And what does the third person, so the person on the right, appear to be doing?

**A.** A similar task, manipulating valves.

MR. SUSLAVICH: All right. Let's continue playing that video.

(Video plays.)

MR. SUSLAVICH: All right. We'll pause it there at 2:30.

BY MR. SUSLAVICH:

**Q.** Again, you saw a zoom in. Did you see the drone footage zoom in there?

**A.** Yes.

**Q.** Did it zoom in on the person who was previously on the right?

**A.** Yes.

**Q.** And what would you say, in your training and experience, he was doing?

**A.** It looks like he's watching the fluids come out of the pipeline.

**Q.** Okay. Let's fast forward to three minutes and 50 seconds in this video, in Government's Exhibit 72. All right. We'll play from here.

(Video plays.)

MR. SUSLAVICH: All right. Pause it there.

BY MR. SUSLAVICH:

**Q.** Again, are we seeing a continuation of that video right there?

**A.** Yes.

**Q.** And it was subtle, but did you see anyone give a sign out there?

**A.** I did not see it.

MR. SUSLAVICH: That's okay.

Let's fast forward to four minutes and 48 seconds.

And just for the record, on that previous video, we stopped at four minutes and 24 seconds.

All right. Four minutes, 48 seconds. Continue playing.

(Video plays.)

MR. SUSLAVICH: All right. Pause it there. We're at five minutes and 33 seconds.

BY MR. SUSLAVICH:

**Q.** And again, is anyone manipulating valves at this

particular point?
**A.** It appears that they're just standing by with their hands on them.
**Q.** So no one is cutting off the flow at this point; is that correct?
**A.** That's what it appears to be, yes.
MR. SUSLAVICH: Let's fast forward to eight minutes and 53 seconds -- or excuse me, eight minutes and 35 seconds. All right. Play from here.
(Video plays.)
MR. SUSLAVICH: Let's pause there at eight minutes and 47 seconds.
BY MR. SUSLAVICH:
**Q.** Now, in this particular clip, did you see anyone give a sign?
**A.** It appears that the individual on top of the catwalk on the vacuum truck put his arm out in a cutting motion to tell them to -- indicate it's probably full or cut the flow of hydrocarbons to the trailer.
MR. SUSLAVICH: All right. Let's continue the video.
(Video plays.)
MR. SUSLAVICH: Pause it there. Eight minutes and 53 seconds.
BY MR. SUSLAVICH:

**Q.** If you need he to replay it, I can, but did you see the person on the right do anything?
**A.** I would have to see it again.
MR. SUSLAVICH: Let's go back, then, to eight minutes and -- let's do 35 seconds. Play it again.
(Video plays.)
MR. SUSLAVICH: And stop there at eight minutes and 59 seconds.
BY MR. SUSLAVICH:
**Q.** Did that person on the right do anything?
**A.** It appears that he may have manipulated some sort of shutoff valve.
MR. SUSLAVICH: All right. Let's fast forward, then, to nine minutes and 19 seconds. And play from there.
(Video plays.)
MR. SUSLAVICH: And we'll stop there at nine minutes and 59 seconds. All right.
BY MR. SUSLAVICH:
**Q.** What did we observe -- what did you observe in that particular clip?
**A.** So it appears that these two individuals just disconnected the hose from the vacuum truck, and now they're emptying the contents of what's left in that hose from the operation that they just did into an overspill container.
**Q.** Were you able to see what the contents of that hose

looked like?

**A.** It was unclear from this view.

MR. SUSLAVICH: Let's fast forward -- let's skip, then, to Government's Exhibit 73. And we'll play from there. At 00.

(Video plays.)

MR. SUSLAVICH: Stop there at seven seconds in.

BY MR. SUSLAVICH:

**Q.** Is this a continuation of the previous exhibit?

**A.** Yes.

**Q.** And what are you observing the individuals doing in this particular clip?

**A.** So the individual on top of the vacuum truck appears to be locking the containments on the access port on top of the vacuum trailer. There's another subject putting away the hose that was connected to the pipeline infrastructure. And then it appears that there's another individual still manipulating the control valves on the actual pigging station.

MR. SUSLAVICH: All right. We'll fast forward, then, to one minute and five seconds in. And we'll play to 1:11.

(Video plays.)

MR. SUSLAVICH: Actually, I might have missed that myself. Can you go back to one minute and five seconds? And

play from there.

(Video plays.)

MR. SUSLAVICH: We'll just keep playing.

(Video plays.)

BY MR. SUSLAVICH:

**Q.** All right. What did you observe --

MR. SUSLAVICH: Pause there at one minute and 31 seconds.

BY MR. SUSLAVICH:

**Q.** What did you observe the individuals doing in that particular clip?

**A.** Basically, high-fiving each other, job complete, mission complete.

**Q.** And the person being high-fived, there was two people high-fiving, where did those people go? Did you catch that?

**A.** It appears one of the subjects went away, towards the passenger vehicle, away from the vacuum truck.

**Q.** And where did the other person go?

**A.** And it appears that the other person went to the actual vacuum truck itself.

**Q.** Did you say -- I'm sorry, I didn't catch that?

**A.** I believe he went to the vacuum truck itself.

**Q.** Okay. Let's continue then to Government's Exhibit 74. All right. Is this a continuation of the previous video?

**A.** Yes.

MR. SUSLAVICH: All right. We'll play it from there.

(Video plays.)

BY MR. SUSLAVICH:

**Q.** All right. What happened? How did the truck get to this particular location? Do you recall?

**A.** Once they completed what they were doing at the location, the vehicle separated. So the passenger vehicle left, and then this vehicle pulled up to this portable restroom.

MR. SUSLAVICH: Got it.

And then play Government's Exhibit 75. All right. Play that.

(Video plays.)

MR. SUSLAVICH: Pause there at approximately ten seconds.

BY MR. SUSLAVICH:

**Q.** What are we looking at there?

**A.** So I, flying the aircraft, followed the vehicle as far as I could. Once it got onto the -- what we call the hardball road, so it's on the actual paved road, and it's traveling away from the location.

**Q.** So a little bit to unpack there.

So when did you start following the truck?

**A.** Upon the individuals' using the restroom, once they got back in the truck and started heading towards the road, I

followed them as far as I could.
**Q.** Got it. So was the truck leaving the site?
**A.** Yes.
**Q.** And approximately how far were you able to follow the truck?
**A.** I believe it was about two or three miles from that location.
**Q.** And why did you have to stop following the truck?
**A.** Several factors, whether electromagnetic interference, and then battery life on the aircraft.
**Q.** And then what did you have to do with the drone after you ceased following the truck?
**A.** I brought it back to the location we were flying from, landed it, packed it up, and then departed the location.
(Counsel confers.)
BY MR. SUSLAVICH:
**Q.** Sergeant Harris, I might have missed it at the beginning. Do you recall what date all of this was filmed on?
**A.** It was July 30th.
MR. SUSLAVICH: July 30th. That's what I thought I heard.
(Counsel confers.)
MR. SUSLAVICH: All right. Pass the witness.
THE COURT: Cross-exam?
MR. OTTAWAY: No questions.

THE COURT: Thank you for your testimony. You're excused.

THE WITNESS: Thank you.

THE COURT: How long is your -- I'm leaving at 4:00. Who's your next witness?

MR. SUSLAVICH: We call Coby Hewitt.

THE COURT: Okay.

All right, sir, come forward to the stand, and I'll swear you in.

(The witness was duly sworn.)

**COBY HEWITT**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. SUSLAVICH:

**Q.** How is it going, sir?
**A.** Good, how are you.
**Q.** Please state your name?
**A.** Coby Hewitt.
**Q.** Investigator Hewitt, what is your occupation and law enforcement agency that you work for?
**A.** I'm a special agent with the Texas Department of Public Safety.
**Q.** So the more appropriate title then would've been Special Agent Hewitt?
**A.** Yes, sir.

**Q.** What are your general duties as a special agent for the Texas Department of Public Safety?
**A.** I am assigned to the oil theft prevention unit with DPS, and we primarily focus on oil field related crimes.
**Q.** Tell me about your experience in the oil theft unit.
**A.** We've worked various types of crimes, where you've got crude oil theft, diesel theft, copper theft. There's several different types of oil field related crimes that we've worked.
**Q.** And how long have you been doing that for?
**A.** I've been in CID for a little over a year. I've been in the oil theft unit since July of last year.
**Q.** And is there any other law enforcement experience that you have?
**A.** Yes, sir. I was a troop for -- a trooper, state trooper, for five years.
**Q.** Do some of your duties include operating UAVs or drones for law enforcement?
**A.** Yes, sir, they do.
**Q.** And how long have you been a drone operator?
**A.** I've been a drone operator since the end of 2024.
**Q.** How did you become involved as a drone operator in this particular investigation?
**A.** I was contacted by Agent Trent Boone to fly a location here in New Mexico.

**Q.** And was that location the 4145 Seven Rivers Highway address?
**A.** Yes, sir, it was.
**Q.** And was that in Carlsbad, New Mexico?
**A.** Yes, sir.
**Q.** Have you ever heard that site being referred to as the Seven Rivers yard?
**A.** Yes, sir, I have, that day.
**Q.** And you might have mentioned this, but what day was the surveillance on?
**A.** July 30th.
**Q.** When you're a drone operator, are you able to see -- well, let me back up.
What can a drone that you fly do?
**A.** We conduct overwatch with it. We observe locations, and we use it for several -- started out using it for cash scenes. We map crash locations, crash reconstruction. We use it for overwatch during operations. It serves several purposes for us.
**Q.** So you're able to get video footage from the drone; is that correct?
**A.** Yes, sir, it has capabilities to record and photograph.
**Q.** And were you able to watch the drone feed in realtime as you operated the drone?
**A.** Yes, sir.

MR. SUSLAVICH: Let's play what has already been admitted as Government Exhibit 9.

(Video plays.)

BY MR. SUSLAVICH:

**Q.** Special Agent, have you seen this video before?

**A.** Yes, sir.

MR. SUSLAVICH: Let's play it from the first 30 seconds, or from 00 to 30 seconds, yeah.

(Video plays.)

BY MR. SUSLAVICH:

**Q.** All right. Can you please tell the Court what we're looking at right there?

**A.** That is the Seven Rivers location.

**Q.** All right. And are you familiar --

MR. SUSLAVICH: We'll just late it play here until 30 seconds. I think it froze there for a brief moment.

(Video plays.)

MR. SUSLAVICH: All right. That's 30 seconds.

BY MR. SUSLAVICH:

**Q.** Were you able to recognize some of the equipment on that particular location?

**A.** Yes, sir.

**Q.** And what equipment in that clip -- it just went out of focus right when we paused, but what equipment did you see in that clip?

**A.** There's frac tanks on the location.

MR. SUSLAVICH: All right. Let's skip, hopefully, to a more focused part of that, at one minute and 20 seconds. And play.

(Video plays.)

MR. SUSLAVICH: Let's pause there at one minute and 33 seconds.

BY MR. SUSLAVICH:

**Q.** All right. What kind of equipment -- what kinds of equipment are you able to see in this particular clip?

**A.** There's a truck tractor towing a water hauler vacuum truck connected to the frac tank.

**Q.** And which frac tank does it appear to be connected to?

**A.** It appears to be connected to the first one.

**Q.** Help me out. Is that the red one?

**A.** Yes, sir.

**Q.** And there's multiple frac tanks there; is that correct?

**A.** Yes, sir.

**Q.** How many?

**A.** There's three.

**Q.** What colors are they?

**A.** Red, blue, and black or navy.

**Q.** And what color is this water hauler truck?

**A.** It's white.

MR. SUSLAVICH: Let's skip -- right now we're at

one minute and 33 seconds. Let's skip to three minutes and 33 seconds. Let's play from there.

(Video plays.)

MR. SUSLAVICH: All right. And we'll pause it right there.

BY MR. SUSLAVICH:

**Q.** Were you able to see any individuals in that clip?

**A.** Yes, sir.

**Q.** How many individuals did you see?

**A.** I saw two.

**Q.** Two.

And do you recall what color of clothes they were wearing in that clip?

**A.** There's one individual wearing a blue shirt, and there's another individual wearing a black shirt.

**Q.** All right. So we'll refer to them as the blue shirt guy and the black shirt guy?

**A.** Yes, sir.

**Q.** You don't recall who they are, correct?

**A.** I have no idea.

MR. SUSLAVICH: Let's skip forward to, on Government's Exhibit -- same exhibit, to seven minutes and five seconds.

(Video plays.)

MR. SUSLAVICH: Pause right there. We're at seven

minutes and ten seconds paused.

BY MR. SUSLAVICH:

**Q.** This is the vacuum truck, correct?

**A.** Yes, sir.

**Q.** Are there any logos on the side of that vacuum truck?

**A.** It appears there's one on the door and on the hatch on the rear of the truck.

MR. SUSLAVICH: All right. Let's skip to Government's Exhibit 10 now. And let's go to two minutes and 30 seconds.

(Video plays.)

BY MR. SUSLAVICH:

**Q.** Now, as we're going, there's multiple clips in these exhibits. Are these all conducted on the same day?

**A.** Yes, sir.

**Q.** And is this a continuation of the previous video we've reviewed them?

**A.** Yes, sir.

**Q.** And why are there multiple videos?

**A.** The drone has a certain battery life, and you have to land it and swap out the batteries.

MR. SUSLAVICH: All right. We'll play from two minutes and 30 seconds.

(Video plays.)

MR. SUSLAVICH: And we're just going to let this

play to five minutes, for the record.

(Video plays.)

MR. SUSLAVICH: All right. We'll pause it there at four minutes and 38 seconds.

BY MR. SUSLAVICH:

**Q.** Did you observe a man in a black shirt?

**A.** Yes, sir.

**Q.** And what was that man in the black shirt doing in this particular clip?

**A.** It appears he's gauging the tank.

**Q.** What does that mean?

**A.** To see the levels of the fluids inside the tank.

MR. SUSLAVICH: Let's skip, then, to nine minutes and 45 seconds. And we'll play this to approximately 12 minutes.

(Video plays.)

MR. SUSLAVICH: All right. We'll pause it there at 11 minutes and 32 seconds.

BY MR. SUSLAVICH:

**Q.** A lot happened in that clip.

**A.** Yes, sir.

**Q.** Let's start with the pickup truck.

**A.** Yes.

**Q.** Did you see a pickup truck in that clip?

**A.** Yes, sir.

**Q.** And did that pickup truck stop near the gate?
**A.** Yes, sir, it did.
**Q.** And who got out of that pickup truck?
**A.** The individual with the black shirt.
**Q.** All right. And what happened after he got out?
**A.** He went over to the rocky area and did something over there. I'm not quite sure what.
**Q.** Okay. And then what happened after that?
**A.** He got back in the truck and drove away.
**Q.** All right. So he left the field -- or he left the location?
**A.** Yes, sir.
**Q.** All right. And did you pick up what the vacuum truck did at the very end of that clip?
**A.** It began to pull off.
MR. SUSLAVICH: All right. Let's continue playing.
(Video plays.)
MR. SUSLAVICH: All right. Pause it there at 11 minutes and 40 seconds.
BY MR. SUSLAVICH:
**Q.** Is someone -- you mentioned that that vacuum truck is pulling off. Would you -- after seeing more of that clip, would you concur with that?
**A.** Yes, sir.
**Q.** So would you say someone is operating that vacuum truck

in that moment?
**A.** Yes, sir.
MR. SUSLAVICH: Let's skip now to Government's Exhibit 11 -- yes, Government's Exhibit 11. All right.
BY MR. SUSLAVICH:
**Q.** Is this a continuation of Government's Exhibit 10?
**A.** Yes, sir.
**Q.** The vacuum truck is not at the yard. How did it get there? Do you recall?
**A.** How it got there?
**Q.** To its location in 00, at Government's Exhibit 11?
**A.** It drove out. It left out the location and made a right and approached the highway.
MR. SUSLAVICH: All right. Let's fast forward, then, to three minutes and 43 seconds. There we go. Press play.
(Video plays.)
MR. SUSLAVICH: Actually, I might have been wrong on my time stamps there. Let's go back to 00 and just play it from there.
(Video plays.)
MR. SUSLAVICH: All right. We'll pause it there at 41 seconds.
BY MR. SUSLAVICH:
**Q.** What did we observe in that particular clip?

**A.** The truck turns onto Highway 285 and begins traveling, I believe, east, towards Carlsbad.
**Q.** Towards Carlsbad?
**A.** Yes, sir.
**Q.** Did you follow -- did you follow the truck from here?
**A.** I observed it with the drone as far as I could, but there were other units in position to observe it.
**Q.** And you partially mentioned this, but why didn't you continue following the drone -- excuse me, following the truck with your drone?
**A.** We had units on the roadway, as well as there's another operator up the road awaiting the arrival of the truck.
**Q.** Would your drone have been able to follow the truck?
**A.** It could have gone maybe a mile or so, but not too far.
**Q.** And why not?
**A.** The battery life and the wind, all of that impacts how long you can fly and the distance that you can fly. And with other units in play, it wasn't -- it wasn't feasible to risk it, due to them already being able to see the truck on the roadway and where it was going.
MR. SUSLAVICH: Got it.
Let's switch now to what's been previously admitted as Government's Exhibit 12. And let's play the first few seconds of this clip.
(Video plays.)

MR. SUSLAVICH: Let's pause it there at five seconds.

BY MR. SUSLAVICH:

**Q.** What are we looking at here?

**A.** It's a pickup, and then there's going to be a vacuum truck in the same configuration almost as the previous video.

**Q.** All right. Let me rephrase the question.

Where are we in the --

**A.** The Seven Rivers location.

**Q.** Okay. And what time is this?

**A.** I'm not sure the time. It was just after nightfall, I know that. I'm not positive on the exact time. The same date, but a different time.

**Q.** So it's the same date as the exhibits that we were previously watching?

**A.** Yes, sir.

**Q.** Was that date July 30th, 2025?

**A.** Yes, sir.

**Q.** And you said this was just after dark?

**A.** Yes, sir.

MR. SUSLAVICH: Let's skip, then, to three minutes, in Government's Exhibit 12. Press play.

(Video plays.)

MR. SUSLAVICH: And we'll stop there at three minutes and 17 seconds.

BY MR. SUSLAVICH:
**Q.** Special Agent, what do we see in that particular clip?
**A.** That's the water hauler driving into the location.
**Q.** And it's hard to tell on the video, when you observed this, did that look like the same water hauler that was in the previous clips?
**A.** I remember it being white, but I can't say it's the exact one. But it was white just like the other one, yes, sir.
MR. SUSLAVICH: Okay. Let's skip, then, to Government's Exhibit 13. And play.
(Video plays.)
MR. SUSLAVICH: And stop at about six seconds.
BY MR. SUSLAVICH:
**Q.** Is this a continuation of the previous Government's Exhibit 12?
**A.** Yes, sir.
**Q.** And again, is it broken up because of memory and video constraints?
**A.** Yes, sir.
**Q.** All right. And are we observing the Seven Rivers yard here, as well?
**A.** Yes, sir.
**Q.** And let's finally skip to ten minutes and 41 seconds in Government's Exhibit 13.
(Video plays.)

MR. SUSLAVICH: All right. Pause at ten minutes and 47 seconds.

BY MR. SUSLAVICH:

**Q.** What did we just observe in that short clip?

**A.** I was landing the drone at the location that we were observing from.

**Q.** So that's what it looks like when these drones land?

**A.** Yes, sir.

MR. SUSLAVICH: Let's skip now to Government's Exhibit 7.

BY MR. SUSLAVICH:

**Q.** What is Government's Exhibit -- what has previously been admitted as Government's Exhibit 7 depict?

**A.** That's going to be an oil hauler at the Seven Rivers location.

**Q.** So this is a -- is this a still image?

**A.** Yes, sir.

**Q.** Were you able to take still images, as well as video surveillance, when you were operating the drone?

**A.** Yes, sir.

**Q.** And this is a still image that you took?

**A.** Yes, sir.

MR. SUSLAVICH: And let's skip to --

BY MR. SUSLAVICH:

**Q.** Well, before we do, you were in the middle of describing

the equipment that you see in this particular image.
**A.** Yes, sir.
**Q.** Do you see three frac tanks?
**A.** Yes, sir, three frac tanks.
**Q.** Are they the same frac tanks as in the previous drone footage?
**A.** Yes, sir.
**Q.** And what kind of truck do you see, if any?
**A.** It's a truck tracker, towing a oil hauler tanker trailer.
**Q.** And that's -- and that's -- well, in your training and experience, is that kind of truck different than a vacuum truck?
**A.** Yes, sir.
**Q.** How is it different?
**A.** Oil haulers specifically transport only oil. Vacuum trucks haul away waste, water, other byproducts. But the oil haulers only transport oil.
**Q.** Do you recall when you took this picture?
**A.** Yes, sir.
**Q.** When was that?
**A.** This was when we initially were driving to the location, we observed that truck at the location. We got the drone up and were able to observe it. It was an oil hauler.
**Q.** Why didn't you take a video of this, like you took a video of the previous -- well, why didn't you take a video of

this?

**A.** The information that we had received prior was that this was not the truck that we believed was going out and committing the thefts. This was a truck coming to pick up oil, not the suspect truck.

**Q.** So you deliberately chose to take a picture, rather than a video?

**A.** Yes, sir.

MR. SUSLAVICH: Let's switch, then, to Government's Exhibit 8.

BY MR. SUSLAVICH:

**Q.** What does -- what do you see here in Government's Exhibit 8?

**A.** You can see the logo on the side of the truck tractor.

**Q.** All right. Are there any hoses in this particular image?

**A.** Yes, sir.

**Q.** Where is that hose?

**A.** It's connected to the red frac tank.

**Q.** And what does the other end of that hose connect to?

**A.** I believe it's connected to the side of the oil hauler.

**Q.** And when was this photo taken?

**A.** This would have been before the video of the water hauler at the location.

**Q.** So same day.

**A.** Yes.

**Q.** And it's the same time as Government's Exhibit 7?
**A.** Yes.
MR. SUSLAVICH: No further questions, Your Honor. Thank you.
THE COURT: Cross-exam?
MR. OTTAWAY: No questions.
THE COURT: Thank you for your testimony, sir. You're excused.
THE WITNESS: Yes, ma'am. Thank you.
THE COURT: How long is your next witness?
MR. DICKENS: Your Honor, I heard the Court announce that they wanted to end at 4:00. I don't think I can do a ten-minute witness, Your Honor.
THE COURT: All right. Then we will adjourn for the day. Be back at 9:30 tomorrow, and we'll adjourn at 4 o'clock, as well.
How many witnesses does the government have left?
MR. DICKENS: Your Honor, let's see. That was witness number five out of 14, so we have nine more, if my math serves me correct.
THE COURT: About nine more?
MR. DICKENS: Yes, Your Honor.
THE COURT: Okay.
MR. DICKENS: We should be able to finish our case tomorrow at this rate.

THE COURT: All right. And were the parties anticipating in this case doing, like, findings of fact and conclusions or law? Or what are you thinking, Mr. Dickens?

MR. DICKENS: Your Honor, I think that would probably be a good way to do it and go about it, since this is a bench trial, and it's a bit complex because we have many moving parts in an oil theft case.

THE COURT: From defense, is that what you were anticipating, as well?

MR. OTTAWAY: Yes.

THE COURT: All right. Then we'll see everybody back here, and we'll start again at 9:30.

Before we do that, anything I can do for the government?

MR. DICKENS: Nothing else.

THE COURT: What about from defense?

MR. OTTAWAY: No.

THE COURT: All right. We'll see you in the morning. Thank you.

(Court in recess at 3:49 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of New Mexico, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 19th day of August, 2026.

/s/ RACHEL M. LOPEZ

Rachel M. Lopez, CRR
Official Court Reporter

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

___________________________________

UNITED STATES OF AMERICA,

Plaintiff,

Criminal Action No.
5:25-cr-04750-MIS-4

v.

CHRISTOPHER ORTEGA,

Defendant.

___________________________________

BEFORE THE HONORABLE MARGARET I. STRICKLAND, DISTRICT JUDGE

BENCH TRIAL - DAY 2

Thursday, August 20, 2026
9:33 a.m.

United States Courthouse
Guadalupe Courtroom
100 North Church Street
Las Cruces, New Mexico

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE - NEW MEXICO
BY: JAMES ANDREW DICKENS AND BENJAMIN TURNER SUSLAVICH
200 North Church Street
Las Cruces, New Mexico 88001
(575) 522-2304
james.dickens@usdoj.gov

On behalf of the Defendant:

LAW OFFICES OF ANDREW OTTAWAY
BY: ANDREW OTTAWAY
11 Bogie Lane
Suite 1C
Ruidoso, New Mexico 88345
(817) 559-0466
ottaway9@swbell.net

**TABLE OF CONTENTS**

**TRIAL WITNESSES**


| On behalf of the Plaintiff: | Page |
|---|---|
| JOHN SNEATHEN | |
| By Mr. Dickens | 4 |
| STUART N. DOLLAR | |
| By Mr. Dickens | 10 |
| By Mr. Ottaway | 57 |
| By Mr. Dickens | 59 |
| TRENT BOONE | |
| By Mr. Dickens | 61 |
| By Mr. Ottaway | 87 |
| By Mr. Dickens | 90 |
| NATHAN JERONIMUS | |
| By Mr. Dickens | 91 |
| QUENTIN FRANZOY | |
| By Mr. Dickens | 114 |
| TARA TRIPP | |
| By Mr. Dickens | 119 |

**P R O C E E D I N G S**

(In open court.)

THE COURT: All right. We're back on in criminal case 25-cr-4750.

Everybody ready to proceed from the government?

MR. DICKENS: The government is ready, Your Honor.

THE COURT: From the defense?

MR. OTTAWAY: We're ready.

THE COURT: Call your next witness, Mr. Dickens.

MR. DICKENS: Thank you, Your Honor. The government will call John Sneathen.

(The witness was duly sworn.)

MR. DICKENS: Play it please the court?

THE COURT: Sure.

**JOHN SNEATHEN**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Sir, can you please introduce yourself by telling us your name and spelling your last name?

**A.** My name is John Sneathen, S-n-e-a-t-h-e-n.

**Q.** And sir, how are you employed?

**A.** I'm currently a commander at the Eddy County Sheriff's Office.

**Q.** How long have you worked in law enforcement?

**A.** Fifteen years.
**Q.** What agencies have you worked for during those 15 years?
**A.** Carlsbad Police Department and the Eddy County Sheriff's Office.
**Q.** I want to go back to the summer months of 2025, specifically to July 25th of 2025. How were you employed at that time?
**A.** I was with the Eddy County Sheriff's Office.
**Q.** Were you performing any specific duties for that department?
**A.** Yes. I was assigned to the Pecos Valley drug task force.
**Q.** Were you asked to do anything in regards to an investigation on that July 25th date?
**A.** Yes. I was contacted by Agent Boone to assist in a follow --
**Q.** Okay.
**A.** -- of some trucks.
**Q.** And why is it that multiple officers would have to be involved in following trucks?
**A.** To avoid being detected, we normally help each other out. It's not uncommon for us to help multiple agencies do certain things like that.
**Q.** Okay. So when you say you don't want to be detected, what do you mean by that?
**A.** I have to use multiple vehicles in order to not get, you

know, seen or allow the person that you're trying to follow know that they're being followed.

**Q.** Okay. So you're following what type of vehicles?

**A.** Two oil hauler semis.

**Q.** Are you very familiar with the oil business or more familiar with law enforcement and drug investigations?

**A.** Law enforcement.

**Q.** Okay. So how is it that you were told what vehicles to follow?

**A.** We were in direct communication the entire time with all the agents, including Agent Boone.

**Q.** So Boone basically told you, "This is the" -- gave you a description of the vehicles to follow. And then, as the vehicles drove, you were all in communication to pass the vehicles off back and forth?

**A.** Yes, sir.

**Q.** Can you tell us where you were when you started your part following the vehicles?

**A.** We were in Carlsbad, New Mexico.

**Q.** And where did the vehicles go?

**A.** Into Texas.

**Q.** And as they drove across into Texas, did -- did you continue to follow them, or did you stop at the Texas line?

**A.** We continued.

**Q.** And where did those vehicles go?

**A.** To a remote oil location. It wasn't necessarily a town. It was outside of a town, smaller towns in the area. But it wasn't -- just a remote oil field location.
**Q.** And how were you certain that you crossed into the State of Texas?
**A.** On 285, it's clearly marked when you leave the State of Texas and New Mexico. It's with the signage.
**Q.** Were you the actual agent that watched them go to that remote oil location in Texas?
**A.** I was.
**Q.** And what did you observe when those vehicles, those oil haulers arrived there?
**A.** They drove up to the station, hooked up hoses, looked what appeared to be unload, and then left the area.
**Q.** And did both oil haulers connect to that station?
**A.** Yes.
**Q.** And did both appear to unload their contents at that station?
**A.** Yes.
**Q.** Did you take any recordings or pictures of those two oil haulers at that station?
**A.** I did.
**Q.** Of those two oil haulers?
**A.** Oh, no. The photo that I took was after they were -- so when they went to the area, I was too far back. But then

when we got there, we took photos of the station. And at the station, there was other vehicles that had already pulled up.
**Q.** And again, because you do not want them to know that you were following them, is there -- is that the reason that you didn't drove up close and take pictures as they were unloading?
**A.** Correct. Our vehicles aren't necessarily oil-field-looking trucks, so we waited for them to leave the area so they wouldn't see us.
**Q.** And after they left the area, you said you took photos; is that correct?
**A.** Yes, sir.
**Q.** And have you looked at Government's Exhibits 41 and 42 before testifying?
**A.** Yes.
**Q.** And, in fact, are those the photographs that you took, back on July 25th, of that station where those two vehicles arrived?
**A.** Yes.
**Q.** I'm going to go ahead and show you Government's Exhibit 41. There is an oil hauler there at that station; is that correct?
**A.** Yes.
**Q.** But, again, that is not one of the oil haulers that you followed?

**A.** No, sir.
**Q.** Okay. But as we look at this photograph, do you see that oil hauler hooked up to that station by a pipe or two?
**A.** Yes.
**Q.** And is that basically what you saw both of those oil haulers do that you followed from New Mexico?
**A.** Yes.
**Q.** Let's go ahead and --
Are you familiar with what's called "LACT" stations?
**A.** Somewhat.
**Q.** Okay. Is that a LACT station?
**A.** Yes.
**Q.** Okay. Let's go ahead and look at Government's Exhibit 42. What are we looking at in Government's Exhibit 42?
**A.** It's a picture of a sign that I took. It contains the name of the company, and, I believe, the GPS.
MR. DICKENS: Okay. If we could zoom in on the sign. Maybe.
BY MR. DICKENS:
**Q.** Okay. Now that we're zoomed in on the sign, does it actually have -- can you see the GPS coordinates there?
**A.** Yes.
**Q.** Okay. And, again, those GPS coordinates show that that

facility is in the State of Texas, correct?

**A.** Yes.

MR. DICKENS: No further questions, Your Honor. Thank you.

THE COURT: Cross-exam?

MR. OTTAWAY: No questions.

THE COURT: Thank you for your testimony. You're excused.

MR. DICKENS: And, Your Honor, this witness may be permanently excused.

THE COURT: Is that okay with defense?

MR. OTTAWAY: Yes.

THE COURT: All right. You're permanently excused, sir. You can leave.

The government can call its next witness.

MR. DICKENS: Thank you, Your Honor. The government will call Stuart Dollar.

THE COURT: All right, sir. Come up here, and I'll swear you in.

(The witness was duly sworn.)

**STUART N. DOLLAR**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Sir, can you please introduce yourself to the Court by

telling the Court your name?
**A.** Yes. It is Stuart Nicholas Dollar.
**Q.** And can you spell your last name for the record?
**A.** D-o-l-l-a-r.
**Q.** Without telling us where you live, can you tell us just what town you live in?
**A.** Midland, Texas.
**Q.** And what sort of jobs have you held as an adult?
**A.** Mining industry. I worked pipeline for two years, and then back to mining. And I worked at a hospital.
**Q.** So would you say most of your experience, then, would be in the mining industry?
**A.** Yes, sir.
**Q.** You talked about pipeline. What type of pipeline did you work?
**A.** Welded pipe.
**Q.** Oh. Okay. So little to no experience in the oil industry?
**A.** Very little.
**Q.** Okay. At any time, did you ever communicate with a gentlemen by the name of Maxwell Jensen?
**A.** Yes, I did.
**Q.** How did that come about?
**A.** I met him on Indeed. I applied for a job. I believe the company name was Big Striker Energy.

**Q.** And so when you say you interviewed with him based on an Indeed ad, how did you interview?
**A.** I sent my resume, and he gave me a call. I believe it was June 11th.
**Q.** Okay. Did you ever actually meet him in person?
**A.** No, I did not.
**Q.** Any video calls?
**A.** No.
**Q.** So it was all just phone calls.
**A.** Yes, sir.
**Q.** When the phone call first came through, what name popped up on your phone?
**A.** It was "Zachary Jensen."
**Q.** So how was it that you became aware that you were talking to a Maxwell Jensen, instead of a Zachary Jensen?
**A.** I didn't realize that until the next day when he called me and said, "Hey, it's Max."
**Q.** Okay. And at that time, you recognized it was the same voice you had talked to the day before?
**A.** Yes.
**Q.** The same phone number?
**A.** Yes.
**Q.** What sort of job listing did you apply for?
**A.** It was a yard manager position that paid $950 a week.
MR. OTTAWAY: Judge, I'm sorry, I'm old, I can't

hear him.

THE COURT: Can you move a little closer to the microphone for us. Thanks.

THE WITNESS: Yes.

MR. DICKENS: May I approach the witness and adjust that slightly?

THE COURT: Of course, yeah. Go ahead.

MR. DICKENS: I don't know if it's attached or not.

THE WITNESS: No, it's not attached.

MR. DICKENS: Let's slide that way over to you, that way you don't have to lean over.

Thank you, Your Honor.

THE COURT: Go ahead.

BY MR. DICKENS:

**Q.** So I think the last question was, or the last statement was it was a yard manager?

**A.** It was a yard manager.

**Q.** And how much were you to be paid per week?

**A.** $650 per week -- or, sorry, $950 per week.

**Q.** And in that interview, what sort of job duties were you told that you were going to handle as a yard manager?

**A.** I was going to watch the yard and sell off equipment, because he was in legal trouble and he needed to get rid of stuff to make money.

**Q.** And where was the yard?

**A.** The yard was in Odessa, Texas.
**Q.** And was it under a business name or a yard name at that time?
**A.** Yes, it was under Toro.
**Q.** And selling off the equipment may mean that was a short-term job, right? As soon as you get rid of the equipment, you're done?
**A.** Yes.
**Q.** But you took the job, anyway?
**A.** Yes, I did.
**Q.** Did -- would you describe the yard for the Court.
**A.** It was pretty much an oil yard. It had a bunch of tanks, stationary tanks, and then it had mobile tanks. And it had a boiler.
**Q.** Okay. Let's talk about the tanks. Can you describe the type of tanks that were at the yard?
**A.** Yes. Multiple mobile tanks, like frac tanks; round haul tanks that you can just haul off with a truck, semitruck; and then stationary tanks for semis that go in there and remove or add oil or fluids.
**Q.** When you talk about frac tanks, do those come in different styles? Round, square, rectangular? Describe them.
**A.** Yes, they do. Square and round, to my knowledge.
**Q.** And do you remember how many tanks of all these types

were in the yard?

**A.** I can't recall a rough estimate. Was eight around, three square, four square.

**Q.** Did you, at any time, become suspicious about what was happening at this yard?

**A.** Yes. Immediately. Whenever I got off the phone with Max, the first --

**Q.** And why is that?

**A.** He said he was in legal trouble, and he wanted to sell off things in a yard; that just raised a lot of red flags to me. And then I started Googling the yard, his name, and then I came up with a bunch of information.

**Q.** Tell us what you found by a simple Google search on Maxwell Jensen.

**A.** The first -- the first item that popped up was father/son indicted on $300 million of oil theft in South Texas.

**Q.** How were you to access this yard?

**A.** I was -- he told me I needed to go to the yard. I'm probably going to have to cut a lock because his brother wasn't there a few days later -- or a few days earlier, and he did not leave a key.

**Q.** Again, another red flag that you're being asked to break a lock to access a yard?

**A.** Yes, that's correct.

**Q.** Okay. Did you have to research a lot to find these

articles on Mr. Jensen?
**A.** It wasn't very hard, no.
**Q.** Was there any information about where the -- Jensen was charged out of?
**A.** It just said "South Texas," I believe Brownsville.
**Q.** Any indication of legal troubles there in the Odessa area?
**A.** I didn't find anything on that, no. But he said he owned the yard.
**Q.** Okay. What did you do when you became concerned about Mr. Jensen's criminal activity?
**A.** I first contacted the Odessa detective unit. They didn't reply back to me. They didn't call me back. Immediately after, I called the FBI.
**Q.** And did you end up meeting with anybody at the FBI?
**A.** Yes. I got a phone call back from the FBI that evening. I talked to a secretary at first, and then I had a meeting a few days later with a special agent.
**Q.** Any idea if you remember his name?
**A.** Yes. It was Nathan.
**Q.** Okay. And did you provide this information that you had learned from talking with Maxwell Jensen?
**A.** Yes, I did.
**Q.** And did you offer to become a confidential source or a confidential informant?

**A.** Yes, I did.
**Q.** What did you want in return for that?
**A.** I wanted my record expunged.
**Q.** And when you say "record," is that a criminal record?
**A.** Yes. Two felonies.
**Q.** Okay. Were you told whether they could or could not expunge that record?
**A.** Yes. They could not.
**Q.** Did you still agree to be a confidential source for them?
**A.** Yes, I did.
**Q.** Eventually, did you receive any payment for being a confidential source?
**A.** Eventually I did, yes.
**Q.** Do you remember how much that was?
**A.** I think $5,000.
**Q.** Okay. As a confidential informant, did you continue to function as an employee of Max Jensen?
**A.** Yes, I did.
**Q.** Were you able to sell off any of the equipment there for Mr. Jensen?
**A.** The only equipment that did get sold was the -- a centrifuge. And that was the first day I showed up. He already had that planned to sell. And then oil that was left over in the tanks.
**Q.** How about any efforts to bring more oil into the

facility?
**A.** Yes. He did have one person drop off oil. It was late at night. I think it was 93 barrels, if I remember correctly. And then he wanted me to source out oil to come in to the yard.
**Q.** When you say "source out" incoming oil, what do you mean by that?
**A.** He wanted me to go out and find pumpers that could bring oil into us.
**Q.** Now, you don't have much experience in the oil business, right?
**A.** Correct.
**Q.** Did he explain to you how you were supposed to go out there and find these sources of oil?
**A.** Yes. He wanted me to go to his competitors' yards and wait until the trucks left and waive them down. Or he wanted me to go to truck stops and talk to pumpers, and see if they could bring stuff in.
**Q.** And did you do any of that?
**A.** No, I did the no.
**Q.** Why did you not do any of that?
**A.** I was not directed by the FBI to do so.
**Q.** Okay. At any time, with your communications with Max Jensen, did he switch phones, phone numbers?
**A.** Yes.

**Q.** Can you tell us how often that would occur?
**A.** The first phone number he switched within, I would say, three to five days; second phone number was something he told me to use only for certain stuff that we needed to talk about. And then one phone number he kept pretty much the entire time after he switched.
**Q.** Did you make any efforts to record any of the calls with Mr. Jensen?
**A.** Yes.
**Q.** Can you tell the Court how you went about that?
**A.** I had one phone in one hand, put it on speaker, and the other phone would record.
**Q.** So you didn't get any super fancy equipment from the FBI? You were literally holding phones near each other?
**A.** Yes.
**Q.** Okay. How about any sort of documentation or recording of any other communication? Text messages? Any other written communication?
**A.** Yes, all text messages were saved and screenshotted. There were pictures sent back and forth. He sent me multiple writings, and I was able to transfer that over to him.
**Q.** What did you do with these recordings of phone calls, as well as the text messages?
**A.** I gave it to the DPS and FBI.
**Q.** Have you been able to listen to some of those voicemails,

which are Government's Exhibits 17 through 30?
**A.** Yes, I have.
**Q.** And have you also been able to look at the transcripts that were connected to those voice calls?
**A.** Yes, I have.
**Q.** And do you believe you recognize those as the phone calls that you had between you and Max Jensen?
**A.** Yes.

MR. DICKENS: Your Honor, I'm going to play some of those recordings now for each exhibit. I've provided the Court with the transcripts. So the recording is 17, the transcript is 17A.

Does the Court have access to those, or do I need to provide those transcripts?

THE COURT: No, I have them. Thank you.

MR. DICKENS: At this time, let's go ahead and play what's already been admitted as Exhibit 17, audio recording. We're going to start at minute 8:50.

(Audio plays.)

MR. DICKENS: If you could stop that. I apologize. Start at the very beginning. I apologize. My notes were not accurate.

(Audio plays.)

MR. DICKENS: Okay. You can stop it. Excellent.

BY MR. DICKENS:

**Q.** Okay. There's quite a bit to unpack in that. This is a conversation fairly early in your relationship with Mr. Jensen, correct?
**A.** Yes.
**Q.** So he talks in there about a Tom. By that point, did you know who Tom was that he was talking about?
**A.** No, I did not.
**Q.** And he talks about Hound Dog Energy. Did you know anything about Hound Dog Energy at that time?
**A.** No, I did not.
**Q.** He talks about a sliding scale. What's a sliding scale?
**A.** It was a sliding scale on the quality of product that would come in and how much each person could make.
**Q.** And how did he send that to you?
**A.** Via text message.
MR. DICKENS: Ms. Sanchez, if we could bring up Exhibit 31, page 1. If you could sort of zoom in on that picture on that page, please.
BY MR. DICKENS:
**Q.** Looking at Exhibit 31, page 1, do you recognize that picture?
**A.** Yes, I do.
**Q.** And what is that picture?
**A.** That is the picture that Max sent me for the pay scale.
**Q.** Okay. And BS&W, that's the purity of the oil. That's on

the column on the left-hand side; is that correct?
**A.** Yes, it is.
**Q.** What does the "P" stand for in that?
**A.** I'm assuming pumper.
**Q.** Okay. And then what's the middle column there?
**A.** "Stew."
**Q.** Okay. I'm glad you can read that distinction of your name there, Stew.
And then, finally, the last column?
**A.** That's the payout for Max.
**Q.** So when it says two, five, at zero to 30, what is he telling you there in that sliding scale?
**A.** That's the percentage that we would get paid.
**Q.** So $5 or five percent? Do you remember which?
**A.** It was $5 per barrel.
**Q.** Okay. At that time, were you familiar with how much oil was going for, especially pure oil, which would be a zero to three?
**A.** I do not.
**Q.** You were not, because you're not familiar with the oil business, right?
**A.** Correct.
**Q.** Okay. And then towards the bottom, it says that the oil is 40 to 50. That would be very poor oil, correct?
**A.** Yes.

**Q.** And how much was he willing to pay for a very poor oil?
**A.** Nothing.
**Q.** So he really wanted the good oil to come into this yard?
**A.** Yes, that's correct.
**Q.** The discussion there of the LLC, he was encouraging who to create an LLC?
**A.** A guy that I had that was fabricated.
**Q.** Okay. Let's actually backup and talk about that. You talk about having a source of oil in this recording? Did you actually have a source of oil that was interested in bringing oil in?
**A.** No, I did not.
**Q.** That was a made-up entity just for working as a confidential source; is that right?
**A.** That's correct.
**Q.** But, again, in the conversation between you and Mr. Jensen, this source of oil was going to be doing just that, bringing the oil into the facility, right?
**A.** Correct.
**Q.** And Mr. Jensen suggested that you tell him to create an LLC, right?
**A.** Correct.
**Q.** Meaning a business name.
Did he suggest what type of business that he should be creating?

**A.** Yes. It was a -- I just heard it. I already forgot.
**Q.** Does consulting sound right?
**A.** Consulting firm, there we go.
**Q.** Would a business who's bringing oil into this facility be a consulting business?
**A.** No, it would not.
**Q.** What type of business would that be?
**A.** That would be a hauling business or a cleanout business.
**Q.** So he was suggesting that the LLC be based on fictitious information?
**A.** Correct.
**Q.** In this conversation, does he indicate that he has to pay Hound Dog Industry [sic] or Tom for these oil transactions?
**A.** Yes, that's correct.
**Q.** And how much does he indicate he has to pay him?
**A.** 25 percent.
MR. DICKENS: Let's go ahead, in this same exhibit, which, Ms. Sanchez, is Exhibit 17. If we could start at minute 12:45 now.
(Audio plays.)
MR. DICKENS: Okay. Let's go ahead and stop it there.
BY MR. DICKENS:
**Q.** In that latter section of this conversation, once again the yard in Carlsbad is mentioned; is that right?

**A.** Yes, that's correct.
**Q.** And he indicates that he is one of the people running that yard; is that correct?
**A.** Correct.
**Q.** Okay. Let's -- in this conversation --
MR. DICKENS: Actually, we'll go ahead and play Exhibit 18 now, Ms. Sanchez.
(Audio plays.)
BY MR. DICKENS:
**Q.** Okay. In this conversation, you mentioned getting a prepaid phone. What were you -- why did you mention that?
**A.** So that way people wouldn't have my real number.
**Q.** Okay. The fear is that you would be purchasing something from somebody's working for the feds or working for law enforcement?
**A.** Yes.
**Q.** Mr. Jensen didn't tell you, "Don't do that. You don't need a burner phone," or anything of that nature?
**A.** He never said that.
**Q.** And he mentions a phrase here of, "If anybody says the word 'stolen,' just walk away"; is that right?
**A.** Correct.
**Q.** Did you understand that to mean don't buy stolen oil? Or just, if people mention it, they were probably working for law enforcement.

**A.** If somebody mentions stolen oil, that's an immediate red flag, and don't do it.
**Q.** And did he ever tell you, "Don't buy stolen oil"?
**A.** He never did.
MR. DICKENS: Let's go ahead now and move on to Government's Exhibit 19.
Ms. Sanchez, if you could play from minute 4:05 to minute 4:47. There.
(Audio plays.)
BY MR. DICKENS:
**Q.** In that short conversation, you talk about riding with a motorcycle group. Why is it that you talked about that?
**A.** It was just conversation, so that way he would think that I knew some sketchy people.
**Q.** Okay. And in that conversation, does Mr. Jensen seem to know the capacity of the Carlsbad yard?
**A.** Yes.
**Q.** And how do you know that, or what did he say that told you that?
**A.** I don't know if it was in this conversation or another conversation, but he said he's moving a lot of product through that yard.
**Q.** In this conversation, does he mention the yard isn't very big, and they would have to have good product to go there?
**A.** Yes.

**Q.** So if a yard isn't very big, what does that mean?
**A.** That means he's got to move product in and move it out really quick.
MR. DICKENS: Let's go ahead now, Ms. Sanchez, and play Government's Exhibit 20. Let's go ahead start from the beginning, and go to about minute 2:25.
(Audio plays.)
BY MR. DICKENS:
**Q.** Okay. Mr. Stuart, in that discussion, once again, the source of you oil that you're talking about to Mr. Jensen, it's fabricated, right?
**A.** Correct.
**Q.** But you talk about this source of oil not wanting to go to that yard. Why is it that the source of oil -- why is it that you told him that the source of oil did not want to go to that yard?
**A.** Mainly because I didn't have a guy, and I knew that yard had been raided and that would be an easy well to tell him, "Hey, the guy doesn't want to go here."
**Q.** How did you know the yard had been raided?
**A.** Google search.
**Q.** Okay. So, again, the yard that Maxwell Jensen is connected to, the yard that Maxwell Jensen's hired you to run was, again, easily accessible online as being known for being raided by law enforcement?

**A.** That's correct.
**Q.** And when you say "raided," what do you mean by that?
**A.** They came in. They arrested everybody. I remember reading that -- well, that's it.
MR. DICKENS: Okay. So let's go ahead, Ms. Sanchez, and go on to minute 13:07. And we will play to minute 24:33.
(Audio plays.)
MR. DICKENS: Stop there. What's the number at that point?
MS. SANCHEZ: 24:32.
MR. DICKENS: 24:32?
MS. SANCHEZ: Yes.
BY MR. DICKENS:
**Q.** Okay. So again, Mr. Dollar, lots of stuff to unpack there. We start off with you telling him that the source of oil doesn't want anything that leads back to him. Again, why would your fictitious source of oil not want his name on anything like a business account?
**A.** Because it wouldn't be credible oil. It wouldn't be purchased.
**Q.** It would be -- it would be stolen oil or illegal oil?
**A.** Correct.
**Q.** Okay. And so by telling Mr. Jensen that, his reaction was not, "Don't do that." His reaction was to trying and

find a workaround for the oil still to come into the Toro yard there in Odessa?
**A.** Correct.
**Q.** And that workaround was basically for you to take over the yard and all the paperwork, right?
**A.** Correct.
**Q.** Form your own business, put your name on the sign, correct?
**A.** Correct.
**Q.** He even talks about a rental agreement. What was the -- what was his suggestion as to the rental agreement for the yard?
**A.** I would rent the yard, and I would send him a check so that way there was money going to him. And but he would credit that right back to me, what he was going to wire me for what would be coming into the yard.
**Q.** And at the beginning of the conversation, he talks about, "This is a burner phone," the phone that you're calling him on, correct?
**A.** Correct.
**Q.** Did he, Mr. Jensen, admit that his yard there, the Toro yard, had a burnt reputation?
**A.** Yes, it did.
**Q.** And that it could be found online?
**A.** Yes.

**Q.** One of the statements there at the very end was, quote, This stuff is -- I think it's, "If this stuff is as good as it is, we can get paid every week for it, just like clockwork."

So the deal that you were setting up with Mr. Jensen, would the oil be processed at all there at the Toro yard?

**A.** No. It would not have to be.

**Q.** Why not?

**A.** Because it's supposed to be perfect oil.

**Q.** So what would -- what would you be doing with that perfect oil?

**A.** Immediately selling it.

MR. DICKENS: Let's go ahead now and play Exhibit 21, Ms. Sanchez. And we'll start at the very beginning. And, in fact, we're going to play this whole recording.

(Audio plays.)

BY MR. DICKENS:

**Q.** So Mr. Stuart, in that conversation, do you make it clear that the source of oil that you're talking about works for a large oil company?

**A.** Yes.

**Q.** And what oil company was that?

**A.** Diamondback.

**Q.** Even with your limited understanding of the oil business, would a employee for a large company be allowed to sell, give away, or dispose of large amounts of pure oil?
**A.** No.
**Q.** The conversation then goes on to talk a lot about the tickets. What are they talking about when they talk about -- when you talked about the tickets?
**A.** Delivery tickets of where the oil came from.
**Q.** Okay. And the importance of having some sort of proof of what came in and what went out of the business?
**A.** Yes.
**Q.** And the proof of -- the importance of that was related to law enforcement how?
**A.** That way you can prove where it came from.
**Q.** Prove that oil came in, oil went out, right?
**A.** Exactly.
MR. DICKENS: Let's go ahead and move on now to audio 22, ma'am. And we'll start at minute 22:38 and play to minute 3:48.
(Audio plays.)
BY MR. DICKENS:
**Q.** Okay. Mr. Stuart, in that short clip there, once again, does Mr. Jensen mention his partner or friend that's doing business in Carlsbad?
**A.** Yes.

**Q.** And indicates that his business would basically be funneling some of the money back and forth. You'll be paying him, or he'll be paying you -- I forget which now, the way the money was supposed to be going?
**A.** Yes. It was his company paying me.
MR. DICKENS: Okay. Let's go ahead now and play, in that same recording for a minute, from 7:45, Ms. Sanchez, to the end.
(Audio plays.)
MR. DICKENS: Go ahead and stop right there. That should be around minute 8:45.
BY MR. DICKENS:
**Q.** In that conversation, there is discussion about safe marketing grounds. What was the meaning between you and Mr. Jensen about safe marketing grounds?
**A.** A place where there wouldn't be any law enforcement.
**Q.** Because you'd be doing what?
**A.** Talking to people about bringing oil in.
**Q.** And what type of oil?
**A.** Stolen oil.
MR. DICKENS: Okay. Now, Ms. Sanchez, I apologize, let's go to minute 10:47, and play that to the end.
MS. SANCHEZ: 10:47?
MR. DICKENS: 10:47 is what I have, yeah.
(Audio plays .)

BY MR. DICKENS:
**Q.** Okay. So, once again, I think we talked about earlier about Mr. Jensen switching his phones. Is this one example of him admitting that?
**A.** Yes.
MR. DICKENS: Let's go ahead and skip to Exhibit 24, Ms. Sanchez. And we'll start playing that from minute 1:50 to 2:31.
(Audio plays.)
MR. DICKENS: Are we on Exhibit 24?
MS. SANCHEZ: Yes.
MR. DICKENS: And we're starting at 1:50?
MS. SANCHEZ: Yes.
MR. DICKENS: Okay. Let's go ahead and play that.
(Audio plays.)
BY MR. DICKENS:
**Q.** Okay. Previously, Jensen, in these recordings, had talked about an employee out in the Carlsbad area. Is this the first time that you remember hearing the name "Chris" associated with that?
**A.** Yes.
**Q.** And how did Mr. Jensen describe Chris?
**A.** As a mountain of a man.
**Q.** And connected to any sort of organization?
**A.** Yes. He used to ride with the Bandidos.

**Q.** And earlier you had talked about a motorcycle group that you would drive with; is that right?
**A.** Correct.
**Q.** Did Mr. Jensen suggest that you connect with Chris about that or to connect with other people?
**A.** Yes.
**Q.** Can you tell the Court about that?
**A.** Yes. He wanted me to talk to Chris to see if the people that I knew were credible or not.
**Q.** Did you claim to have some sort of connection to another source of oil that was connected to the Bandidos in any way?
**A.** Yes, I did.
**Q.** Tell the Court about that, please.
**A.** I told Max that I had a source in -- south of Carlsbad that was a pumper, and he was a Bandido.
MR. DICKENS: Okay. Ms. Sanchez, let's go ahead and play that same recording from about minute 3:48, to the end.
(Audio plays.)
BY MR. DICKENS:
**Q.** Okay. Mr. Stuart, in this conversation, you sort of start off by saying your source of oil, the fictitious source, was angry, was actually cussing a lot. What was the reason that you gave Mr. Jensen for this fictitious source being so upset?

**A.** Because that yard had been raided, and no one wants to go there.
**Q.** And when you talk about the yard, that's the Toro yard in Odessa?
**A.** Yes. Correct.
**Q.** So if he's afraid that you guys might be working for the cops now, as you say in the recording, what would that mean about the load of oil going to that Toro yard?
**A.** That it would be stolen.
**Q.** In this conversation, they also have -- you talk a lot about the Chris working in Carlsbad. And what is Chris supposed to make an introduction for?
**A.** To talk about the guys I knew.
**Q.** And the guys, in what particular way would he have any in with those guys?
**A.** Yes.
**Q.** No, why would he have any in or any connection with the source of oil that you were talking about?
**A.** Because I said that I knew some Bandidos.
**Q.** In this conversation, does he mention -- does Mr. Jensen mention that Chris is working at that Carlsbad yard?
**A.** Yes.
**Q.** And does he mention, in fact, that they received three loads yesterday?
**A.** Yes.

**Q.** So by this conversation, it appears that Mr. Jensen knows about that yard and knows about the daily operations of that yard?
**A.** Correct.
**Q.** And how is it that you are to make connection with Chris?
**A.** He was supposed to call me.
**Q.** And so who was supposed to set up that communication between you and Chris?
**A.** Max did.
MR. DICKENS: Let's go ahead now and play Exhibit 25, Ms. Sanchez. And we're going to go ahead and play this whole recording.
(Audio plays.)
MR. DICKENS: We're just going to stop that real quick.
BY MR. DICKENS:
**Q.** This is -- is this Mr. Jensen that you're talking to?
**A.** No.
**Q.** Who is it that you're talking to?
**A.** Mr. Ortega.
**Q.** We're going to jump way ahead in the story. Did you ever actually physically meet a Chris Ortega?
**A.** I might have, a few years back.
**Q.** Let me back up and say, as part of an undercover, did you ever meet with a Christopher Ortega?

**A.** Yes.

**Q.** And do you recognize the voice of the person that you met with in person as being the same voice that's on this recording?

**A.** Yes.

**Q.** Going to how you met him, but you do recognize that voice as Christopher Ortega's voice?

**A.** Yes, I do.

MR. DICKENS: Ms. Sanchez, if we could go back to the beginning. Thank you.

(Audio plays.)

BY MR. DICKENS:

**Q.** Mr. Stuart, in that conversation, you were describing the source of oil, or a source of oil, that you were pretending to have. No truth to that, correct? There was no source of oil?

**A.** No truth.

**Q.** So when Chris was asking you for the identity, were you just trying to make that up spur-of-the-moment?

**A.** Yes, I was.

MR. DICKENS: Okay. Let's go ahead now, Ms. Sanchez, and play Government's Exhibit 27. And we'll start at minute 1:45, and we'll go to 4:34.

(Audio plays.)

BY MR. DICKENS:

**Q.** Okay. Mr. Stuart, in this bit of the conversation, what is it that Mr. Jensen is encouraging you to use Chris for?
**A.** Vetting the room to see if people are trustworthy or not, pretty much.
**Q.** And "trustworthy" in this business would mean a legitimate source of oil or somebody who's just not going to be law enforcement?
**A.** Someone who's not going to be law enforcement.
MR. DICKENS: Okay. Ms. Sanchez, let's go ahead and play from minute 14:21, to the end of the conversation.
(Audio plays.)
BY MR. DICKENS:
**Q.** Mr. Dollar, you mentioned Hugo in this. Who's Hugo?
**A.** He was supposed to be the hauler that was going to be bringing oil in, but completely fake.
**Q.** And why bring Hugo out to the Carlsbad/Hobbs area?
**A.** So that way they could see -- or that way he could have seen how it was ran and if that was a safe location.
**Q.** And did, in fact, did Mr. Jensen encourage Hugo to meet with Tom or Chris?
**A.** Correct.
MR. DICKENS: Ms. Sanchez, if we could play Exhibit 26. And we'll start at the beginning and play the whole thing.
(Audio plays.)

BY MR. DICKENS:

**Q.** Once again, what is Mr. Jensen encouraging you to do with Hugo and the Carlsbad yard?

**A.** Go to the Carlsbad yard and see the tickets, see the unloading, the loading, everything.

**Q.** And meet with people there?

**A.** Yes.

**Q.** Previously, he had mentioned, obviously, meeting with, potentially, his homeboy Tom and Chris. In this one, he mentions a Carlos, a source of oil; is that right?

**A.** Correct.

**Q.** Is that the first time that you had heard the name "Carlos," that you remember?

**A.** Yes.

MR. DICKENS: Let's go ahead now, Ms. Sanchez, and play Exhibit 28. We're going to start at 4:56 and go to 6:11.

(Audio plays.)

BY MR. DICKENS:

**Q.** Mr. Dollar, in this particular recording, there's a statement there where Mr. Jensen says, quote, I mean, we've probably only need two or three. I mean, we don't make money storing it. Once they put a couple loads in there, we want to get if picked up.

What is he telling you there?

**A.** As soon as they get a few loads in those tanks, they want to hurry up and sell it.
**Q.** Is there any processing that's being done on these loads?
**A.** No.
**Q.** Any need to wait and separate the oil from any contaminants?
**A.** No.
**Q.** It was very quick, but did you hear a second voice on there, not just Mr. Jensen, but another voice in the background?
**A.** I did not.
**Q.** Not the screaming child?
**A.** No.
MR. DICKENS: Okay. It was very quick. Thank you. I'll just pass along on that one.
Let's go now to Exhibit 29, Ms. Sanchez. And we're going to play, I think, from the beginning, to a minute -- I'm sorry, to second 51.
(Audio plays.)
MR. DICKENS: Ms. Sanchez, let's go now to minute 4:26, and play to 6:09.
(Audio plays.)
BY MR. DICKENS:
**Q.** Okay. Mr. Dollar, in that one, did you hear a second voice on the call?

**A.** Yes.

**Q.** Okay. In this one, they talk about, obviously, Tom traveling down to Carlsbad to meet with Hugo, correct?

**A.** Correct.

**Q.** And then they talk about Tom not looking like something. What are they talking about there?

**A.** That he does not look like a fed.

**Q.** And why would it be important for Hugo to not meet somebody that looked like a fed?

**A.** Because he was supposed to be bringing stolen oil.

MR. DICKENS: Let's go ahead, Ms. Sanchez, and play Exhibit 30. We're going to start at minute 4:00, all the way to the end.

(Audio plays.)

MR. DICKENS: Stop the recording. Thank you.

BY MR. DICKENS:

**Q.** Okay. Mr. Dollar, again, lots to unpack here. There was a quote, sort of at the beginning, where Mr. Jensen said, "Like 20 questions with Chris about the other thing that you have in Carlsbad."

What was Mr. Jensen encouraging you to do with Mr. -- with Chris on that issue?

**A.** I don't recall.

**Q.** Okay. Was Mr. Jensen still under the belief that there might be a deal with the Bandido member?

**A.** No. I told him that deal was probably going to fall through, because I didn't know if he was credible or not.
**Q.** Okay. Did Mr. Jensen tell you how much money passed through Tom Rees's business in cash when they first started it up?
**A.** Yes.
**Q.** And that was about half a million dollars; is that correct?
**A.** Correct.
**Q.** There's discussion in there about, after you get your business running with a good source of oil, such as Hugo, that you could then hire somebody; is that right?
**A.** Correct.
**Q.** What was Mr. Jensen encouraging you to hire? What type of person?
**A.** The person that would come in and do the same thing that I was supposed to be doing.
**Q.** Which is?
**A.** Selling oil.
**Q.** So someone to actually work the yard while you were off living the high life?
**A.** Yes.
**Q.** You talked about saving text messages and photographs that were exchanged between you and Mr. Jensen, right?
**A.** Yes.

**Q.** In fact, we already saw one of those, being the sliding scale that was sent to you by Mr. Jensen; is that right?
**A.** That's correct.
**Q.** In preparation for today, did you see numerous other text messages or screenshots of text messages that were contained in the Government's Exhibit 33?
**A.** In Exhibit 33.
MR. DICKENS: Let's go ahead and bring up, since we've already admitted, Ms. Sanchez, Government's Exhibit No. 33, first page.
THE WITNESS: Yes, I sent that.
MR. DICKENS: Okay.
Let's go ahead and go to page 4, Ms. Sanchez.
THE WITNESS: Yes.
MR. DICKENS: Let's see it over here.
BY MR. DICKENS:
**Q.** What is the conversation between you and Mr. Jensen in this text exchange?
**A.** This would -- this was for getting oil over to Carlsbad.
**Q.** Okay. And is there any mention of frac tanks in this?
**A.** I don't see any.
**Q.** Well, looking at the bottom, does it say page "73"?
**A.** Yes. So we were going to move the frac tanks to Carlsbad.
**Q.** Okay. So who was it that asked you to move frac tanks to

Carlsbad?

**A.** Max.

**Q.** And do you remember how many frac tanks you were going to move to Carlsbad?

**A.** Two.

**Q.** Do you remember, just off the top of your head, what colors they were?

**A.** Blue.

MR. DICKENS: Let's go ahead, then, and go to page 5, Ms. Sanchez.

BY MR. DICKENS:

**Q.** Once again, is there conversation here about your source of oil?

**A.** Yes.

**Q.** And, again, just so it's clear, the source of oil was supposed to work for what company?

**A.** Diamondback.

**Q.** And then, again, is there conversation about moving the frac tanks on this?

**A.** Yes.

**Q.** And the frac tanks, it looks like that conversation was dated on June 18th; is that right?

**A.** That's correct.

**Q.** And is that about the time when the frac tanks were moved?

**A.** Yes.

MR. DICKENS: Let's go ahead and go to page 6, Ms. Sanchez.

BY MR. DICKENS:

**Q.** What are we looking at on page 6, sir?

**A.** Page 6 is the location of the Carlsbad yard.

**Q.** And who sent the -- is that like a Google Maps link?

**A.** Yes.

**Q.** And who sent that map to whom?

**A.** Max sent that to me.

**Q.** And, also, there is information there about a contact. Whose contact is that?

**A.** That would be Thomas.

**Q.** And how is Tom described in that interaction?

**A.** He's over the yard out there.

MR. DICKENS: Ms. Sanchez, let's go to page 10.

BY MR. DICKENS:

**Q.** In this exchange, is there, once again, discussion about finding sources of oil? Or is that about frac tanks? I forget.

**A.** Yes, that was about oil.

**Q.** Okay. On that particular page, at the top, does it list the phone number that you used most often for Mr. Jensen?

**A.** I can't recall.

**Q.** Okay. But is that a number that you used to contact

Mr. Jensen?
**A.** Yes.
**Q.** And just for the record, can you read that number for us?
**A.** (575) 665-2716.
MR. DICKENS: Ms. Sanchez, can you go to page 19 now.
BY MR. DICKENS:
**Q.** In the text portion of this screenshot, what are you and Mr. Jensen discussing?
**A.** He wanted me to get fill dirt so that way I could have it sent out there to Carlsbad to make berms for the tanks that were coming in.
**Q.** And why do you need dirt berms around oil tanks?
**A.** To keep the oil in, in case it was to leak on the ground.
**Q.** And again, he's asking you to do work on the yard there at Seven Rivers.
**A.** No, he's not asking me to do work there, just get materials send there.
**Q.** Just get materials sent there.
But, I guess, do work for that yard?
**A.** Correct.
**Q.** Okay. So let's talk again about Hugo and this deal that you had on the -- to meet up with Tom and Chris.
We've listened to the recordings. Who was it that told you to have Hugo go to that location?

**A.** It was Max.
**Q.** And what location were you going to meet everybody at?
**A.** At the Carlsbad location.
**Q.** And was this -- was this something that you shared with the law enforcement that was working you as a confidential source?
**A.** Yes.
**Q.** Did they agree to have you meet with the people there?
**A.** Yes.
**Q.** And what, if anything, were you provided in order to record this interaction?
**A.** They provided me a phone that was capable of recording and GPS.
**Q.** And where was this location that you were going to meet them at?
**A.** Seven Rivers.
**Q.** The same address that we just saw previously that was sent to you by Max Jensen?
**A.** That's correct.
**Q.** So as you traveled to that location, did you expect anybody to be with you? In other words, you talked about Hugo accompanying you; is that right?
**A.** Yes. He was supposed to be driving in later.
**Q.** Okay. So nobody was supposed to be with you at that time?

**A.** Correct.
**Q.** Was there any plan to have a person show up in an oil truck, pretending to be Hugo?
**A.** Yes.
**Q.** Let me try to back that up.
Did law enforcement plan on sending somebody in an oil truck?
**A.** No.
**Q.** So that was, again, just part of your cover story?
**A.** Correct.
**Q.** And why were you going out to that location?
**A.** To meet with Thomas and Chris.
**Q.** When you arrived there, who did you meet with?
**A.** I met with Thomas first and then Chris.
**Q.** And was anybody else at the yard when you went there?
**A.** Yes. Mr. Ortega's wife.
**Q.** Was she somebody you actually met?
**A.** No. No interaction.
**Q.** Okay. Where was she?
**A.** She was in the truck.
**Q.** Did she ever get close enough to overhear any of the interaction that you had with Tom or Chris?
**A.** No.
**Q.** Had you ever been to the yard before?
**A.** I'm sorry?

**Q.** Had you ever been to that yard before?
**A.** No.
**Q.** When you arrived there, did you see any of the frac tanks that you had moved from the Toro yard?
**A.** Yes.
**Q.** And again, that was two tanks; is that right?
**A.** Correct.
MR. DICKENS: If we could bring up Exhibit 52.
BY MR. DICKENS:
**Q.** Again, we're looking at 52 here. In that photograph -- do you recognize that photograph?
**A.** Yes.
**Q.** How is it that you recognize that photograph?
**A.** I took that photograph.
**Q.** Where were you sitting when you took that photograph?
**A.** I was in my Jeep, at the Odessa yard, when the trailers were getting moved.
**Q.** Okay. And you sent that to whom?
**A.** I sent that to Max.
**Q.** Why did you send that to Max?
**A.** So that way he could see that the trailers were loaded and about to be on the way to Carlsbad.
**Q.** Okay. When you met them with Thomas Rees and Christopher Ortega, do you remember Carlos being there or the white vacuum truck?

**A.** Yes. Carlos pulled up shortly after the meeting started.
**Q.** Did you have any interaction with him?
**A.** No, I did not.
**Q.** With this device, the cell phone that law enforcement provided you, were you aware that it was recording?
**A.** Yes.
**Q.** And have you listened to that recording?
**A.** Yes.

MR. DICKENS: Okay. Ms. Sanchez, let's go ahead and play Exhibit 34.

And again, Your Honor, there is a transcript of 34A.

And Ms. Sanchez, let's go ahead and play minute 6:45 to minute 10:08.

(Audio plays.)

MR. DICKENS: Stop it there.

BY MR. DICKENS:
**Q.** That very first statement there, "Not much of a yard," is that you speaking?
**A.** Yes.
**Q.** And why did you say that?
**A.** Because I was expecting tanks all over the place.
**Q.** And what did you see when you arrived at the yard?
**A.** Dirt pad, small berms, and two tanks, two frac tanks.

MR. DICKENS: Go ahead, Ms. Sanchez.

(Audio plays.)

BY MR. DICKENS:

**Q.** Okay. Mr. Dollar, in this particular interaction, the very first thing that we get from Mr. Ortega is, "He's right. You don't look like a hippy," some laughing, "that's what Max said."

Again, what's that conversation with Ortega as soon as you get out of the vehicle?

**A.** No, I'm the one that said that you don't look like a hippy -- or you do look like a hippy to Tom.

MR. DICKENS: Let's go ahead and listen to minute 7:40 again.

(Audio plays.)

BY MR. DICKENS:

**Q.** That is you, isn't it, Mr. Dollar?

**A.** Yes, sir.

MR. DICKENS: We'll need to make a change to that transcript, then. Thank you for bringing that to our attention.

BY MR. DICKENS:

**Q.** So what is that conversation that you're saying somebody looks like a hippy?

**A.** I'm saying that Tom looked like a hippy, because that's what Max told me.

**Q.** And then you talk about a "Javier Rodriguez." Who are

you talking to when and mentioning the name Javier Rodriguez?

**A.** I am talking to Chris.

**Q.** And why are you mentioning the name Javier Rodriguez?

**A.** That was supposed to be my guy that was a Bandido, a supposable Bandido out there.

**Q.** Okay. And next you talk about Hugo, and Mr. Ortega asks you if that's the source or asks you about the source of the oil, this Hugo that's coming. How do you describe Hugo or his source of oil?

**A.** I described him as an asshole.

**Q.** Well, what I meant was how do you describe his employment?

**A.** Oh. He was a friend of a guy that worked at Diamondback, and they would move oil together.

**Q.** So again, would a large company like Diamondback, in your knowledge, even as limited as it is, would they be able to sell off 180 barrels of oil?

**A.** No.

MR. DICKENS: Okay. Ms. Sanchez, let's go ahead now and play for a minute 10:08 to 12:08.

(Audio plays.)

BY MR. DICKENS:

**Q.** Okay. Mr. Dollar, in this particular portion of the recording, you talk about the Odessa yard and how your source of oil, Hugo, did not want to deliver to the Odessa yard.

And it's Mr. Ortega that talks about -- how does Mr. Ortega describe the yard or the reputation of the yard?
**A.** Terrible.
**Q.** Does he describe it as "fucking heat" on it?
**A.** Yes.
**Q.** What -- what was your understanding of what this fucking heat on it meant?
**A.** It means that it's being watched.
**Q.** Does Mr. Ortega talk, also, about Jensen and his knowledge of Jensen's legal problems?
**A.** Yes.
**Q.** What does he say about them?
**A.** He says he made way too much money, way too quickly and that's going to get people to catch on real quick.
**Q.** How does Mr. Ortega describe the Seven Rivers yard and any sort of law enforcement looking at it or investigating it?
**A.** He doesn't. He says it's real quiet out there.
MR. DICKENS: Ms. Sanchez, can you please play now from minute 12:08 to 17:05.
(Audio plays.)
BY MR. DICKENS:
**Q.** Okay, Mr. Dollar. In this conversation, does it appear that Mr. Ortega is familiar with oil prices, the going rate of oil prices?

**A.** Yes.
**Q.** Even talks about oil companies and how they can have contracts that will ride the going rate of oil?
**A.** Yes.
**Q.** And does he talk about how much the yard could get in a day or a week for -- of oil coming in?
**A.** Yes.
**Q.** He talked about thousands of barrels?
**A.** Yes.
**Q.** You talk about Max scaring you. Why did you bring up Max scaring you with Mr. Ortega and Mr. Rees?
**A.** So that way they can give me a little bit more information on how I could potentially get away with doing what we were going to be doing.
**Q.** And Mr. Ortega's response is what?
**A.** Marketing.
**Q.** Marketing to who?
**A.** Marketing to Hispanics.
**Q.** And so his advice was not: Always verify the source of your oil?
**A.** Correct.
**Q.** His advice wasn't to always verify the legitimacy of the oil?
**A.** Correct.
**Q.** His advice was to go to independents?

**A.** Go to independents.
**Q.** And that they would instantly know what deal you were talking about?
**A.** Correct.
MR. DICKENS: Okay. Ms. Sanchez, if we could play minute 17:05 to 18:47.
(Audio plays.)
BY MR. DICKENS:
**Q.** Mr. Dollar, that's a conversation -- is it clear that Mr. Ortega knows that Mr. Jensen is out on conditions of release for a felony offense?
**A.** Yes.
**Q.** Is it also clear that he knows that it was a serious one, since the bail was hundreds of thousands of dollars?
**A.** Yes.
MR. DICKENS: Ms. Sanchez, if we could play the same clip, but from minute 18:47 to minute 27:36.
(Audio plays.)
THE COURT: Mr. Dickens, would you pause it for a second?
MR. DICKENS: Pause.
THE COURT: I have a noon judges' meeting.
MR. DICKENS: Okay.
THE COURT: So we want to start again at 1:15?
MR. DICKENS: Yes, Your Honor.

THE COURT: Okay. See you all at 1:15.

(Court in recess at 12:00 p.m. and reconvened at 1:22 p.m.)

THE COURT: Do we have our witness?

MR. DICKENS: Yes, Your Honor.

THE COURT: All right.

All right, sir. You're still under oath from this morning.

Go ahead, Mr. Dickens.

MR. DICKENS: Your Honor, just to make a record, I believe we cut off the recording at 26:06, and we're going to go ahead and actually stop there.

BY MR. DICKENS:

**Q.** Mr. Dollar, this individual who you knew as Chris, that you met with on August 21, 2025, do you see that person in the courtroom?

**A.** Yes, I do.

**Q.** Can you tell the Court where he's sitting, point him out and tell us what he's wearing?

**A.** Yes. He's sitting over there, wearing a blue shirt.

MR. DICKENS: And may the record reflect that he has identified the defendant, Your Honor?

THE COURT: Yes.

MR. DICKENS: With that, Your Honor, the government has no further questions.

THE COURT: Cross-exam?

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:

**Q.** Mr. Dollar, Max contacted you from an Indeed posting that you made?

**A.** No, not that I made; that he made.

**Q.** Okay. You contacted him?

**A.** No. I sent him my resume, and then he e-mailed -- or called me.

**Q.** How long into the process did he tell you about his legal trouble?

**A.** I would -- well, during the first interview, he said that he had legal troubles, and he needed to sell stuff. And that's what I would be out there doing, selling stuff.

**Q.** He had legal problems?

**A.** Yes.

**Q.** All right. On your resume, did you have your criminal record listed?

**A.** No.

**Q.** Is your criminal record available to the public?

**A.** Yes.

**Q.** What felonies show on your criminal record?

**A.** Two counts aggravated assault with a deadly weapon.

**Q.** And did you get the feeling that Max was trying to use your past against you?

**A.** I've never had that problem in the past.
**Q.** He opened up to you about his legal troubles. Did you talk to him about your legal troubles?
**A.** Not until later.
**Q.** What did you tell him later?
**A.** Later -- this would have been a couple of weeks later, that I told him that I had felonies and not to worry.
**Q.** In these videos that we've listened to, somewhere in the process Max is talking about Chris, and he says, "Maybe we should be cutting him in."
**A.** Yes.
**Q.** Do you remember him saying that?
**A.** Yes.
**Q.** How far along in the process was it before Max said that?
**A.** I do not recall a date, but I'm going to estimate about three to five weeks or three to four weeks.
**Q.** So if he's talking about cutting him in and throwing him a few bucks, would you think that he was not in at that time?
**A.** Not for the Odessa location.
**Q.** Or any part of the criminal enterprise?
**A.** I cannot comment on that.
**Q.** All right. And what did Tom tell you was Chris's position with the company, Hound Dog Energy?
**A.** I don't recall.
**Q.** Did he say he was an employee?

**A.** Employee, yes.

MR. OTTAWAY: Okay. I'll pass the witness.

THE COURT: Redirect?

**REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** It went very fast there; perhaps I missed it.

When defense counsel was talking to you about a question about, "We should cut him in," meaning cut Chris in, I didn't catch your answer. What was that answer to what that conversation was about?

**A.** To the Odessa location.

**Q.** Okay. So he was talking specifically about the Hugo deal or something of that nature, right?

**A.** That's -- well, no, that would have been to the fake, made-up Bandidos that I knew in Carlsbad.

**Q.** So the Bandido deal -- right. Because you had the Hugo deal and the Bandido deal.

**A.** Yes.

**Q.** And Mr. Jensen was talking about cutting Chris in on the Bandido deal, correct?

**A.** Correct.

**Q.** Mr. Jensen wasn't talking at all about what Chris's connection to the Carlsbad yard or any deals he had for the Carlsbad yard?

MR. OTTAWAY: Let me object to that question. It

calls for this witness to speculate on Max's thought processes.

THE COURT: It's a leading question. Why don't you ask it a little more open-ended, so we don't get speculation, and I can follow.

MR. DICKENS: Certainly.

BY MR. DICKENS:

**Q.** In that whole conversation about cutting him in, what was the only deal that you and Mr. Jensen were discussing at that time?

**A.** At that time, we were discussing the Hugo deal, and we were also discussing the potential for the Bandido guys that I made up in Carlsbad.

**Q.** So at any part of that discussion, were you discussing any deals with -- that Chris may already have with the Hound Dog Energy?

**A.** No.

MR. DICKENS: Thank you.

No further questions, Your Honor.

THE COURT: Thank you for your testimony, sir. You're excused.

MR. DICKENS: Your Honor, may he be permanently excused?

THE COURT: Yes --

Any objection from the defense?

MR. OTTAWAY: (Shakes head.)

THE COURT: He's permanently excused. No objection from defense.

The government can call its next witness.

MR. DICKENS: Thank you, Your Honor. The State will call Agent Trent Boone.

THE COURT: You work for the government now.

MR. DICKENS: The United States will call Agent Boone.

Thank you, Your Honor.

(The witness was duly sworn.)

**TRENT BOONE**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Sir, will you please introduce yourself to the Court by telling the Court your full name, and spell your last name, please.

**A.** Yes. My name is Trent Boone, B-o-o-n-e.

**Q.** And, sir, how are you employed at this time?

**A.** I'm employed as a special agent with the Bureau of Land Management.

**Q.** And what does a special agent with the Bureau of Land Management do?

**A.** We investigate crimes on federal land.

**Q.** How long have you been a special agent?
**A.** Approximately two years.
**Q.** And what sort of positions did you hold with the Bureau of Land Management before that?
**A.** I was a uniformed officer.
**Q.** So how many years total do you have with the Bureau of Land Management?
**A.** Approximately 11 years.
**Q.** And have you worked for any other law enforcement agencies?
**A.** No, I have not.
**Q.** As your time as a Bureau of Land Management officer, have you been involved in investigations in the oil field?
**A.** I have.
**Q.** And, in fact, have you received any sort of specialized training in these investigations?
**A.** Yes. When I took the job with the BLM, we had to spend time with what we call "petroleum engineer technicians" with the Bureau of Land Management, and their job is to go out and inspect oil and gas locations on federal land. So I shadowed them for a few days.
**Q.** And through that, did you learn some basics about the oil and gas industry so that you can better perform your job as an investigator?
**A.** Yes, I did.

**Q.** Have you actually received any sort of awards for your investigations into the oil and gas business?
**A.** Yes. I got agent of the year last year for it.
**Q.** How did you start your investigation involving -- that ultimately involved Christopher Ortega?
**A.** On June 18 of 2025, I received a phone call from Special Agent Nathan Jeronimus, from the Midland FBI office. And he informed me that a source had walked in and explained to him that Maxwell Jensen had a -- or possibly had an oil theft scheme north of Carlsbad, 4154 Seven Rivers Highway.
**Q.** Okay. And based on the information that you received from the FBI, what did you do next?
**A.** I started doing periodic surveillance, shortly after the phone call, for approximately a month.
**Q.** Let me stop you there.
And we'll bring up what's already been admitted as Government's Exhibit 7.
Looking at Government's Exhibit 7, do you recognize that?
**A.** Yes, I do.
**Q.** And what is that?
**A.** That is the yard at 4154 Seven Rivers Highway.
**Q.** And can you tell us what county that is in?
**A.** That is in Eddy County, New Mexico.
**Q.** And is there anything else to this yard, besides fencing,

any other buildings, structures, equipment on this yard, than what we see in Government's Exhibit 7?
**A.** No, sir, there's not.
**Q.** Is it unusual for an oil yard to have only three frac tanks in it? If you feel comfortable saying, sir.
**A.** Most oil yards have more than just three frac tanks in them.
**Q.** Through your investigation, did you determine what person or business was operating that yard?
**A.** I did. Hound Dog Energy.
**Q.** And did you go through that and figure out who was the operator of Hound Dog Energy?
**A.** Yes, I did.
**Q.** And who was that?
**A.** That's Thomas Rees.
**Q.** When you were doing your periodic, personal observations of this sight, was there any sort of vehicles that were commonly at this site?
**A.** Yes, there was several vehicles common, one vacuum truck and then multiple other vehicles.
**Q.** Let's talk about the vacuum truck. Did it appear to be the same vacuum truck, or was it different vacuum trucks?
**A.** It appeared to be the same one.
**Q.** And what made you believe it was the same vacuum truck?
**A.** It was white tractor, white trailer, had the markings in

red on both sides of the truck, "MIS, LLC."
**Q.** And was it -- was the vacuum truck there only when it was disgorging oil, or was it routinely at this site?
**A.** It was routinely there, as if it was parked. When it wasn't moving around, it was usually parked there overnight.
**Q.** Now, just because we're looking at Government's Exhibit 7, we're talking about a vacuum truck, is that the vacuum truck that you're describing?
**A.** No, that's not.
**Q.** Okay. Did you ever personally watch that vacuum truck leave that facility?
**A.** I did. On July 22, 2025, I followed that vacuum truck out into the oil field.
**Q.** Is there difficulty in that particular area, the greater Carlsbad area, when you follow a vehicle that you don't want them to know they're being followed?
**A.** Specifically the area that he went was very wide open, not a lot of traffic, so it was not difficult.
**Q.** Okay. Where did you follow it to?
**A.** I followed it to Plains All American location, northeast of Carlsbad.
**Q.** And did you watch what it did there?
**A.** I did.
**Q.** And what did it do there?
**A.** It appeared to back up to pipeline risers, also known as

pigging stations, and hook up hose to it.
**Q.** Now, we've previously watched a video, but I'm going to show you a still, which has been marked as Government's Exhibit 4. This, obviously, wasn't the day that you were watching; is that correct, agent?
**A.** That's correct.
**Q.** But is this basically the same behavior or actions that you witnessed of the vacuum truck pulling up to a pigging station?
**A.** The only difference the day I observed, I didn't notice -- on the first time I was watching, I didn't notice another white truck there at that point.
**Q.** Let's talk about your location. Could you see both sides of the semitruck or vacuum truck?
**A.** I could not. I could only see what would be the driver's side of it.
**Q.** Okay. So if that Plains All American truck or that white truck would've been on the other side, you might not have been able to observe it that day?
**A.** Correct.
**Q.** Again, with your experience, should vacuum trucks be hooking up directly to the pipeline like that?
**A.** No, they should not.
**Q.** Again, are you taught about the enforcement of the codes for oil truck, oil haulers, and vacuum trucks?

**A.** Yes, we are.

**Q.** Should a vacuum truck be hauling pure crude oil?

**A.** No, sir.

**Q.** Why is that?

**A.** It's not, according to US DOT regulations, authorized to haul flammable crude oil.

**Q.** And crude oil -- pure crude oil would be very flammable?

**A.** Yes, sir.

**Q.** What did you see the truck do after disconnecting from that pipeline? Or did you stay around long enough to see it disconnect? Let's start with that.

**A.** I watched it start moving forward, and I left -- left the area.

**Q.** And why would you leave at that point?

**A.** The truck that I was in didn't blend in well in the oil field, and I just wanted to get away at that point and then planned to go back later.

**Q.** What was your fear that you didn't want to be observed?

**A.** Just get burned. They see an unusual truck watching them and --

**Q.** Okay. At that point, were you -- did you have any idea where that vacuum truck went to after you left the area?

**A.** I -- not initially. I did not follow it out. I left and went back, got into a white truck, and then went -- was planning to go back and photograph the area; drove past the

Seven Rivers yard, and the vacuum truck was at the Seven Rivers yard.
**Q.** So let's just make sure that we get the timeline right. When you initially followed out there, you're driving a nonwhite truck we'll just say?
**A.** Correct.
**Q.** You watch it hookup to the pipeline. It starts to leave, but you leave the area first, correct?
**A.** Correct.
**Q.** You switched to a white truck. Is that a because white trucks are more common in the area?
**A.** They're very common in the oil field.
**Q.** Okay. And then you go back towards that area. But as you're going back there, what do you observe?
**A.** I observe the vacuum truck at the -- near the frac tanks at the Seven Rivers yard.
**Q.** So, again, this would be July 22, 2025, you see the vehicle leave the Seven Rivers facility, go out into the fields, and then come back to the Seven Rivers facility?
**A.** Correct.
**Q.** Where did you go after observing the vacuum truck there at the Seven Rivers?
**A.** I went to the theft location, where I observed the theft occurring, and I photographed the area.
**Q.** I'm going to go ahead and show you Government's

Exhibit 38.

Sir, what are we looking at in Government's Exhibit 38?

**A.** That is the gates where the white vacuum truck backed up to the pipeline risers.

**Q.** Okay. Let's go ahead now and turn to 39. What are we looking at in Government's Exhibit 39?

**A.** It's going to be the same -- same view, just closer to the gates.

**Q.** As you got up to the gate, did you realize whether the gate was or was not locked?

**A.** It was locked.

**Q.** Did that raise any concerns or cause you to think what was going on in the situation?

**A.** Yes, I did.

**Q.** What was that?

**A.** That, potentially, there was a Plains All American employee complicit.

**Q.** And that's because the lock is still there and broken?

**A.** Correct.

**Q.** Let's go ahead and go to Exhibit 40. What are we looking at in 40, sir?

**A.** That's a different angle. That is the location of the pipeline riser where they hooked on their hose to.

**Q.** And what is that white container at the bottom of the

pipeline?
**A.** That's a catch tub, used to -- when they're doing their pigging operations, used to catch the excess oil that comes out with that PIG.
**Q.** So a very small amount of oil would be lost in that process, correct?
**A.** Yes, sir.
**Q.** After making those photographs that we just saw, what did you do next?
**A.** I left the area, drove back north route out of that area. While driving out, that road parallels that same pipeline. I got approximately a mile and a half up the road and noticed the vacuum truck had returned to another riser feeding station and was in the process of hooking up to it.
**Q.** And again, would this be the same vacuum truck that we've discussed previously?
**A.** It did.
**Q.** Okay. Let's talk about July 25th. What, if anything, did you do in your investigation on July 25th?
**A.** That day, I observed two oil hauling trucks parked at the Seven Rivers yard in front of the frac tanks. One of them appeared to be hooked up to the frac tanks. After that, I planned to follow them, and I called some agents from Pecos Valley group task force to help me follow these guys.
**Q.** And why would you want multiple vehicles to follow the

oil haulers?
**A.** Just assistance in following and not being seen, you know, being able to tradeoff with other agents so they don't notice us.
**Q.** Was there concern that the oil haulers would be part of some sort of knowledge or conspiracy regarding the oil thefts?
**A.** There was.
**Q.** Where did these two oil haulers go after leaving the Seven Rivers facility?
**A.** They drove south, down Highway 285, all the way down just north of Pecos, Texas. And then we turned east on small Texas county roads to a LACT station.
**Q.** Did these oil haulers appear to be traveling in tandem?
**A.** They did.
**Q.** Why is that? What makes you believe that?
**A.** They were both from the same company. I believe they --
**Q.** Did they leave the facility at the same time?
**A.** They did. They left together, traveled together all the way to the LACT.
**Q.** Do you remember what company they were with?
**A.** They were with 9G.
**Q.** Let's go back to Government's Exhibit 7. Again, this would have been from a drone on a different date, but is this basically the same setup that you saw on the 25th of July,

2025?
**A.** Yeah, the trailer is very similar. The actual tractors, the truck portion was different than that, but it was definitely oil haulers for both of them.
**Q.** Are oil haulers permitted to carry pure crude oil on the highways?
**A.** Yes, sir, they are.
**Q.** Do you have any idea what the going rates for oil was around that time?
**A.** I believe in July, it was close to $90 per barrel.
**Q.** And do you have any idea how much an oil hauler can carry?
**A.** Approximately -- the max capacity is 200 barrels, however, due to weight concerns, they usually haul approximately 180 barrels.
**Q.** So if both of those were full, would that exceed -- well exceed $5,000 going across state lines into Texas?
**A.** Did you say if they were full, sir?
**Q.** Yes.
**A.** Yes, absolutely.
**Q.** Are there LACT stations closer to the Seven Rivers facility than going all the way to just outside Pecos?
**A.** There's multiple closer.
**Q.** Did it strike you as strange that, if they're looking just to sell the oil, that they transport the oil so far away

from where they purchased it?
**A.** Yes, they would.
**Q.** Does transporting oil cost significant amounts?
**A.** I don't know what the cost is.
**Q.** That's fine.
Let's talk now about June 30th of 2025. What, if anything, did you do in your investigation on June 30th?
**A.** Are we talking July 30th, sir?
**Q.** I apologize, July 30th.
**A.** July 30th, we did a multiagency operation. I had observed this vacuum truck coming and going from the yard several times, so I called some agencies with drones to come over and we set up an operation to watch a theft in progress.
**Q.** Were you able to watch what the drones were able to see in realtime?
**A.** We were.
**Q.** Where were you stationed? We understand that there was two drones, one operating towards the pipelines, and one operating towards Seven Rivers. At which location were you?
**A.** I was roving and assisting other agents in keeping an eye on the truck when the drones weren't watching it.
**Q.** Have you been able to watch those videos even as they were played in court yesterday?
**A.** Yes, sir.
**Q.** Were you able to identify any of the people there that

were filmed at the Seven Rivers facility?
**A.** Yes, we were able to identify one.
**Q.** Let's talk about the gentleman that was wearing the blue t-shirt that was standing next to the vacuum truck. Who was that?
**A.** I believe that to be Carlos Contreras.
**Q.** And the gentleman that gauged one of the tanks that was wearing the black T-shirt, who was that?
**A.** He was later identified as Chris Ortega.
**Q.** Do you see Christopher Ortega here in the courtroom today?
**A.** Yes, I do.
**Q.** Can you point him out, and tell us what he's wearing?
**A.** He's right there with his attorney, wearing a blue shirt.
MR. DICKENS: Your Honor, may the record reflect that he has identified the defendant?
THE COURT: Yes.
BY MR. DICKENS:
**Q.** So after these drones, were there any other methods used by law enforcement to track the vacuum truck?
**A.** Yes. I had applied for a tacker warrant and placed two separate trackers on the truck.
**Q.** Would that have been around the same time as the drones or a different time?
**A.** Yes, sir. We -- I was -- the tracker warrant was signed

July 29th. The 30th, after we did the drone operation, myself and some agents from Pecos Valley group task force went into the Seven Rivers yard and placed the first tracker.
**Q.** Did the tracker provide realtime data on where that tracker device went?
**A.** Yes, it did.
**Q.** And again, just so I'm clear, what vehicle did you place it on?
**A.** The trailer portion of the white MIS vacuum truck.
**Q.** And what sort of information did you -- did you receive from this tracker device?
**A.** Realtime information on where it traveled to, when it stopped, how long it stopped for.
**Q.** And looking at that data from that first device, what pattern did you observe?
**A.** I observed that it traveled out to approximately five different Plains All American Pipeline riser locations. It would stop for approximately 30 minutes at each -- each time it went out to those risers, and then would return straight back to the Seven Rivers yard.
**Q.** When it would stay still for long periods of time, where would it be parked?
**A.** It would be parked at Seven Rivers yard.
**Q.** At some point, did that tracking device stop transmitting data?

**A.** It did.
**Q.** Can you tell the Court about that?
**A.** I don't recall the date, but I think it was August 13th, I noticed it had just stopped working or stopped moving. I assumed it had fallen off. Myself and some other agents went out there, attempted to find it, and we never found it.
**Q.** With that first device now becoming detached, inoperable, whatever happened? Did you place any other devices?
**A.** We did. I got another tracker, and on August 14th, went back out with agents from Pecos Valley group task force, and placed that tracker on the truck.
**Q.** And, once again, were you able to receive live information from that tracker as to the location of that white vacuum truck?
**A.** Yes, we were.
**Q.** What sort of pattern did you observe with this device?
**A.** The same. Same patterns as before.
**Q.** Going out to Plains All American and returning to Seven Rivers?
**A.** Yes, sir.
**Q.** Is any idea, between these two devices, how many trips out to Plain sites and returning to Seven Rivers occurred?
**A.** Between the recorded trips with the trackers and the visually watching, a total of 23 trips observed.
**Q.** Did, eventually, this device also stop transmitting

information?
**A.** It did.
**Q.** Tell me about that.
**A.** On August 20th, I would periodically check what the tracker was doing, noticed that it was stopped at an intersection north of Carlsbad, on a county road. I checked it periodically through the day. Several hours later, I decided to go out and check it, assuming that it had just fallen off again. Drove out there to this county road, and it was placed nicely next to the white line of the county road.
**Q.** Did you retrieve the device?
**A.** I did.
**Q.** Did you notice anything about the device?
**A.** Yes, sir. Once I retrieved the device, I opened it up, and in the padding on the top of the tracker was etched "fuck you" in it.
**Q.** What would that indicate to you?
**A.** That they had found my tracker.
**Q.** What other method did you use to try and document trips of this white vacuum truck out into the oil field?
**A.** In between the first tracker falling off and the second one being placed, I was taking a game camera out to one of the locations that it appeared that the vacuum truck frequented the most for oil theft, and I planned to place

that camera. I -- while traveling out there, approximately a mile away, I saw that the vacuum truck and a Plains All American pickup truck were both present at that location already. I briefly looked at the map and could tell there was only one route out of that area, so I went ahead and placed the game camera next to the road.

**Q.** Just in case people aren't familiar with "game camera," what is a game camera?

**A.** A game camera is just a motion activated camera.

**Q.** I'm going to go ahead and show you what's been admitted as Government's Exhibit 35. Do you recognize Government's Exhibit 35?

**A.** Yes, sir, I do.

**Q.** And what is that?

**A.** That is going to be a game camera photo of what we later figured out is German Ortiz's Plains All American pickup.

**Q.** And the date and the time, is that accurate to your memory as to the actual date and time when that was taken?

**A.** Yes, sir, it is.

**Q.** Let's go ahead and look at 36. What are we looking at in Government's Exhibit 36?

**A.** That is the white, MIS vacuum truck leaving the location right behind the Plains All American pickup.

**Q.** And again, the date and the time on 35 was August 13th, at 4:50 p.m.

And on this one is what?
**A.** 4:54 p.m.
**Q.** So four minutes later?
**A.** Yes, sir.
**Q.** And again, the white, MIS, LLC, that's the same vacuum truck that you've been talking about this whole time?
**A.** Yes, sir, it is.
**Q.** If we can go to 37. What are we seeing in 37?
**A.** That's just going to be a second photo of the white vacuum truck.
**Q.** Let's talk now about August 21st of 2025. Did the investigative team make a determination to make arrests on that day?
**A.** Yes, sir, we did.
**Q.** And what exactly was supposed to happen that date, in order to make the arrests?
**A.** We coordinated with Midland FBI and Texas DPS to have the informant come and introduce himself to the guys working at the Seven Rivers yard.
**Q.** And during that communication, were you able to listen live to the interaction between the confidential informant and the people that were at that location?
**A.** Yes, sir, I was.
**Q.** And through that, did you learn who he was meeting with? Or do you recognize the names -- or the voices now?

**A.** Yes, sir.
**Q.** And who was it that the confidential informant met with?
**A.** He met with Christopher Ortega and Thomas Rees.
**Q.** After the confidential informant left the scene, what happened?
**A.** Agents and law enforcement moved in and arrested Rees and Ortega.
**Q.** Were you able to move in right away, or did it take some time in order to coordinate all of that?
**A.** It was right away.
**Q.** Prior to making the arrests, was that vacuum truck observed at the Seven Rivers facility?
**A.** Yes, it was.
**Q.** Was it there when the arrests were made?
**A.** It was.
**Q.** Let's talk about the items seized. Were you aware of whether or not any sort of electronic devices were seized from Christopher Ortega?
**A.** Yes, sir, his cell phone was seized.
**Q.** And were you able to look through that cell phone?
**A.** Yes. We, with consent from Chris Ortega, looked through that cell phone.
**Q.** And did you document some of the items that you found on that cell phone?
**A.** Yes, sir, we did.

**Q.** I'm going to go ahead and show you Government's Exhibit 45. What are we looking at in Government's Exhibit 45?
**A.** I believe that's a WhatsApp text stream, specifically photos of Hound Dog load tickets.
**Q.** And do you remember who's in that texting group, if you remember today? Don't worry about it, sir.
**A.** I do not recall.
**Q.** But, again, that's off of Christopher Ortega's phone call?
**A.** That's correct.
**Q.** Let's go ahead and look at page 3 of that. What are we looking at in page 3, sir?
**A.** Those are photos from -- of Hound Dog Energy load tickets.
**Q.** And then the very next page? What are we looking at there, sir?
**A.** Those are oil haul tickets. I can't see the name, but they resemble the 9G oil hauler tickets.
**Q.** So there's a difference between the Hound Dog Energy load tickets for incoming oil and the 9G tickets for outgoing oil?
**A.** That's correct, sir.
**Q.** Were you aware whether or not any physical load tickets were located at the Seven Rivers facility?
**A.** Yes. There was multiple load tickets recovered from

Ortega's truck.
**Q.** Let's go ahead and show you Government's Exhibit 49. What are we looking at in Government's Exhibit 49?
**A.** That's a Hound Dog Energy load ticket.
MR. DICKENS: Ms. Sanchez, if we could sort of focus in at the top of that document. Thank you very much.
BY MR. DICKENS:
**Q.** What sort of information is being documented here on this load ticket?
**A.** So the date -- the date and time; ticket number; the transport, MIS, LLC, which is the vacuum truck; the driver, Carlos. And I'm unsure on the signature on that one.
**Q.** Could be a signature for Carlos, but it's not the cleanest signature?
**A.** Correct.
**Q.** Is there any information on there about where the oil is ultimately coming from, the source oil?
**A.** No, sir.
MR. DICKENS: Ms. Sanchez, if we could go down to the lower section now.
BY MR. DICKENS:
**Q.** What are we looking at here for the lower part of that load ticket?
**A.** So these are going to be gauge levels; total number of barrels; and then operator, which appears to be Chris.

**Q.** Okay. So you do talk about gauging. What is gauging?
**A.** Gauging is the method used for oil companies to measure levels of oil in various different tanks.
**Q.** So in this particular load ticket, it's documenting that Carlos brought in 135 barrels; is that right?
**A.** That's right.
**Q.** At the bottom, that last row, what information is on that last row?
**A.** The only -- the operator's name, "Chris."
**Q.** Do you know what BS&W is?
**A.** I do.
**Q.** And what is BS&W?
**A.** It's basic sediments and waste.
**Q.** So BS&W of .1 would mean what?
**A.** Perfect oil.
**Q.** In the load tickets that were recovered from Christopher Ortega's vehicle, how many were attributed or signed by Chris, or Christopher Ortega, if you remember, sir?
**A.** I do not remember.
MR. DICKENS: Fair enough.
If we could bring up Exhibit 59.
BY MR. DICKENS:
**Q.** Sir, what are we looking at in Exhibit 50 now?
**A.** This will be a 9G oil hauling load ticket.
**Q.** And these were also recovered from the vehicle of

Christopher Ortega?
**A.** Yes, they were.
MR. DICKENS: Let's go once again, Ms. Sanchez, and focus at the top of this ticket.
BY MR. DICKENS:
**Q.** What sort of information do we have at the top of this ticket?
**A.** The top is going to be the date; the trucked by, which is 9G energy partners; ticket numbers.
**Q.** Okay. And according to this ticket, when was the oil accepted or picked up?
**A.** It appears to be 7/26/25.
**Q.** And where was it -- who's picking it up?
**A.** The pickup name or pickup account is -- I'm sorry, trucked by is 9G. The pickup account is Caribou Energy.
**Q.** Are you familiar with these two companies?
**A.** Yes, sir, I am.
**Q.** Are you familiar with whether they are operated or run, maybe not as the same company, but as related companies?
**A.** Yes. The owner names were the same on both companies, and also the addresses for both companies were the same.
**Q.** On this ticket, does it show who was providing the oil?
**A.** It does. It says "Hound Dog Energy" is the operator.
**Q.** Okay. Does it say -- give latitude and longitude for where it was picked up?

**A.** I believe it does for the -- I'm sorry, it does, on the bottom left.

MR. DICKENS: Okay. Ms. Sanchez, if we could go down below. So maybe that middle section.

BY MR. DICKENS:

**Q.** What are we looking at? What sort of information are we looking at in this one?

**A.** Gross barrels; net barrels; most importantly, BS&W is 0.1.

**Q.** So on this one, even though the amount these vehicles could carry was, you said, about 180, this one, they only got about 80 barrels; is that right?

**A.** That's right, sir.

MR. DICKENS: If we could go down to the lower section, Ms. Sanchez.

BY MR. DICKENS:

**Q.** What sort of information are we seeing here?

**A.** Sort of drop-off information. This just shows Andrews, Texas. I'm not sure if that's correct or not. Who picked it up, what the driver's name was of the oil truck.

**Q.** So again, according to this ticket, this oil is being directed towards Andrews, Texas; is that correct?

**A.** That's correct, sir.

**Q.** So that would be crossing the state line?

**A.** That would be.

**Q.** Are load tickets important to investigating oil theft crimes?
**A.** Yes, it is.
**Q.** Why is that?
**A.** We know who -- if it's filled out correctly, we'll know the location of where that came from, the trucking company name, the operator name, quantities of oil, and where it was going to be dropped off at.
**Q.** Is it, therefore, important that these load tickets are accurate?
**A.** It is.
**Q.** And, in fact, is that part of the regulation of operating the oil industry, that these load tickets are supposed to be accurate information?
**A.** That's correct, yes.
**Q.** I think the only last thing I have is, was there a time where the vacuum truck appeared to be inoperable during your investigation?
**A.** There was. After the first tracker was found or fell off, whatever happened to it, we made an attempt to go out a couple nights and place the second tracker. And there was some mechanics working on the truck late into the night.
**Q.** Okay. So even with the -- I'll leave it there.
MR. DICKENS: One second, please, Your Honor.
THE COURT: Uh-huh.

(Counsel confers.)

MR. DICKENS: No further questions, Your Honor. Thank you.

THE COURT: Cross-exam?

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:

**Q.** Investigator Boone, did you know Chris Ortega before this case?

**A.** Yes, sir, I did.

**Q.** How did you meet him before?

**A.** Just in a professional capacity. I was a uniformed law enforcement officer, and on several occasions, I had consensual contacts with Chris.

**Q.** Was he cooperative?

**A.** He sure was.

**Q.** Was he helpful?

**A.** He was.

**Q.** What did he help you with, years before?

**A.** Um --

**Q.** If you can talk about it.

**A.** There was an investigation involving a young girl. He knew the -- I don't know -- I don't know details. It was an investigation involving a young girl, who had been taken by her stepfather. Christopher Ortega knew this individual, and he offered to go out and try to talk him down for the safety

of the child.
**Q.** And that was helpful to law enforcement?
**A.** Yes, sir, it was.
**Q.** And so when you arrested him, did he voluntarily give a statement?
**A.** He did.
**Q.** And did he voluntarily give you the access to his telephone?
**A.** He did.
**Q.** And since this case has started, has he come in to be interviewed twice or once?
**A.** Yes, sir. I believe -- I believe twice.
**Q.** Were you present at both of those?
**A.** Yes, I was.
**Q.** Was his postarrest statement consistent with those two debriefings?
**A.** (No response.)
**Q.** Did his story change appreciably between the night he was arrested, the first debriefing, or the second debriefing?
**A.** I think they stayed pretty similar.
**Q.** Now, somebody drove him from the arrest scene to the closest jail, correct?
**A.** Correct.
**Q.** And whoever that officer was made a tape recording of the conversation as they went?

**A.** Yes. It's common to have our body cameras rolling.
**Q.** And have you listened to that?
**A.** I did, sir.
**Q.** And basically, he never stopped talking for two hours, right?
**A.** Correct.
**Q.** Was the statements in that period of time consistent with the other two?
MR. DICKENS: Your Honor, I'm going to object to hearsay and lack of knowledge, personal knowledge.
THE COURT: I mean, it's a jury trial -- I mean, it's not a jury trial. It's a bench trial. I'm going to let him answer. Overruled.
Go ahead, answer the question.
MR. OTTAWAY: I'll rephrase it.
BY MR. OTTAWAY:
**Q.** Was that statement about the same as the other three?
**A.** I don't recall everything that was said in there.
**Q.** Okay. Fair enough.
Did you ever see Chris Ortega at a pigging station?
**A.** No, sir, I did didn't.
**Q.** Did you ever see him driving a truck?
**A.** No, sir, I didn't.
**Q.** Did you only see him at the Seven Rivers fracking yard?
**A.** Yeah. Going to and from, but, yes, sir.

**Q.** Okay. And have you ever made the comment that he was just at the wrong place, at the wrong time? Chris Ortega.
**A.** I don't recall that.
MR. OTTAWAY: Okay. I'll pass the witness.
THE COURT: Redirect?
MR. OTTAWAY: Could I ask -- I'm sorry.
THE COURT: What do you want to ask?
BY MR. OTTAWAY:
**Q.** Did Mr. Ortega help you find some more load tickets?
THE COURT: Counsel, tell me what you want to ask.
MR. OTTAWAY: I'm sorry, what?
THE COURT: You wanted to come back and restart your cross. What's the question that you have?
MR. OTTAWAY: Did Chris Ortega help you find other load tickets.
THE COURT: All right. Go ahead and answer.
THE WITNESS: Okay. Chris did, in one of our meetings, explain why we could find more load tickets, yes.
MR. OTTAWAY: I'll pass the witness.
THE COURT: All right. Redirect.

**REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:
**Q.** Defense counsel asked if you knew Mr. Ortega prior to this investigation.
Did you know any organizations that he was part of?

**A.** Yes, sir, I did.
**Q.** What was that?
**A.** Known him to previously be part of Bandidos.
**Q.** And, in fact, did he hold any position in the Bandidos?
**A.** Sergeant-of-arms.
**Q.** And is the Bandidos an organization that is known for its lawful behavior?
**A.** No, sir, it's not.

MR. DICKENS: That's all the questions that I have. Thank you.

THE COURT: Okay. Thank you for your testimony, sir, you can step down.

THE WITNESS: Thank you.

THE COURT: You can call your next witness.

MR. DICKENS: Thank you. The United States calls Nathan Jeronimus.

(The witness was duly sworn.)

**NATHAN JERONIMUS**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:
**Q.** Sir, can you please introduce yourself to the Court by telling the Court your name and spelling your last name?
**A.** Yes, sir. My name is Nathan Jeronimus, J-e-r-o-n-i-m-u-s.

**Q.** And, sir, how are you employed?
**A.** I'm employed as a special agent with the Federal Bureau of Investigation.
**Q.** How long have you worked for the FBI?
**A.** I've worked for the FBI since April 2023.
**Q.** And before that, do you have any other law enforcement experience?
**A.** Yes, sir. I joined the marshal service in 2019 and transferred to State Department diplomatic security in 2022, and since 2023 have been with the FBI.
**Q.** So how long, total, have you worked for law enforcement?
**A.** Coming up on seven years, sir.
**Q.** How did you first get involved in the case that ultimately led to an investigation involving Mr. Christopher Ortega?
**A.** I initially became involved with the case when I received a call from our office in Midland, Texas, about a person who was -- who had responded to a hiring -- or who had been contacted by a person by the name of Jensen, who wanted him to do a job for him.
**Q.** And, in fact, did you meet with this individual?
**A.** I spoke over the phone that day with this individual.
**Q.** Okay. And who did that end up being?
**A.** That ended up being Stuart Dollar.
**Q.** In talking with Mr. Dollar, did it appear that he might

have information that would be useful to law enforcement?
**A.** Yes. Mr. Dollar said that he was being approached by Mr. Jensen to break a lock at a property and to basically help them remove equipment from that property.
**Q.** And based on that, did you or the FBI sign him up as a confidential informant at that time?
**A.** We did not sign him up just then as a confidential informant, no, sir.
**Q.** Did you continue to communicate with Mr. Dollar, or did you pass him off to any other agency?
**A.** At that moment, we had not passed him off yet. But we said, "If there's more concerning activity, then you can reach out to us."
**Q.** We're going to jump now all the way to -- actually, let me back up.
Did you have any communications with Mr. Dollar about what he might want for providing information?
**A.** Yes. Later on, Mr. Dollar had more information that was concerning and of interest to law enforcement. And he stated that he would either like to, one, have his criminal history expunged; to receive payment; or, three, just do the right thing.
**Q.** Okay. Is there -- was he -- did he have any of his criminal history expunged by you or any agency that you know of?

**A.** He has not.
**Q.** Knowing that he still couldn't get his criminal history expunged, did he continue to cooperate?
**A.** He did.
**Q.** You talk about the indication -- I'll pass that by.
Let's jump now all the way to August 21st of 2025. Were you part of the team that arrested individuals at the Seven Rivers facility, in Carlsbad, New Mexico?
**A.** I was.
**Q.** Were you able to listen to Mr. Dollar's interaction there at that facility?
**A.** I was able to listen to parts of it, yes.
**Q.** Okay. And after the arrests were made, did you conduct any interviews of the people that were arrested there?
**A.** I did.
**Q.** Who did you interview?
**A.** I interviewed Mr. Christopher Ortega and Mr. Thomas Rees.
**Q.** And do you see Christopher Ortega in the courtroom today?
**A.** I do.
**Q.** Can you point him out, and tell us what he's wearing?
**A.** He's seated there, in a blue shirt, and glasses.
MR. DICKENS: Your Honor, may the record reflect that he has identified the defendant?
THE COURT: Yes.
BY MR. DICKENS:

**Q.** With the information that you had from the wire worn by Mr. Stuart Dollar, did you use any of that information in the interview with the defendant, Mr. Ortega?
**A.** I did.
**Q.** Were you able to tell him, at that point, yes, Stuart Dollar was an informant, or were you still trying to keep that secret?
**A.** We were still trying to keep that secret.
**Q.** So you're able to use the information, but not directly out Mr. Dollar, correct?
**A.** That's correct.
**Q.** Okay. Have you been able, in preparation for trial, to listen to Government's Exhibit 44?
**A.** I have.
**Q.** And is that the recording of the interview of Mr. Ortega?
**A.** Yes, sir.

MR. DICKENS: Ms. Sanchez, if we could bring up Exhibit 44. And we'll start at the beginning and end at minute 5 and 02.

(Audio plays.)

BY MR. DICKENS:
**Q.** Agent Jeronimus, in that initial conversation -- actually, let me back up.

Obviously, you watched him be read the *Miranda* rights, correct?

**A.** Yes.
**Q.** And he voluntarily agreed to give a statement?
**A.** Yes.
**Q.** In this first interaction, what sort of information are you getting as to the structure of this organization?
**A.** We were just trying to understand, essentially, who's bringing oil to the -- to the yard, who owns the yard, who runs the yard, and the hierarchy of the operation.
**Q.** Okay. So who does he indicate was the first person to interview him?
**A.** Apologies. Could you repeat that?
**Q.** Who is the first person that he indicated interviewed him for this job?
**A.** I think initially he stated that Max Jensen had reached out.
**Q.** And then he was passed off to whom?
**A.** To Tom Rees.
**Q.** And his initial statement about what he thought the yard was doing, was doing what was --
**A.** Receiving oil and selling oil, skim oil.
**Q.** Skim oil. What's "skim oil"?
**A.** Skim oil, from my experience in Texas, has been that essentially when oil -- when produced water is shipped from a production location to a disposal, and the disposal is supposed to dispose of produced water, which is waste

product, there is trace amounts of oil left inside that produced water that is skimmed off of the water, collected over time, and then sold.

**Q.** So he believes this should be products from the reclamation type of business, correct?

**A.** From saltwater disposals, yes, sir.

**Q.** Was he able to identify the white vacuum truck and who operated the white vacuum truck?

**A.** He was.

**Q.** And who was that?

**A.** That being Carlos and his family and associates.

MR. DICKENS: Okay. Ms. Sanchez, let's go ahead and play 5:02, all the way to -- I apologize -- it looks like 9:45.

(Audio plays.)

BY MR. DICKENS:

**Q.** Agent Jeronimus, in this segment of the conversation, you're talking a lot about the quality of the oil. Why was the quality of the oil something that you were interested in when you were interviewing Mr. Ortega?

**A.** The quality of the oil would indicate whether it was actually waste product that wouldn't be coming from a production facility, versus oil that's sellable crude oil, which typically is 1 percent BS&W or lower.

**Q.** And what information did you learn from Mr. Ortega about

the oil that Carlos was bringing in?
**A.** Mr. Ortega claimed that the quality of the oil was such that it would be production oil, that it was .1 to .5 percent.
**Q.** You also asked about the amount that was brought in, and he says different things. He talks one time as, quote, It varies. Some days they'll do one load. Some days they'll do five.
Your response is, "Five loads and a water hauler."
"Like," Mr. Ortega says, "130 barrels a load."
So does 130 barrels sound about right for the capacity of a water hauler or a vacuum truck?
**A.** It does.
**Q.** So if we're doing five loads in a day, 130, my attorney math tells me that's over 600 -- and we'll stop there -- over 600 barrels in a day; is that right?
**A.** That's correct.
**Q.** At a later time, he gives an estimate of about 141. Do you remember that part of the conversation?
**A.** In terms of the total for the day?
**Q.** Yes.
**A.** I think he said five hundred and forty --
**Q.** Sorry, 541.
**A.** Yes, sir.
**Q.** Thank you very much. I'm glad you're paying attention.

So, again, would that be consistent with somebody who's getting waste oil or slop oil that they would have access to 500 or 600 barrels in a single day?
**A.** Not in my experience from what I've seen.
**Q.** Next you talk about the value of what he's paying. And Mr. Ortega knows the value of what Tom Rees is paying for this pure oil. What is the going rate? What is the amount that he tells you?
**A.** The going rate for clean oil was $35 per barrel.
**Q.** Is that, again, the market value for clean oil?
**A.** No, it is not.
**Q.** Do you have any idea what the market value was back then?
**A.** Typically -- well, the market value in Eastern New Mexico and West Texas would be West Texas Intermediate price, which can range anywhere from the mid 50s to upwards of $90 over the years. But at that exact month, I don't have that number in my mind.
**Q.** Fair enough, sir. Fair enough.
Mr. Ortega gives an example of, back when he was out in the oil fields, he'd witness somebody come along and just suck up small amounts. Do you remember that part of the statement?
**A.** I do.
**Q.** Again, would that account for 500 barrels of pure crude oil in one day, with the example that he provided to you?

**A.** No.

MR. DICKENS: Okay, Ms. Sanchez, if we could play from minute 9:45 to 11:45.

(Audio plays.)

BY MR. DICKENS:

**Q.** Agent Jeronimus, in this fairly short clip, we have Mr. Ortega talking about the length of time it takes for the vacuum truck to go out and come back. And he gives different answers. An hour out and an hour back, would that be sufficient time to go out to the Plains All American Pipelines and return, or do you know?

**A.** I don't know off the top of my head.

**Q.** Fair enough, sir.

How much was Ortega being paid for working at the yard?

**A.** He was being paid, initially, $950 per week. And approximately two weeks prior to August 21st, he was bumped up to a thousand dollars per week.

**Q.** And this -- this last discussion about another source, did he also mention he got a commission for that load from Phantom, LLC?

**A.** Yes. He mentions -- or, yeah, he mentioned being -- identifying his own stream through other drivers.

MR. DICKENS: Okay. Ms. Sanchez, let's go to from minute 11:45 to minute 15:56.

(Audio plays.)

BY MR. DICKENS:

**Q.** Agent, in this clip, he talks about his communication, or limited communication, with Max. He says he had one phone call with Max. Do you remember what he said about that phone call with Max?

**A.** He said he had a conference call with Max, in which Max said his numbers were down, he needed to get his numbers up.

**Q.** Numbers down, what did you take that in the context of this conversation?

**A.** In the context of this conversation, I took that to mean oil, that they wanted to increase the volume of oil that they were receiving at the yard.

**Q.** So that would indicate that Max would be aware of the numbers coming in, as well as encouraging somebody to increase the numbers for the business?

**A.** That's correct.

**Q.** He would be acting as something of a manager or a supervisor, right?

**A.** That's correct.

**Q.** Did Mr. Ortega indicate there was a time when nobody else was there? Obviously, Max wasn't there, but also Tom had left?

**A.** He did talk about a time in which Tom had left, and he managed the yard.

**Q.** So approximately how much time are we talking about in his employment there?
**A.** I'd have to be refreshed on that number.
**Q.** Okay.
**A.** I apologize.
**Q.** Does he say where Tom would go when he left the yard?
**A.** That Tom would return to Utah.
**Q.** As part of this investigation, did you learn where Max Jensen was residing at this time?
**A.** Yes. We understood that Max Jensen was on house arrest in Utah.
**Q.** In Utah, as well.
There's lots of talk about the 9G, the picking up. All of that indicated the tickets, as well as talking to people. Where did that indicate the oil was going after it left the Seven Rivers facility?
**A.** That all indicated, according to statements and the tickets, that the oil was traveling to Andrews and/or Tarzan, Texas.
**Q.** And there is, again, conversations about the purity of the oil. Did it appear, from Mr. Ortega, whether the business there at Seven Rivers had the ability to test the oil for its purity there on scene?
**A.** They did not, no.
**Q.** So he made a couple of different statements about how he

would know whether the oil coming in and going out was pure. What are the two ways he knew that?

**A.** I believe, in this portion, he stated that he knew good oil versus bad. But also that --

**Q.** Based on what? His past experience?

**A.** Yes, that's correct.

**Q.** And then what else?

**A.** And then also the oil haulers that would arrive to pick up the oil would, quote, spin out the oil.

**Q.** What does "spin out" mean?

**A.** That means, in the context of an oil hauler purchasing oil, they would put a sample of oil into a centrifuge, along with chemicals to separate the oil from any waste, and they would determine the percentage of waste inside of that oil to determine its quality.

**Q.** And did he indicate that he was present and watched them do this process and saw the result?

**A.** Yes.

MR. DICKENS: Ms. Sanchez, if we could now go from minute 15:54 to minute 19:54. I'm sorry, 15:56 to 19:34.

(Audio plays.)

BY MR. DICKENS:

**Q.** At the beginning of this section, there was a question that was kind of a broad question of, "Tell us about the other yards." He names two other cities. What cities did he

name?
**A.** He named Loving and -- I apologize, was it Malaga?
**Q.** Okay. And he does talk about being a pumper; is that right?
**A.** He does.
**Q.** So how long did he act as a pumper back in the day?
**A.** He said he worked for Cimarex for three or four years, and as a con- -- for other companies, as well.
**Q.** Now, in that, he talks about skim oil being taken to disposal; is that right?
**A.** He does.
**Q.** Did he -- through that conversation, did you get the impression that he was trying to tell you that's what Seven Rivers did?
**A.** Yes. He stated that Tom had told him that that's what Seven Rivers was doing.

MR. DICKENS: Ms. Sanchez, if we could then move on to 19:34 to 25:14.

(Audio plays.)

BY MR. DICKENS:

**Q.** Agent Jeronimus, so in this conversation, you ask him questions about, you know, basically, don't deal with people if they're going to say "stolen," right?
**A.** That's correct.
**Q.** Is that sort of a quote that you got from listening to

the undercover conversation between Stuart Dollar and Mr. Ortega?

**A.** It is.

**Q.** And having actually listened to that undercover conversation, does Mr. Ortega admit that, you know, if somebody says "stolen," you just don't deal with it?

**A.** Walk away.

**Q.** In that conversation, how does he react when you ask him about this, in this conversation, in this interview?

**A.** In this conversation, he states, essentially, that they hadn't heard about busts, or anything, or sting operations set up by the police.

**Q.** In this one, you seem to start pressing him about how he reacted to, in your words, "damn near perfect oil, and quantities in the thousands of barrels, over multiple days."

How does he react to you pressing him on that issue of the quality and quantity of the oil?

**A.** He states that he expressed concerns to Tom over this.

**Q.** Concerns about what?

**A.** That this stuff doesn't just come from waste or -- paraphrasing, that, yeah, this doesn't seem like waste oil, effectively.

**Q.** So in other words, he's expressing concern that Carlos's explanation for this does not meet reality?

**A.** That's correct.

**Q.** That there must be some other source of this oil than coming from waste oil, skim oil?
**A.** Yes.
**Q.** And according to Mr. Ortega in this interview, what was the reaction of Tom Rees to that?
**A.** Tom advised to just keep writing tickets.
**Q.** And you talked to him about the scenarios of where oil could be coming from in this quantity and quality. Now, how does Mr. Ortega react to that? What does he tell you?
**A.** He said he had many scenarios running through his head.
**Q.** Like what?
**A.** One scenario would be a frac job, where one of the employees at the frac site was related to Carlos and his other family members.
**Q.** And simply allowing them to take significant amounts of oil?
**A.** Yes.
**Q.** Which would make the oil coming in through Carlos what?
**A.** That would be oil coming up as part of a frac job that would be stored on an oil company's lease site.
**Q.** I asked my question inartfully.
Making the oil being given to Carlsbad legal or illegally?
**A.** Illegal.
**Q.** Are you familiar with the term of a "well watcher"?

**A.** I'm --
**Q.** If you're not, that's fine?
**A.** I'm not, no.
**Q.** How does he describe Carlos and the group of people that are around Carlos?
**A.** Sketchy.
**Q.** Meaning, again, in the conversation, what does "sketchy" in that context mean?
**A.** He elaborated and stated that they carried guns with them -- or a gun with them.
**Q.** And, again, did that surprise you to hear about an armed vehicle -- or actually, let me back up.
Did he say that the firearm was in the vacuum truck or in the follow-along pickup?
**A.** He stated that the firearm was inside the pickup truck that would lead the vacuum truck. And at a different time, he said the pickup followed the vacuum truck everywhere it went.
**Q.** So you say, at one point, "So it's like an armed guard when they go out and get oil"; is that right?
**A.** That's correct.
**Q.** Did that strike you as odd that there would be an armed guard for a vacuum truck?
**A.** Yes, it did.
MR. DICKENS: Okay. Ms. Sanchez, let's jump to

minute 40:20. And we will play it all the way to 40:24 -- I'm sorry, 47:24.

(Audio plays.)

BY MR. DICKENS:

**Q.** Agent Jeronimus, in this particular section, there was a conversation, sort of, at the beginning about somebody who wanted to bring in a tank full of mixture that had lots of water in it. Do you remember that?

**A.** That's correct.

**Q.** And what did Mr. Ortega say about the Seven Rivers yard and whether they would bother to take in oil that had other contaminants in it like water?

**A.** He said they wouldn't take that in.

**Q.** They wanted only the high grade, pure stuff, right?

**A.** That's correct.

**Q.** There's talk in here about a gentleman that was driving a Jeep Gladiator. Who was that?

**A.** That would have been Stuart Dollar.

**Q.** The informant?

**A.** Yes, sir.

**Q.** And you asked Mr. Ortega about some text messages on his phone, and he admits that the text messages he was sending out about making a lot of money. Do you remember that conversation?

**A.** I'd have to refresh my memory on that specific part.

**Q.** Fair enough. No problem.

You talked to Christopher Ortega about why he's being asked to talk to that source of oil that was a Bandido member. Do you remember that?

**A.** Yes, sir.

**Q.** And what was Mr. Ortega's understanding as to why he was going to talk to this source of oil?

**A.** To build trust.

**Q.** Does there need to be trust if you're dealing in legitimate commodities, like legal oil?

**A.** Not typically, and to require vetting, no.

**Q.** Okay. You talked to Mr. Ortega about measures that he took to secure the Seven Rivers yard, and he just talked about locks and a camera, I believe; is that right?

**A.** That's correct.

**Q.** But he does talk about not letting people know much about the site, about the yard?

**A.** That's correct.

**Q.** Why does he say he was told not to let people know about the yard?

**A.** He was told that people, if they learned of the yard's location and the amount of oil there, that they would steal the oil.

**Q.** So does that mean that he would be familiar with the fact that oil is a commodity that can be stolen, correct?

**A.** That's correct.
**Q.** And, therefore, it would be a commodity that could be resold?
**A.** That's correct.
MR. DICKENS: Ms. Sanchez, if we could play from minute 47:24 -- and let me get that end number -- to 58:43, please.
(Audio plays.)
BY MR. DICKENS:
**Q.** A couple times during this part of the conversation, does Chris talk about his interactions with Tom about expressing concern over the source of the oil?
**A.** He does.
**Q.** He's trying -- sort of, what is Tom's reaction, according to Chris?
**A.** Tom's reaction is: Write the tickets. Just keep the -- just write the tickets, essentially.
**Q.** And then that last interaction, does Chris admit that maybe he should have asked more questions?
**A.** He does.
**Q.** You ask him, at one point, about the tickets, and you again quote, I think, from the undercover, "Have a paper trail to cover your ass." What's his reaction to -- to that quote, to being told that these tickets are just a paper trail to cover yourself?

**A.** He states --

I can't remember his direct reaction to that sentence, I'm sorry.

**Q.** That's fine.

But does he indicate that, once again, he recognized that even if the tickets were saying they're waste oil, that this oil is still just too clean?

**A.** Yeah. He reemphasized the point that he made earlier in the interview, that it's very high quality oil.

**Q.** You ask him, at one point, "Does anybody ever talk about wanting to find a pumper?"

Does he state that there was somebody who talked about wanting to find a pumper?

**A.** Yes. He said Carlos stated that he wanted to find a pumper.

**Q.** And, again, would a pumper be allowed to simply give away large amounts of oil?

**A.** They would not.

**Q.** You ask him questions about vetting people, and he talks about the vetting. I think his words were, "Just making sure they're not a piece of shit that's going to steal from me."

Do you remember that conversation?

**A.** I do.

**Q.** Indicating that, again, he recognized that oil theft is, unfortunately, part of the oil industry, right?

**A.** That's correct.
**Q.** And if that -- if oil can be stolen from Seven Rivers, what could be being sold to Seven Rivers?
**A.** Stolen oil could then be sold to Seven Rivers.
**Q.** And then, finally, there's some questions asked about, "Does Tom know?" And he states something about Tom's knowledge compared to Max. Do you remember what that statement was?
**A.** He said Tom was just going off of what Max told him.
MR. DICKENS: Thank you, sir.
One second, please, Your Honor.
THE COURT: Of course.
Where are you going? You stay here.
THE WITNESS: My apologies.
THE COURT: You're good.
MR. DICKENS: No further questions, Your Honor. Thank you.
THE COURT: Do you need a break?
THE WITNESS: No.
THE COURT: Okay. Cross-exam?
MR. OTTAWAY: No questions. No.
THE COURT: You get a break, anyways. You're excused.
You can call your next witness.
MR. DICKENS: Your Honor, may he be permanently

excused?

THE COURT: From defense? Can he be permanently excused, this witness?

MR. OTTAWAY: Yes, he can be excused.

THE COURT: Okay. All right.

MR. DICKENS: Actually, Your Honor, I apologize.

THE COURT: We're going to take a five-minute break.

(Court in recess at 3:19 p.m.
and reconvened at 3:23 p.m.)

THE COURT: Does the government have any more witnesses?

MR. DICKENS: Yes, Your Honor.

THE COURT: How many?

MR. DICKENS: Your Honor, at this point, we have three, Your Honor.

THE COURT: Okay. Call the next one.

MR. DICKENS: Thank you, Your Honor. The government will call Quentin Franzoy.

And Your Honor, as he's coming up, I'll make a record. The last witness, Nathan Jeronimus, actually, I'm going to reserve. I know I asked to release him, but I'm going to reserve him until after the defendant testifies.

THE COURT: Okay.

Come forward, and I'll swear you in.

(The witness was duly sworn.)

**QUENTIN FRANZOY**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Sir, can you please introduce yourself to the Court by telling the Court your name and spelling your last name?

**A.** Yes. My name is Quentin Franzoy, last name spelled F-r-a-n-z-o-y.

**Q.** Sir, how are you employed?

**A.** I'm a special agent with the Bureau of Land Management.

**Q.** And how long have you worked for BLM?

**A.** I've worked for BLM for approximately 15 years.

**Q.** Have you worked for any other law enforcement agencies?

**A.** Yes, sir. Prior to that, I was with the air marshals for approximately ten years.

**Q.** So approximately 25 years altogether?

**A.** Yes, sir.

**Q.** Did you assist Agent Trent Boone in this case, where Mr. Ortega has been charged?

**A.** Yes, sir.

**Q.** Let's talk about surveillance. Can you tell us anything about any surveillance that you assisted with?

**A.** Yes, sir. On July 30th, I was asked to help out with a surveillance operation down near Carlsbad, New Mexico. It

was approximately 3:00/3:30 in the afternoon. I was placed in a location between the yard, where the oil was being brought to, and to the route that we believed that the theft would occur, as this is an area where recent thefts prior had occurred.

**Q.** And what type of vehicle were you expecting to observe?

**A.** We -- there was a commercial vacuum truck, or water hauler truck, that we had observed in the yard. There was also a white, GMC pickup truck that we had observed in the yard where the oil was being taken. So we expected to see the pickup truck go to the location of the previous thefts and expected the commercial vehicle truck to most likely follow that, as we thought that the pickup truck was acting as a scout for the theft operations.

**Q.** And tell us what you observed during this part of the operation.

**A.** Yes, sir. So I observed the -- I was notified that the pickup truck had left the yard. Shortly after that, I observed it pass my location. I stayed in visual contact with the pickup truck, which was a white GMC, and it also had a white, plastic tank in the back that was kind of easily to identify.

It proceeded on the relief route, outside of Carlsbad, and then it turned north on Canal Road. And then from there, I saw it head toward Illinois Camp Road, which

went off to the north, where there was a lot of oil wells, and pipelines and oil industry, and that's the area where the thefts had occurred previously.

**Q.** And did you follow the truck, or were you following the vacuum truck?

**A.** I followed the truck for a short distance on the relief route. I never left the relief route. I could just visually see the truck proceed north.

I then turned around and was going to post back up in my location, and I was radioed that the commercial vehicle truck, the vacuum hauler, passed me. I let it get a little ways down the road, and then I turned around and I followed the vacuum truck.

**Q.** What happened at that point?

**A.** The vacuum truck proceeded the same route that I observed the pickup truck proceed. It turned off of the relief route, on to Canal Road. And from there, it got on to Illinois Camp Road and proceeded north. And I continued to follow it from a distance for approximately four to five, six miles.

And when I observed it turn off Illinois Camp Road on to Angel Road -- I believe that was the name of it -- turned off towards the east, I then radioed that information to the next law enforcement officer that was going to be picking up the surveillance.

**Q.** When did you next observe the pickup truck?

**A.** So I -- I stayed in the area for approximately 30, 40 minutes from when I had handed off the commercial vehicle vacuum truck. I was notified via radio that the -- they were -- the vacuum truck was finished loading up with oil, and it was now proceeding back south. So then I began proceeding south, down Illinois Camp Road, to go post back up to my previous position.

When I was heading south on Illinois Camp Road, I observed the same white, GMC pickup, with the plastic tank in the back, parked off on the side of Illinois Camp Road, approximately a mile or half a mile south of where the commercial vehicle truck had turned off.

I notified the other officers via radio that the pickup truck was in that location, and it appeared to be sitting there to watch traffic.

**Q.** And did that cause you any concern for the nature of your investigation?

**A.** It did, because we -- I just wanted to relay that to the other law enforcement, that way they wouldn't get burned or be seen following the semitruck in close proximity.

**Q.** So the observations that you made, did it appear that this truck was conducting what is commonly called "countersurveillance," looking for law enforcement?

**A.** Yes, sir.

**Q.** Let's then now jump to August 21st of 2025. Were you

part of the arrests that were made on that date?
**A.** Yes, sir.
**Q.** What was your role in all of that?
**A.** My role was to just assist in the arrest as needed. Once the word was given to do the takedown, I arrived on scene a short time after some of the first officers arrived on scene. So they had already -- had begun taking people into custody. When I showed up, I asked, you know -- I believe I spoke to Officer Boone and asked what needed to be done. He had notified me that there was a loaded firearm in the front seat of the pickup truck that Mr. Ortega had been in when law enforcement arrived at the yard.
**Q.** Okay. Just to be clear, the white pickup truck that Ortega was operating, that's not the white truck that you saw doing countersurveillance, correct?
**A.** Correct. The white pickup truck countersurveillance was in a white GMC. Mr. Ortega was in a white Ford F150.
**Q.** The -- in that vehicle did you -- that Mr. Ortega was operating, did you find Hound Dog load tickets?
**A.** Yes, sir, I did.
**Q.** And did you seize that as part of the investigation?
**A.** Yes, sir, I did.
**Q.** And did you also find 9G load tickets?
**A.** Yes, sir.
**Q.** And did you seize those as part of the investigation?

**A.** Yes, sir.

MR. DICKENS: Thank you, sir. No further questions.

THE COURT: Cross-exam?

MR. OTTAWAY: No questions.

THE COURT: Thank you for your testimony, sir. You're excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: You can call your next witness.

MR. DICKENS: Your Honor, the government calls Tara Tripp.

And, Your Honor, may this witness be permanently excused?

THE COURT: From defense?

MR. OTTAWAY: No objection.

THE COURT: All right. You may be permanently excused. Thanks.

Come forward to the stand here, and I'll swear you in.

(The witness was duly sworn.)

**TARA TRIPP**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Could you please introduce yourself to the Court by

telling the Court your name and spelling your last name?
**A.** Tara Tripp, T-r-i-p-p.
**Q.** And how are you employed?
**A.** I'm a special agent with Homeland Security Investigations or HSI.
**Q.** And what -- how long have you held that position?
**A.** I was hired in September of 2024.
**Q.** Have you worked for any other law enforcement agencies?
**A.** Yes. Previously, I worked as a criminal investigative analyst for approximately three years for the State of Georgia.
**Q.** What exactly are the duties of a special agent for Homeland Security?
**A.** We investigate a variety of federal crimes, which would include money laundering, drug trafficking, human trafficking, customs and immigration violations, among many others.
**Q.** How did you get involved in the investigation that ultimately resulted in the arrest of Christopher Ortega?
**A.** In August of 2025, the Bureau of Land Management approached HSI for investigative assistance.
**Q.** Have you ever received any specialized training in cell phones or electronic data?
**A.** Yes. I've received training in basic data recovery and acquisition. I've also been trained on seizing evidence,

including electronic devices.
**Q.** Let's talk about extracting data from these electronic devices. Are you familiar with that process?
**A.** Yes.
**Q.** And in this particular case, were you asked to review any electronic data?
**A.** Yes. I reviewed seven different data extractions from cell phones as related to the defendants in this case.
**Q.** Okay. Let's talk first about Mr. Christopher Ortega. What sort of electronic data did you review in relation to Mr. Ortega?
**A.** There was a cell phone seized off of Ortega on August 21, 2025, and data was extracted from that phone. I reviewed the report.
**Q.** What sort of information did you find on there that would be relevant to this investigation?
**A.** Among the relevant information were conversations that I assessed were with Carlos Contreras. They were two different phone numbers.
**Q.** How about any pictures that were found on the phone?
**A.** Yes. I also located approximately 46 different load tickets with Hound Dog Energy, LLC's, name at the top of those, and the media and WhatsApp conversations.
**Q.** Were you aware that those load tickets were also seized in their physical format?

**A.** Yes, I'm aware of that.
**Q.** While you looked at the electronic data seized on that phone, were you able to lineup dates and volumes and sources of oil that came in to Hound Dog according to those tickets?
**A.** Yes, that information was present on the tickets, and I made an Excel spreadsheet to visually demonstrate that information.
MR. DICKENS: If we could bring up Government's Exhibit 46, Ms. Sanchez.
BY MR. DICKENS:
**Q.** Is this the spreadsheet that you created?
**A.** Yes, it is.
MR. DICKENS: Ms. Sanchez, can we just focus, sort of, on that top text for a little while.
MS. SANCHEZ: Like this?
MR. DICKENS: That's perfect.
Oh, we're going super fancy. Just choose a view, and let's stick with it. Perfect.
BY MR. DICKENS:
**Q.** What information are you -- did you put in your spreadsheet?
**A.** So if there was a number associated with the invoice, that's the first column. The data date that -- most of this information was handwritten, and so this is the date that I observed on the ticket. They listed BBLs, which is the

industry term for barrels of oil. This was also noted. The operator was typically listed. They would note a driver and then a transport company.

**Q.** Okay. So, again, if we know that Mr. Ortega was not hired until late June, but the first date we have on this is June 2nd, that could be because of errors in the paperwork or just really bad handwriting?

**A.** It's possible. It was not all entirely legible.

**Q.** Okay. When you were looking at all of this data, who was the vast -- who was the source of the vast majority of the barrels of oil, according to the tickets that came in to Hound Dog Energy?

**A.** Carlos or MIS, LLC.

**Q.** And did you become familiar that these were -- MIS, LLC, was printed on the side of the vacuum truck?

**A.** Yes. At a later date.

**Q.** Okay. Can you give the Court an idea of how much of or what percentage of the oil, according to these tickets, was accounted for by Carlsbad or MIS, LLC?

**A.** In this table, it's approximately 93 percent.

MR. DICKENS: Let's go ahead and -- Ms. Sanchez, if we could just go to the side of the spreadsheet there.

BY MR. DICKENS:

**Q.** What information are you giving the Court on this section?

**A.** That's the sum of the total barrels of oil that was listed, so approximately 5,839 barrels.
**Q.** I think you said that these were 46 load tickets?
**A.** Yes, that's correct.
**Q.** How many of the load tickets were not attributed to a Carlsbad or to MIS or MIS, LLC?
**A.** Four.
**Q.** Four of the 46?
**A.** Yes, sir.
**Q.** Let's now bring up Government's Exhibit 47.
Agent Tripp, what are we looking at in Government's Exhibit 47?
**A.** So this exhibit includes screenshots of the Cellebrite extraction from Ortega's phone.
MR. DICKENS: Let's go ahead and focus in on that top section on this, Ms. Sanchez. The top bubbles, I should say. There we go.
BY MR. DICKENS:
**Q.** You have the source there listed as "EL 29." First off, how do you get EL 29? Is that something that you created, or is that something that was on Mr. Ortega's cell phone?
**A.** That's something that was on Mr. Ortega's cell phone.
**Q.** How is it then that you attributed EL 29 as Carlos?
**A.** As you can see in the exhibit, the first -- the first text from EL 29, he self-identifies as Carlos.

Additionally, the phone number that's listed above in the exhibit, that ends in 9285, was saved in a co-defendant's phone under the name "Carlos Contreras."

Additionally, the content of the conversation was predominantly load tickets, coordinating drivers for oil, and those factors combined led me to assess that this was Carlos Contreras.

**Q.** And the green bubble, the name comes out as "Chris (owner)." Why is that Chris (owner)?

**A.** The Cellebrite program is user friendly and is identifying that the owner of the device itself -- is that it's not necessarily a title that's listed in WhatsApp itself.

MR. DICKENS: Okay. Thank you.

So let's -- Ms. Sanchez, let's go to the next section, the lower section.

BY MR. DICKENS:

**Q.** In this particular interaction between Carlos and Chris, what's occurring? What's being discussed?

**A.** They appear to be coordinating drivers.

MR. DICKENS: Ms. Sanchez, let's go to the next page. And again, focus at the top section.

BY MR. DICKENS:

**Q.** In this section, Agent Tripp, what do the two appear to be discussing?

**A.** The amount of oil that will be brought in.
**Q.** And is it, in this particular section, 100 barrels?
**A.** Yes, it is.
MR. DICKENS: And, Ms. Sanchez, let's go to the lower section.
BY MR. DICKENS:
**Q.** In this section, what do they appear to be discussing?
**A.** The delivery of the oil to the yard.
**Q.** According to this statement by Chris, is he going to be present for the delivery?
**A.** It does not appear to so.
MR. DICKENS: Let's go to the next page, Ms. Sanchez.
BY MR. DICKENS:
**Q.** Agent Tripp, what's being discussed in this section?
**A.** The time of day that they're going to be working, how many loads, and trackers.
**Q.** So according to, at least the top section of this, how many loads is Carlos going to bring in on that particular day or night?
**A.** Two or three.
**Q.** And you talk about trackers being mentioned. What do they mention about the trackers?
**A.** That someone is putting trackers on -- presumably, on their vehicle, and they're not going to get their oil.

**Q.** And is that information being provided by Chris or by Carlos?
**A.** By Carlos.
MR. DICKENS: Ms. Sanchez, let's go to the next page.
BY MR. DICKENS:
**Q.** Agent Tripp, what's being discussed in this interaction?
**A.** So this is a separate conversation, with a different phone number that's been saved in Ortega's phone as "Carlos water hauler," but picks up roughly the same time frame that the last phone number was ceased to be used. And in this one, they're discussing placing the oil in different tanks and they're photos of load tickets.
**Q.** So would this indicate that Mr. Ortega is communicating with Carlos through a different phone number than he was just days before?
**A.** Yes, that's correct.
**Q.** But, again, they're still discussing bringing in loads; is that correct?
**A.** Yes.
**Q.** And in this one, again, does it indicate whether Christopher Ortega would be present for the load coming in?
**A.** As he says, just put it in the red tank, and it appears that Ortega would not be present.
**Q.** What are the two texts or communications at the bottom?

**A.** Those are images of the Hound Dog Energy, LLC, load tickets, being sent from Ortega to Carlos.

MR. DICKENS: Thank you.

Ms. Sanchez, let's go ahead and go to the next one.

BY MR. DICKENS:

**Q.** What's being communicated in this texting communication?

**A.** Carlos is explaining that they had a problem with the truck that they were using.

**Q.** Does Mr. Ortega appear happy with the amount of oil coming in to the facility?

**A.** Yes, he does. He says, "We're making that money."

MR. DICKENS: Let's go to the next page. Focus on the top text section, please.

BY MR. DICKENS:

**Q.** What are we looking at in this particular section, Agent Tripp?

**A.** Once again, it's the delivery of oil and engaging it in different tanks.

**Q.** And again, does it appear from this that Christopher Ortega was present for that delivery and gauging?

**A.** No, it does not.

MR. DICKENS: Okay. Ms. Sanchez, let's go to the bottom one.

BY MR. DICKENS:

**Q.** What are we looking at, Agent Tripp, in this one?

**A.** The image at the bottom is another load ticket, and they're also discussing someone that was posted by the yard.
**Q.** Okay. Just referred as a "bad guy"?
**A.** That's correct.
**Q.** And the bad guy had stopped somebody?
**A.** Yes.
**Q.** Would that, again, appear from the conversation to mean that it was a police officer or a law enforcement in the area?
**A.** It's possible.
MR. DICKENS: Okay. Ms. Sanchez, let's go ahead and bring up Exhibit 48.
BY MR. DICKENS:
**Q.** Agent Tripp, what are we looking at in Government's Exhibit 48?
**A.** So these are also extractions or screenshots of the Cellebrite extraction, but this time it's a conversation between Christopher Ortega and Tom Rees.
MR. DICKENS: Okay. Let's go ahead and focus on that top section, Ms. Sanchez.
BY MR. DICKENS:
**Q.** Does it appear, based on the conversation, that this might be the first time that these two are interacting?
**A.** Yes.
**Q.** And because they have to introduce themselves more

formally than if people who know each other would be introducing themselves?

**A.** That's correct.

**Q.** The date on these texts is at least listed as June 22nd of 2025. In your examination, would that be an accurate date for these communications?

**A.** (No response.)

**Q.** I see hesitancy. Go ahead and explain why you're hesitant.

**A.** I'm hesitant because it's a UTC time zone code, and so that would be -- I believe it's seven hours ahead of the New Mexico Mountain Time zone. So since this one is -- it's 12:44 a.m., then it's highly likely that for New Mexico, that's actually June 21, 2025. And the physical device, it will show as Mountain Time, but they're all standardized in the Cellebrite extraction to the UTC time zone.

**Q.** Excellent explanation. So we'll talk approximate dates, then.

**A.** Thank you.

**Q.** So the approximate date would be June 22nd or June 23rd of 2025?

**A.** Yes. Or the 21st.

MR. DICKENS: 21st to 22nd. Okay. Thank you very much.

So let's go ahead and go down to the lower section,

Ms. Sanchez.
BY MR. DICKENS:
**Q.** What's the communication going on here between Mr. Ortega and Mr. Rees?
**A.** Ortega is informing Tom Rees of the loads that are being brought in, which tanks they are using, and how they're being filled.
**Q.** Okay. So keeping his -- keeping Mr. Rees informed of the daily operation?
**A.** Yes.
MR. DICKENS: Thank you.
Let's go to the next page. If we could zoom in. Excellent.
BY MR. DICKENS:
**Q.** What are we looking at in this page?
**A.** That they're attempting to recruit additional drivers.
MR. DICKENS: Okay. Thank you very much.
Let's go to the next page. Do your best to zoom in towards the top. There we are.
BY MR. DICKENS:
**Q.** Again, does it appear that Mr. Ortega is keeping Mr. Rees apprised of the general operation going on?
**A.** Yes, it does, as he's informing him a new person is showing up, and then Carlos is bringing another load.
MR. DICKENS: Thank you.

Ms. Sanchez, if we could go towards the lower half.

BY MR. DICKENS:

**Q.** What's being discussed here?

**A.** How many barrels of oil have been brought in and if a sample was taken.

**Q.** The business listed in this text message is a Phantom, LLC. When you were examining the load tickets, did you find any load tickets for Phantom, LLC?

**A.** Yes.

**Q.** And there was only one; is that correct?

**A.** Yes.

**Q.** And, in fact, in this particular interaction, they are discussing and they talk about it being pretty dark; is that right?

**A.** Yes. That's the exact language used.

MR. DICKENS: Okay. Let's go to the next page, Ms. Sanchez.

BY MR. DICKENS:

**Q.** What's being discussed or exchanged between Mr. Ortega and Mr. Rees in these?

**A.** In these, Ortega is also sending Reese the Hound Dog Energy, LLC, load tickets and informing him that Carlos and someone named "Randy" is also on the way to pick up a load.

MR. DICKENS: Okay. And let's focus on the bottom now, Ms. Sanchez.

BY MR. DICKENS:
**Q.** In this one, what are they discussing in these exchanges?
**A.** So the first tiny image is actually a screenshot of banking information. And then what follows from Rees is information on how much money should be exchanged and divided to which people.
**Q.** Okay. In that, does Mr. Rees indicate how much money Mr. Ortega is to receive for bringing in some oil?
**A.** Yes. $550.
**Q.** And he is going to be paid how much, and how is he to distribute it?
**A.** Well, they're going to be, it would appear, at least two transfers, one for Carlos's check, which is $14,040, and then there will be another one that the transfer should be combined at $4,400. His guy gets the 3,850, and then Ortega would receive $550 out of that.
MR. DICKENS: Thank you.
Ms. Sanchez, let's go to the final page -- or, actually, the next page.
BY MR. DICKENS:
**Q.** Agent Tripp, what's being discussed here between Mr. Ortega and Mr. Rees?
**A.** It is Carlos bringing in loads of oil.
**Q.** And how much loads, according to this -- or how many loads did Carlos bring in on or about June 13, 2025 -- sorry,

August 13, 2025?
**A.** Four loads.
**Q.** And how many barrels would that -- was that, according to this communication?
**A.** Approximately 559 barrels, according to Rees.
MR. DICKENS: Let's go to the next page and final page, Ms. Sanchez.
BY MR. DICKENS:
**Q.** Agent Tripp, what's being discussed here between Mr. Ortega and Mr. Rees?
**A.** Ortega is keeping Rees informed of how many barrels of oil have been brought in in a week, who brought those barrels in, and then how many have been sold.
**Q.** So in this particular week, how many barrels were brought in?
**A.** 2,518.
**Q.** And of those 2,518 barrels, how many were credited to Carlos?
**A.** The vast majority, 2,413.
**Q.** So all but 105 barrels?
**A.** Yes.
**Q.** How many barrels, according to this, were sold out of that will Seven Rivers facility that week?
**A.** 2,246.
**Q.** According to this, do those two men think that is a good

and profitable week?

**A.** Yes, they do.

MR. DICKENS: Let's go now to Government's Exhibit 78.

BY MR. DICKENS:

**Q.** What are we looking at, Agent Tripp, in Government's Exhibit 78?

**A.** These are screenshots from the Cellebrite extraction from Jensen's seized phone. These are conversations between Jensen and Stuart Dollar.

**Q.** And can you give us, again, the approximate date for these communications?

**A.** Throughout August 2025 -- well, August 21st, 2025.

**Q.** And we'll go ahead and look at the lower section here. On that August -- approximately August 21, 2025, time period, are they discussing that Stuart Dollar is headed off to a meeting?

**A.** Yes.

**Q.** Besides looking at electronic data, did you make any efforts to collect information from the New Mexico Secretary of State?

**A.** Yes, I did.

**Q.** What sort of information did you seek to collect?

**A.** We requested business records on ABC&M, LLC, and the business records or articles of corporation for the Hound Dog

Energy, LLC.

MR. DICKENS: Ms. Sanchez, let's first bring up Government's Exhibit 54, page 3.

I've got to get closer to that with my glasses. Okay.

BY MR. DICKENS:

**Q.** Agent Tripp, what are we looking at in Government's 54, page 3?

**A.** This is the State of New Mexico, Secretary of State's response to our legal process, in which it states the articles of organization for Hound Dog Energy, LLC, enlists Thomas Rees as a member.

**Q.** Does it list any other members for this business?

**A.** Well, the registered agent are Registered Agents, Inc. But no other.

**Q.** No other human beings are listed?

**A.** No.

**Q.** Okay. And does it have a date for this filing?

**A.** Yes. It's dated April 21, 2025.

**Q.** Okay. You said you also requested information on ABC&M, LLC?

**A.** Yes, that's correct.

**Q.** Why were you seeking information on ABC&M, LLC?

**A.** Because Carlos Contreras had incorporated that business.

**Q.** And did you receive any information from the Secretary of

State regarding ABC&M, LLC?
**A.** Yes.
MR. DICKENS: Let's go ahead and bring up Government's Exhibit 60, Ms. Sanchez.
And again on this one, we're going to just stay on page one.
BY MR. DICKENS:
**Q.** What are we looking at on page 1?
**A.** The Secretary of State, in New Mexico's response to our legal process, which lists the articles of organization for ABC&M, LLC, in which Carlos Arturo Contreras is a member, as well.
**Q.** Okay. And again, the sole human being member that is listed, correct?
**A.** That is correct.
**Q.** And what is the date of the filing for this?
**A.** July 1, 2025.
MR. DICKENS: One second, please, Your Honor.
(Counsel confers.)
MR. DICKENS: Thank you, Your Honor. No further questions.
THE COURT: Cross-exam?
MR. OTTAWAY: No questions.
THE COURT: Thank you for your testimony. You're excused.

Can this witness be permanently excused? From the defense?

MR. OTTAWAY: No objection.

THE COURT: All right.

Well, we're concluding at 4:00. It's almost 4:00. The government has one more witness; is that right?

MS. SUSLAVICH: That is correct, Your Honor. He's not going to be particularly short.

THE COURT: Okay. Well, that doesn't surprise me.

We'll do -- then we'll start again tomorrow at 9:30. We'll do the government's witness, and then we'll move to defense's case-in-chief.

I don't anticipate having closing argument, since we're doing findings of fact and conclusions of law. I guess if they wanted to do written ones, they could. Has the government given that any thought?

MS. SUSLAVICH: We have a closing prepared, but we'll defer to the Court, if they prefer.

THE COURT: I mean, I probably prefer something in writing.

From defense?

MR. OTTAWAY: I sent something. I sent some proposed finding, but I didn't know how to send it, so I sent it to your clerk.

THE COURT: That's fine. That's a good way to send

it.

I think we'll do closings in writing, if the parties want to submit a closing. And then we'll just do -- I'll give a deadline for proposed findings of fact and conclusions of law.

So we'll do the last witness tomorrow for the government.

And then we'll do defense's case-in-chief.

We'll do rebuttal, if there is any kind of rebuttal.

And then we won't do closing. I'll just have it submitted in writing. We'll get a deadline for that, and we'll do findings of fact and conclusions of law.

Anything else I can do for the government before we end for today?

MR. DICKENS: No, Your Honor.

THE COURT: From defense?

MR. OTTAWAY: No.

THE COURT: All right. We'll see you all tomorrow at 9:30.

(Court in recess at 3:58 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of New Mexico, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 26th day of August, 2026.

/s/ RACHEL M. LOPEZ

Rachel M. Lopez, CRR
Official Court Reporter

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

---

UNITED STATES OF AMERICA,

Plaintiff,

Criminal Action No.
5:25-cr-04750-MIS-4

v.

CHRISTOPHER ORTEGA,

Defendant.

---

BEFORE THE HONORABLE MARGARET I. STRICKLAND, DISTRICT JUDGE

BENCH TRIAL - DAY 3

Friday, August 21, 2026
9:32 a.m.

United States Courthouse
Guadalupe Courtroom
100 North Church Street
Las Cruces, New Mexico

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE - NEW MEXICO
BY: JAMES ANDREW DICKENS AND BENJAMIN TURNER SUSLAVICH
200 North Church Street
Las Cruces, New Mexico 88001
(575) 522-2304
james.dickens@usdoj.gov

On behalf of the Defendant:

LAW OFFICES OF ANDREW OTTAWAY
BY: ANDREW OTTAWAY
11 Bogie Lane
Suite 1C
Ruidoso, New Mexico 88345
(817) 559-0466
ottaway9@swbell.net

**TABLE OF CONTENTS**

**TRIAL WITNESSES**


| | |
|---|---|
| On behalf of the Plaintiff: | Page |
| MATTHEW SANCHEZ | |
| By Mr. Suslavich | 4 |
| By Mr. Ottaway | 31 |
| | |
| On behalf of the Defendant: | Page |
| THOMAS REES | |
| By Mr. Ottaway | 36 |
| By Mr. Dickens | 41 |
| By Mr. Ottaway | 50 |
| CHRISTOPHER ORTEGA | |
| By Mr. Ottaway | 51 |
| By Mr. Dickens | 72 |
| NAOMI BERNIN | |
| By Mr. Ottaway | 93 |


**MISCELLANEOUS**


| | |
|---|---|
| | Page |
| Motion for Directed Verdict | 96 |

**P R O C E E D I N G S**

(In open court.)

THE COURT: We're back on the record in 25-cr-4750. The government can call its next witness.

MR. SUSLAVICH: Yes, Your Honor. The government calls IRS Criminal Investigator Matthew Sanchez to the stand.

(The witness was duly sworn.)

MR. SUSLAVICH: May it please the Court?

THE COURT: Go ahead.

**MATTHEW SANCHEZ**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. SUSLAVICH:

**Q.** Agent Sanchez, can you please state your name for the record?

**A.** Matthew Sanchez.

**Q.** And where are you employed, sir?

**A.** With the Internal Revenue Service criminal investigation.

**Q.** And what is your current position with the Internal Revenue Service?

**A.** I'm a special agent.

**Q.** Briefly, can you describe your duties as a special agent for the IRS?

**A.** I investigate potential criminal violations of the Internal Revenue Code and other financial crimes, such as

money laundering.

**Q.** And how long have you worked in financial and criminal investigation as a special agent?

**A.** Approximately five years.

**Q.** Does your work as a special agent for the IRS include reviewing bank records and tracing financial transactions?

**A.** Yes, it does.

**Q.** And did you become involved in this investigation to do such activities?

**A.** Yes.

**Q.** As part of this investigation, did you receive, review -- or review financial records relating to Hound Dog Energy, Big Hog Energy, or Big Striker Energy?

**A.** Yes, I did.

**Q.** And what types of financial records did you receive or review?

**A.** They were bank records.

**Q.** And from what financial institutions did you receive those records?

**A.** Wells Fargo.

**Q.** Did you receive records from any other institutions?

**A.** Yes, also Bank of America.

**Q.** And did you review those records from Wells Fargo and Bank of America during this investigation?

**A.** Yes, I did.

**Q.** I'm going to present to you what's already been admitted as Government's Exhibit 55.

And for the record, our legal assistant is also "Sanchez," so hopefully there's no confusion.

Special Agent, do you recognize this exhibit?

**A.** Yes, I do.

**Q.** Can you briefly describe what it is?

**A.** It is a withdrawal from a checking account under the name "Thomas Rees," totaling $7,500.

**Q.** There are multiple pages here. Did you review all of those records prior testifying today?

**A.** Yes, I did.

**Q.** And in summary, what were those records in Government's Exhibit 55?

**A.** These will be withdrawals, so any financial transaction that's going out of the -- that Wells Fargo account will be in this.

**Q.** And how are these withdrawals recorded? I guess what I'm asking is what is this a picture or copy of?

**A.** Hound Dog Energy.

**Q.** All right. Is this a check from Hound Dog Energy?

**A.** This is a cash withdrawal.

**Q.** Cash withdrawal from Hound Dog Energy?

**A.** Correct.

**Q.** And did you prepare any summary exhibits or -- in this

case?
**A.** Yes, I did.
**Q.** And were these records in Government's Exhibit 55 incorporated into that summary?
**A.** Yes, they were.
**Q.** I just want to show you now what's been previously admitted as Government's Exhibit 56. Do you recognize this exhibit?
**A.** Yes, I do.
**Q.** What is it?
**A.** This is a signature card for Hound Dog Energy, from Wells Fargo Bank.
**Q.** I'm unfamiliar, what is a "signature card"?
**A.** A signature card shows the date an account was opened, the name that the account is under, whether it's an individual or a business entity, as well as people who have signature authority for the account.
**Q.** Okay. And at the top, it says "Business Account Application." Would someone be filling this out to open a business?
**A.** Correct.
**Q.** Okay. And what business is listed here on this application?
**A.** Hound Dog Energy.
**Q.** And what is the date that this application was submitted?

**A.** February 27, 2025.
**Q.** And looking at this application, if we turn to the next page of this exhibit, what does it say the industry is for this particular company?
**A.** It says "wholesale trade."
**Q.** And does it provide a description?
**A.** It does, buying and selling oil.
**Q.** I want to turn now to Government's Exhibit 57 --
Actually, before we do that, let's move to Government's Exhibit 59. I'm jumping around.
Mr. Sanchez, what do we see here?
**A.** This appears to be a signature card for Hound Dog Energy.
**Q.** All right. Is that the same Hound Dog -- or is that the same name as the Hound Dog Energy we previously saw on Government's Exhibit 56?
**A.** Yes, it is.
**Q.** All right. I want to turn your attention to about halfway down the page, where it says, "Related customer information."
MR. SUSLAVICH: I don't know if we can zoom in on that.
BY MR. SUSLAVICH:
**Q.** Agent, on your review of the record, who filed this application?
**A.** Thomas Rees.

**Q.** And what kind of relationship does he have to this company, according to the record?
**A.** Sole owner.
MR. SUSLAVICH: If we can zoom out to the whole thing.
BY MR. SUSLAVICH:
**Q.** Turning to the next page of Government's Exhibit 59, and looking right at the bottom, where it says "Bank Use Only," in your review of this record, what was the filing date for this application?
**A.** March 8, 2024.
MR. SUSLAVICH: And zoom out again. Look up to the top table on that second page.
BY MR. SUSLAVICH:
**Q.** What does it say the industry was for this company?
**A.** Wholesale trade.
**Q.** And on your review of this record, what does -- what is a good description of this business?
**A.** Buying and selling oil.
**Q.** Let's move on to Government's Exhibit 61. Agent, do you recognize this?
**A.** Yes, I do.
**Q.** What is it?
**A.** It's a signature card for the business Big Hog Energy.
MR. SUSLAVICH: And could we please zoom in to the

box just underneath the title on Government's Exhibit 61. Actually, the next box down.

BY MR. SUSLAVICH:

**Q.** Agent, on your review of the record, what kind of business is this?

**A.** It's a limit liability company.

MR. SUSLAVICH: All right. Let's scroll down. Let's go to the bottom of that exhibit.

BY MR. SUSLAVICH:

**Q.** And on your review of the record, agent, who, if anyone, is the owner of this company?

**A.** Maxwell Sterling Jensen is listed as --

**Q.** And --

I'm sorry, please repeat your answer.

**A.** Maxwell Sterling Jensen is listed as the manager, and Zachary Golden Jensen is listed as the managing member.

**Q.** Is there a signature next to Maxwell Sterling Jensen's line?

**A.** Yes, there is.

**Q.** And what is the date?

**A.** It is October 2, 2023.

**Q.** All right. Let's move to Government's Exhibit 62 --

Well, actually, let's go back to 61 real quick. Top of the page.

Agent, what kind of account was this application

for? Was it for a checking or savings or CD?
**A.** A checking account.
MR. SUSLAVICH: Checking account. All right. All right. Government's Exhibit 62.
BY MR. SUSLAVICH:
**Q.** Agent, do you recognize this record?
**A.** Yes, I do.
**Q.** What is it?
**A.** It is a signature card for the business Big Striker Energy.
**Q.** All right. And what kind of account type is this?
**A.** A checking account.
**Q.** What kind of legal designation dis this account have?
**A.** It's an individual owner, sole proprietorship, or single member LLC.
**Q.** Agent, in your training and experience, what does that legal designation mean?
**A.** It basically means that it's a business entity, rather than just an individual checking account.
**Q.** All right. And how many owners does that kind of entity have?
**A.** One on this instance.
**Q.** All right. Let's go to the bottom of the page. Who is the applicant?
**A.** Maxwell Sterling Jensen.

**Q.** What is his title?
**A.** Yes.
**Q.** Oh, I asked what is his title?
**A.** Oh. Managing member.
**Q.** Is there a signature on there?
**A.** Yes, there is.
**Q.** And what is the date?
**A.** September 12, 2023.
**Q.** Is there anyone else listed as a -- on this application?
**A.** No, there's not.
**Q.** Let's move to Government's Exhibit 63. Do you recognize this exhibit?
**A.** Yes, I do.
**Q.** What is it?
**A.** It is a signature card for the company Big Striker Energy.
**Q.** All right. Is it a checking or savings or CD?
**A.** A savings account.
**Q.** All right. What is the legal designation for this account?
**A.** Individual owner, sole proprietorship, or single member LLC.
**Q.** So same as the last exhibit that we just showed?
**A.** Correct.
**Q.** Are there any applicants on this?

**A.** Yes.
**Q.** How many?
**A.** One.
**Q.** Who is it?
**A.** Maxwell Sterling Jensen.
**Q.** What's his listed title?
**A.** Managing member.
**Q.** Is there a signature?
**A.** Yes.
**Q.** What is the date?
**A.** September 12, 2023.
**Q.** I'll show you now what's been previously admitted as Government's Exhibit 64. Do you recognize this exhibit?
**A.** Yes, I do.
**Q.** What is it?
**A.** It's a signature card for the company Big Striker Energy.
**Q.** And in your review of the record, what kind of account is this?
**A.** A checking account.
**Q.** What kind of a legal designation does this account have in your review?
**A.** Individual owner, sole proprietorship, or single member LLC.
**Q.** Same as the last one?
**A.** Correct.

**Q.** How many owners?
**A.** One.
**Q.** And what is his name?
**A.** Maxwell Sterling Jensen.
**Q.** What's his title?
**A.** Managing member.
**Q.** Is there a signature?
**A.** Yes, there is.
**Q.** And what is the date?
**A.** February 25, 2025.
**Q.** I told you I was skipping around. Let's move to Government's Exhibit 57.
Agent, do you recognize this exhibit?
**A.** Yes, I do.
**Q.** Did you review it before testifying today?
**A.** Yes, I did.
**Q.** Can you describe, in total, what is it?
**A.** It is a statement of -- monthly statements for the company Hound Dog Energy.
**Q.** What are -- in laymen's terms, what are statements for a company?
**A.** It will show the debits and credits that are going into and out of the account.
**Q.** And, again, for laymen, what is -- what are debits and credits?

**A.** So either money coming into the account or money exiting the account. So if they make a purchase, it will -- it will show that it's a purchase, versus a deposit would be entering the account.
**Q.** And you already mentioned this, but what was the company name that these records pertained to?
**A.** Hound Dog Energy.
**Q.** And did you create any summary exhibits -- well, did you create any reports or exhibits summarizing the records contained in Government's Exhibit 57?
**A.** Yes, I did.
**Q.** And are they complete and accurate?
**A.** Yes, they are.
**Q.** I'm going to show you now what has been previously admitted as Government's Exhibit 58. Do you recognize this?
**A.** Yes, I do.
**Q.** Did you review this exhibit before testifying here today?
**A.** Yes, I did.
**Q.** And could you describe in general what this exhibit is?
**A.** It's a wire transaction report. It will list who is sending a wire transaction, as well as who is receiving that wire.
**Q.** To what account -- account or -- to what account do these records generally pertain to?
**A.** Business accounts.

**Q.** Okay. And did you create any summary exhibits pertaining to Government's Exhibit 58?
**A.** Yes, I did.
**Q.** And did you, in that -- in that exhibit, did you include these records completely and accurately?
**A.** Yes, I did.
**Q.** I want to turn your attention now to Government's Exhibit 76. Agent, what are we looking at here?
**A.** These are incoming transactions into Hound Dog Energy's business account.
**Q.** Did you create this record, or did you obtain it from someone?
**A.** I created this.
**Q.** And could you please describe how you created this?
**A.** I took transactions that were shown on the bank statements, on the wire transactions, and summarized it to just be easier to see the transactions that were incoming.
**Q.** And when you're talking about the bank statements and the wire statements, are you referring to the documents which we have just reviewed?
**A.** Yes.
**Q.** And are you referring to any other documents that we haven't already reviewed?
**A.** Yes.
**Q.** Okay. Well, actually, when making this summary exhibit,

did you rely on the documents which we have talked about?
**A.** Yes.
**Q.** And in the summary exhibit, did you take -- take the information on those documents, and then feed that into your summary exhibit?
**A.** Yes, I did.
**Q.** And did you do so completely and accurately?
**A.** Yes, I did.
**Q.** And when making this -- this is -- anything that's on this sheet is representative of the Government's Exhibits which we have looked at, i.e., the bank statements, the transactions that you have testified about previously to date, right?
**A.** Yes.
**Q.** Okay. I just want to clear that up.
Let's talk about Government's Exhibit 76 here. What -- you say it's incoming transactions. Is this money going into Hound Dog Energy, LLC?
**A.** Correct.
**Q.** Okay. And could you please -- are you able to read -- see that exhibit?
**A.** Yes, I am.
**Q.** Could you please describe who -- what entities or people are sending money into Hound Dog Energy, LLC?
**A.** Big Hog Energy, Big Striker Energy, Caribou Energy,

Vandalay, LLC, and Scott Rees.

**Q.** I want to talk about Big Hog Energy for a second. Is that the same Big Hog Energy, LLC, that we have discussed previously through the signature cards?

**A.** Yes, it is.

**Q.** And who owns that company?

**A.** Maxwell Jensen.

**Q.** All right. You mentioned Big Striker Energy. Is that the same Big Striker Energy that we have previously discussed?

**A.** Yes.

**Q.** And who owns that company?

**A.** Maxwell Jensen.

MR. SUSLAVICH: Looking a little closer here at some of these transactions, could we please zoom in to the box that's on the far right-hand side?

BY MR. SUSLAVICH:

**Q.** Agent, what are these? Well, excuse me. What are we looking at here?

**A.** These are incoming transactions from Caribou Energy, over numerous dates.

**Q.** In the course of your investigation, did you review transactions from Caribou Energy?

**A.** Yes, I did.

**Q.** And are you familiar with what Caribou Energy does?

**A.** They purchase oil.
**Q.** And what kind of transactions are coming in? Are they checks? Are they cash?
**A.** They're automated check house, so they're just electronic transfers that go from their business account, into Hound Dog Energy's business account.
**Q.** So is that what ACH stands for, then?
**A.** Yes.
**Q.** Would that be similar to an e-check or --
**A.** Yes, it would.
**Q.** Okay. And what was the total amount of money coming in to Hound Dog Energy, LLC, from Caribou Energy, a/k/a 9G?
**A.** Approximately $362,873.
**Q.** Let's move to the box just to the left of that.
We mentioned Big Striker Energy. What kinds of transactions were coming in from Big Striker Energy?
**A.** There were Zelle transactions and wire transfers.
**Q.** And what was the total amount of incoming money from Big Striker Energy?
**A.** Approximately $177,400.
**Q.** All right. Let's move just to the left of that now. From Big Hog Energy, what kind of transactions were coming in from that?
**A.** A wire transfer and Zelle transfers.
**Q.** And how much in total?

**A.** Approximately $18,400.
**Q.** And from Vandalay, LLC, just to the left of this one, what kind of transactions were coming in from this particular entity?
**A.** Wire transfers.
**Q.** And approximately how much?
**A.** Approximately $110,000.
**Q.** Is -- who owns -- in your review of the records, who owns Vandalay, LLC?
**A.** Scott Rees.
**Q.** And is he charged here today?
**A.** No, he is not.
**Q.** All right. Let's move to the next box over, just to the left. And who were the -- who was signing these transactions?
**A.** That's Scott Rees.
**Q.** Total amount?
**A.** Approximately $20,000.
**Q.** So adding this all together then, how much money was incoming into Hound Dog Energy, LLC?
**A.** Approximately $688,673.
**Q.** And all of this money was sent on the -- through these individual transactions, on the dates listed in the summary boxes for each account?
**A.** That's correct.

**Q.** I want to turn your attention to what has been previously been admitted as Government's Exhibit 77.

Agent, do you recognize this?

**A.** Yes, I do.

**Q.** What is it?

**A.** These are transactions that were outgoing from Hound Dog Energy, so, in laymen's terms, being what Hound Dog Energy paid to other individuals.

**Q.** Did you obtain this record in your investigation, or did you make it?

**A.** I made it.

**Q.** And were you using the same sources that you utilized in the incoming transactions from --

**A.** Yes, I did.

**Q.** Let me just finish that question.

Did you use the same sources that you utilized in Government's Exhibit 76, which we discussed previously, to make Government's Exhibit 77?

**A.** Yes, I did.

**Q.** So you mentioned outgoing transactions. It's fair to say that this is the money that Hound Dog Energy, LLC, was paying out?

**A.** Correct.

**Q.** And how was Hound Dog Energy, LLC, paying out? Like what types of instruments did it -- did it utilize?

**A.** Hound Dog Energy wrote checks. They sent Zelle and Cash App transfers, as well as wire transfers. And there was also cash withdrawals made.
**Q.** That's probably because of my youth that I take this for granted, but do you know in general, what is Zelle, for someone who doesn't know what Zelle is.
**A.** It's a peer-to-peer monetary transfer portal. So basically an individual or a business entity can send funds to another individual or business entity. They likely link a bank account, or they can just have funds sent to that account and then be able to do electronic transfers that way.
**Q.** So it's an all -- it's a way to electronically transfer funds?
**A.** Correct.
**Q.** All right. What is Cash App?
**A.** It's the same -- pretty similar to Zelle.
**Q.** Let's talk -- let's zoom in to the box on the left this time.
Agent, is this a complete record of all the cash withdrawals from Hound Dog Energy, LLC?
**A.** Yes, it is.
**Q.** And you made this record?
**A.** Yes, I did.
**Q.** And you relied on the exhibits that we have previously talked about to make this record?

**A.** Yes, I did.
**Q.** And what dates do the cash withdrawals range from?
**A.** From March 2025 through August 2025.
**Q.** And what was the total amount of cash withdrawn from Hound Dog Energy, LLC?
**A.** Approximately $260,471.
**Q.** And is there any way to know, based purely on the banking records, which you received, where that cash went to?
**A.** No, there's not.
MR. SUSLAVICH: Let's move to the box just to the right of that. It's titled "Checks."
BY MR. SUSLAVICH:
**Q.** Agent, what is this a record of?
**A.** These are checks issued from Hound Dog Energy, to numerous individuals.
**Q.** What date ranges do these checks run from?
**A.** From June 2025 through August 2025.
**Q.** And were -- was this summary of the outgoing check transactions based on -- based on the records that you received in the course of this investigation that we have gone over?
**A.** Yes.
**Q.** And I don't want you to name everyone there, but was Chris Ortega -- was there ever a check written to Chris Ortega from Hound Dog Energy, LLC?

**A.** Yes.
**Q.** And how many do you see there? Take your time.
**A.** Two checks.
**Q.** What were the dates?
**A.** June 27, 2025, and July 3, 2025.
**Q.** And how much were these checks for?
**A.** $950.
**Q.** Both the same?
**A.** Correct.
**Q.** And were there any checks made to the recipient of Carlos Contreras?
**A.** Yes.
**Q.** And there's numerous checks in this issued to Carlos Contreras, correct?
**A.** Correct.
**Q.** I don't want to go through each one of them, but what was the one issued on the latest date, the last check issued to Carlos Contreras?
**A.** It was August 8, 2025.
**Q.** And how much was it for?
**A.** $14,040.
**Q.** Sir, adding up all the checks accumulated in the course of this investigation, what was the total amount paid in check by Hound Dog Energy, LLC?
**A.** Approximately $145,130.

MR. SUSLAVICH: Let's move to the table titled "Zelle/Cash App," just to the right.

BY MR. SUSLAVICH:

**Q.** Agent, what are we looking at here?

**A.** These are Zelle and Cash App transfers sent from Hound Dog Energy, to multiple individuals.

**Q.** And who -- was Chris Ortega ever paid via Zelle or Cash App?

**A.** Yes, he was.

**Q.** And approximately how many times was Chris Ortega paid via Zelle or Cash App, according to these records?

**A.** Approximately six times.

**Q.** And let's -- let's go through those dates. What was the first date that these records show that Chris Ortega was paid by Zelle or Cash App?

**A.** August 4, 2025.

**Q.** How much was it for?

**A.** $1,000.

**Q.** Okay. What is the next date?

**A.** August 11, 2025.

**Q.** How much?

**A.** $1,000.

**Q.** Next date?

**A.** August 11, 2025.

**Q.** And how much?

**A.** $550.
**Q.** Next date?
**A.** August 11, 2025.
**Q.** How much?
**A.** $1,850.
**Q.** Next date?
**A.** August 15, 2025.
**Q.** And how much?
**A.** $4,200.
**Q.** That's significantly -- significantly more. Would you agree?
**A.** It is.
**Q.** And what was the next date?
**A.** August 18, 2025.
**Q.** And how much?
**A.** $1,000.
**Q.** All right. I want to turn your attention to the recipient listed as ABC&M, LLC. Do you see any records of ABC&M, LLC, being paid by Zelle or Cash App?
**A.** Yes.
**Q.** And in the course of your investigation, did you investigate the company ABC&M, LLC?
**A.** Yes, I did.
**Q.** Could you tell us about that?
**A.** It is a company owned by Carlos Contreras.

**Q.** And what was the last transaction send to ABC&M, LLC, according to these records?
**A.** August 21, 2025.
**Q.** And how much was that transaction for?
**A.** $5,000.
**Q.** What were the total amounts of -- based on these records, what were the total amounts of Zelle transactions sent out from Hound Dog Energy, LLC?
**A.** Approximately $65,780.
**Q.** And what was the total amount of Cash App transactions sent out from Hound Dog Energy, LLC, according to these records?
**A.** Approximately $22,060.
**Q.** All right. Let's move just to the right again, and let's focus on the box titled "Wire Transfers to ABC&M, LLC."
Are these records that you summarized based on the financial records that you received in the course of this investigation that we've already gone over?
**A.** Yes.
**Q.** And where are these wire transfers going to?
**A.** To ABC&M, LLC.
**Q.** Is that the same ABC&M, LLC, that we just discussed, belonging to Carlos Contreras?
**A.** Yes.
**Q.** And how many -- how many wire transfers were there to

ABC&M, LLC, approximately?
**A.** Thirteen.
**Q.** And I just want to go over the last -- let's go over the last three here. What were the last three transactions these records show that Hound Dog Energy, LLC, transferred money to ABC&M, LLC?
**A.** On August 19, 2025.
**Q.** Amount?
**A.** $5,040.
**Q.** Next date?
**A.** August 21, 2025.
**Q.** Amount?
**A.** $9,590.
**Q.** And the last date?
**A.** August 22, 2025.
**Q.** And the amount?
**A.** $9,730.
**Q.** And what were the total amount of wire transfers sent from Hound Dog Energy, LLC, to ABC&M, LLC?
**A.** Approximately $157,900.
**Q.** So we've gone through several forms of payment sent out through Hound Dog Energy, LLC. Did you ever summarize all of this together?
**A.** Yes, I did.
**Q.** And is that summary in the box to the lower right-hand

corner?
**A.** Yes, it is.
**Q.** Okay. And just -- and is this box listed by the recipient?
**A.** Yes, it is.
**Q.** And how much money was -- we've already gone over how much money was paid out in cash. How much money was delivered to ABC&M or its owner, Carlos Contreras, based on these records?
**A.** Approximately $284,155.
**Q.** How much money was delivered to Thomas Rees, the owner of -- or Hound Dog Energy?
**A.** Approximately $3,000.
**Q.** And how much money was delivered from Hound Dog Energy, LLC, to Chris Ortega?
**A.** Approximately $11,500.
MR. SUSLAVICH: One moment.
(Counsel confers.)
BY MR. SUSLAVICH:
**Q.** Agent, just a couple more questions here. In your review of Hound Dog Energy, LLC, what was -- were there any clearing transactions in this account to either shut it down or to balance out the account?
**A.** Yes, there was.
**Q.** And could you please describe what a clearing transaction

is?
**A.** It will be a transaction to basically zero out the account, such as whatever balance may be in there, to withdraw that amount.
**Q.** So it's to withdraw the last cent in that account, if you will?
**A.** Correct.
**Q.** And what was the final amount left in this account? Do you recall?
**A.** I don't recall.
**Q.** Is there anything that could refresh your recollection?
**A.** Yes.
MR. SUSLAVICH: Your Honor, may I approach the witness?
THE COURT: Sure.
BY MR. SUSLAVICH:
**Q.** Agent, I have shown you what has previously been admitted as Government's Exhibit 57. Would you please review it, and when you're done reviewing it, look up to me.
**A.** (Witness complies.)
**Q.** Agent, is your memory refreshed?
**A.** Yes, it is.
**Q.** Do you need me to repeat the question or --
**A.** Yes, please.
**Q.** What was the final amount left in Hound Dog Energy, LLC,

when it was closed out?
**A.** As of August 1, 2025, the balance was $39,370.22.
**Q.** All right. Finally, we talked about Scott Rees. And the course of your investigation, who is Scott Rees?
**A.** Scott Rees is Thomas Rees's father.
(Counsel confers.)
MR. SUSLAVICH: Pass the witness, Your Honor.
THE COURT: Cross-exam?
MR. SUSLAVICH: Or, actually, Your Honor?
THE COURT: Yes.
MR. SUSLAVICH: May I retrieve our exhibit?
THE COURT: Yeah.
Do you have any cross-examination questions?
MR. OTTAWAY: One.
THE COURT: Go ahead.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:
**Q.** Do you know where Scott Rees got the money to send to his son?
**A.** It appeared like Scott Rees took out loans to pay Hound Dog Energy.
**Q.** Like a second mortgage on his house or something?
**A.** I'm not sure. There is a transaction stating a loan advance and potentially pulling money from an IRA.
MR. OTTAWAY: Okay. Nothing further.

THE COURT: Any follow-up on that?
MR. SUSLAVICH: No, Your Honor.
THE COURT: Thank you for your testimony, sir. You're excused.
THE WITNESS: Thank you.
THE COURT: The government can call its next witness.
MR. DICKENS: Your Honor, at this time, the government rests.
THE COURT: All right. From defense? Anything from defense?
MR. OTTAWAY: Yes. We call Tom Rees.
THE COURT: All right. We'll start the defendant's case-in-chief.
Do you have somebody getting him? Go grab him for me.
MR. OTTAWAY: I'll go.
THE COURT: Sure. Thanks.
All right. Come forward here. I'm going to swear you in.
(The witness was duly sworn.)
THE COURT: Counsel, is this Mr. Rees, the co-defendant in this case?
MR. DICKENS: Yes, Your Honor.
THE COURT: Does he have a lawyer?

MR. DICKENS: Your Honor, we told the lawyer about it. The lawyer is not present.

THE COURT: Who's your lawyer?

THE WITNESS: Samuel Joseph or Murdoch Walker.

THE COURT: Who's that? Who's that? Do you know?

THE WITNESS: They're out of state.

MR. DICKENS: Yeah. They're from, I believe, the Atlanta area.

THE COURT: Okay. So did you talk to your lawyers about testifying today in court?

THE WITNESS: Yes.

THE COURT: And they don't want to come?

THE WITNESS: I don't know. I guess not.

THE COURT: All right. I don't know. Mr. Dickens?

MR. DICKENS: Your Honor, it's an unusual situation. That's one of the reasons that the Court -- the government balanced not calling him. But I informed the attorneys. I don't know what else to tell the Court.

THE COURT: Mr. Ottaway, did you talk to the lawyers?

MR. OTTAWAY: No, I have not. I sent messages to them, and they didn't return messages.

THE COURT: Okay. So you understand that you have lawyers -- you're a defendant in this case, and you have lawyers, right?

THE WITNESS: Yeah.

THE COURT: And you understand you have the right to have those lawyers present during things like testifying in the case, correct?

THE WITNESS: Yeah.

THE COURT: And you understand you potentially have constitutional rights not to testify in this case; is that's correct?

THE WITNESS: Yes.

THE COURT: Do you want to go forward and testify?

THE WITNESS: Yes.

THE COURT: You want to go forward and testify without your lawyers here?

THE WITNESS: Yeah. I'll just answer the questions.

THE COURT: All right.

MR. DICKENS: Your Honor, the only thing, I'd ask the Court to admonish the witness about is, potentially, of course, you're the sentencing judge.

THE COURT: Yeah.

MR. DICKENS: So this could still harm his case, depending on the testimony. And, therefore, he may want an attorney.

THE COURT: Do you understand what the prosecutor just said?

THE WITNESS: Yes.

THE COURT: So you're still a defendant in this case. You may be sentenced -- you're likely to be sentenced, at some point, by me. Do you understand that?

THE WITNESS: Yes.

THE COURT: Do you understand things that you say here in court today can be potentially considered in future hearings, like your sentencing hearing.

THE WITNESS: Yes.

THE COURT: You understand that?

THE WITNESS: Yes.

THE COURT: And you still want to go forward and testify?

THE WITNESS: Yes.

THE COURT: Even without your lawyers here?

THE WITNESS: Yeah.

THE COURT: Even though you have the right not to testify -- or you potentially have the right not to testify if you don't want to. Do you understand that?

THE WITNESS: Yes.

THE COURT: You want to go forward and testify?

THE WITNESS: Yeah, I'll testify.

THE COURT: All right. Go ahead.

**THOMAS REES**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:

**Q.** What is your name, please?

**A.** Thomas Rees.

**Q.** How old are you?

**A.** I'm 26.

**Q.** And you flew in just to appear for this?

**A.** Yes.

**Q.** And you have a flight out this afternoon?

**A.** Yes.

**Q.** At what time?

**A.** At 3:46.

**Q.** Now, you and Max Jensen were friends from way back?

**A.** Yes.

**Q.** And then you became business partners?

**A.** Yes.

**Q.** And one of the businesses is this yard here in Carlsbad, correct?

**A.** Yes.

**Q.** And to get that company going, did your dad lend you some money?

**A.** Yes.

**Q.** Do you know where he got the money to help you get started with that?

**A.** He's retired and just had the -- had the money. He sold

his business.
**Q.** Do you know Christopher Ortega?
**A.** Yes.
**Q.** Where did you meet him?
**A.** I met him when I interviewed him for the position.
**Q.** What position?
**A.** Just watching over running my yard.
**Q.** And you young people talk too fast for us old people. So talk a little slower when you can. All right?
**A.** Okay.
**Q.** What was his job?
**A.** To watch over and manage my yard.
**Q.** And gauge tanks?
**A.** Yes.
**Q.** Meet the truck drivers?
**A.** Yes.
**Q.** And what was he supposed to get for this as pay?
**A.** He had a salary of $950 a week.
**Q.** And was there a part of his pay that would depend on if he could find some other people to bring oil?
**A.** Yes.
**Q.** How did that work?
**A.** If he could find potential clients that were selling disposal oil, I would give him a percentage.
**Q.** Okay. So if he found somebody new, you gave him a

percentage.
**A.** Yes.
**Q.** Did that happen one time while he worked for you?
**A.** Yes, one time.
**Q.** And he found the man that brought some oil?
**A.** Yes.
**Q.** Now, the accountant just testified that there was a payment made that wasn't a paycheck; it went to Christopher Ortega for money. Is that the money for his finder's fee for that man?
**A.** Which -- wait, which check?
**Q.** Well, they said there was like $3,600 paid to the man, and $550 paid to Chris Ortega. Is that about the money that we're talking about?
**A.** Yes, if I remember correctly.
**Q.** Is that the only man that he ever found to bring in as a new seller of oil?
**A.** Yes.
**Q.** Now, one time there was some trouble with some valves, and you sent Christopher Ortega $1,850. What was that for?
**A.** I can't remember, but I would assume parts for valves, if I wasn't present.
**Q.** Now, you were here for a pretty good while after Chris Ortega was hired, correct? In New Mexico?
**A.** I left for about a week after he was hired, and then I

came back, yes.
**Q.** When he was -- when you were back in New Mexico, you wrote checks to people, correct?
**A.** Yes.
**Q.** And then after you went back home, you sent money by Zelle?
**A.** Yes. Or wire.
**Q.** Now, who taught Christopher Ortega how to run this yard?
**A.** I did.
**Q.** What did you have to teach him?
**A.** How to gauge tanks and write tickets.
**Q.** And what was your system for having tickets?
**A.** In what sense?
**Q.** What were the tickets used for?
**A.** To see how much product was moved and to -- for the date, time, and BS&W.
**Q.** And you taught him all of those things?
**A.** Yes.
**Q.** He had had some experience in the gas business, right?
**A.** Yes.
**Q.** But not in the oil business?
**A.** From my understanding. I'm not sure.
**Q.** Okay. Now, did you ever have an agreement with Christopher Ortega that you and he would sell stolen oil?
**A.** No.

**Q.** Did you consider him an employee?
**A.** Yes.
**Q.** Was he ever your partner?
**A.** No.
**Q.** Did you ever have some kind of secret agreement, not written down or just a handshake agreement, where you would expect him to handle stolen oil?
**A.** No.
MR. OTTAWAY: I'll pass the witness.
THE COURT: Cross-exam?
MR. DICKENS: Thank you, Your Honor.
THE COURT: Sir, let me ask you some more questions. Who's local counsel for Mr. -- if the other people are out of state?
MR. DICKENS: They never had local counsel.
THE COURT: Are they pro hac vice? Who let them? Do you know?
MR. DICKENS: I don't know, Your Honor.
THE COURT: All right. I'll look it up.
All right. Go ahead, Mr. Dickens.
MR. DICKENS: Sorry, Your Honor, that was before I joined the case.
THE COURT: It's okay. It's all right.
MR. DICKENS: I didn't bother going back and look at it.

THE COURT: It's all right.

**CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Just so we're clear, Mr. Rees, you've pled out to your charges in this particular case, correct?

**A.** Yes.

**Q.** And you are required to come in and testify; is that correct?

**A.** Yes.

**Q.** But again, as the Court went over today, you recognize you have a right to have an attorney, but you've waived that right, correct?

**A.** Yes.

**Q.** Okay. So before you got involved in Hound Dog Energy, would you please summarize your experience in the oil business?

**A.** Very little. I worked for Max Jensen, just for marketing, for -- off and on for probably about two years, didn't really go anywhere, tried to get something, but not a whole lot of experience.

**Q.** Okay. So before those two or three years with Max Jensen, no oil experience whatsoever?

**A.** Yes.

**Q.** So all of the oil experience that you learned through this was through Mr. Max Jensen?

**A.** Yes.
**Q.** So when you were learning things, such as how to set up a business, that was Max Jensen?
**A.** Yes.
**Q.** When you were learning about how to get sources of oil, that would be Max Jensen?
**A.** Yes.
**Q.** When you were learning how to -- what equipment you might need for a yard, that would be Max Jensen?
**A.** Yes.
**Q.** When you were learning how to make sure that you were getting either legitimate or illegitimate sources of oil, that would be Max Jensen?
**A.** Yes.
**Q.** In fact, you helped Carlos Contreras set up a LLC for his vacuum truck business, right?
**A.** Yes.
**Q.** And, in fact, you learned how to do that through Max Jensen, correct?
**A.** Yes.
**Q.** Did you even know how to look up the standard cost for oil or the value of oil before you knew Max Jensen?
**A.** No.
**Q.** So would you agree that, in fact, Max Jensen was key to setting up Hound Dog Energy?

**A.** Yes.
**Q.** And, in fact, it was Max Jensen's idea to set up Hound Dog Energy, correct?
**A.** Yes.
**Q.** Because Max Jensen wanted people to be between him and his source of oil, correct?
**A.** Yeah.
**Q.** And, in fact, before you set up the Seven Rivers yard, you had another yard south of Carlsbad, operating under the Hound Dog Energy name, correct?
**A.** Yes.
**Q.** And, again, that was a -- a yard that was financed and assisted and set up by Max Jensen, correct?
**A.** Yes.
**Q.** And when Max Jensen was arrested, you shut down that yard and actually left the State of New Mexico, correct?
**A.** Yes.
**Q.** And it was only after some time passed that you decided to come back to New Mexico, and set up a second yard for Hound Dog Energy, correct?
**A.** Yes.
**Q.** And that was what became the Seven Rivers yard; is that right?
**A.** Yes.
**Q.** And the same supplier of oil from that first yard in

Carlsbad began to deliver oil to you at that Seven Rivers yard?

**A.** Yes.

**Q.** And that would be Carlos Contreras and his cousin/brother, Christian?

**A.** Yeah. Yeah.

**Q.** Okay. So you were aware that Max Jensen, obviously, was arrested, correct?

**A.** Yes.

**Q.** And it was well known in the business, in that area, of Max Jensen's arrest, correct?

**A.** Yes.

**Q.** He had a bit of a burnt reputation, as they might say, correct?

**A.** Yes.

**Q.** And in communications between you and Chris, are you aware that Chris knew about this burnt reputation of Max Jensen, correct?

**A.** I'm not sure in the beginning, but --

**Q.** But he became aware?

**A.** Yeah.

**Q.** How did he become aware, if you know?

**A.** I don't remember if -- I don't remember if I said something or if he heard, but I'm not 100 percent sure.

**Q.** That's fine. And again, just as we talked about before,

if you're not 100 percent sure, "I don't know" is a good answer. Okay?

**A.** Okay.

**Q.** A couple of the questions that you answered for defense counsel were, "I don't know, but I think." Just tell us what you absolutely remember. Okay?

**A.** Okay. All right.

**Q.** But in your communications with Christopher Ortega, it became clear that Christopher Ortega knew about Max Jensen's legal problems?

**A.** Yes.

**Q.** It became aware -- it became apparent through your communication with Christopher Ortega that he knew about Max Jensen having problems with selling or transporting stolen oil?

**A.** I'm not 100 percent sure on that.

**Q.** How about that, in fact, Max Jensen's burnt reputation applied to his yards in the area, such as the Odessa yard?

**A.** Well -- what was that question? Sorry, I'm --

MR. DICKENS: Let's go ahead and -- I'll back up, and we'll just play a recording.

Ms. Sanchez, if you could bring up Exhibit 34. Let's go ahead and start at about 9:30, please. And we'll just play it for a couple minutes, and then we'll stop. Okay?

(Audio plays.)

BY MR. DICKENS:

**Q.** Do you recognize the -- one of the voices on there as being Christopher Ortega?

**A.** Yes.

MR. DICKENS: Okay. If you could continue, please.

(Audio plays.)

MR. DICKENS: Ms. Sanchez, let's go ahead and stop it there.

And just for the record, we're stopping at about 10:52.

BY MR. DICKENS:

**Q.** Mr. Rees, as you listen to that recording, that is the recording of you and Mr. Ortega on the day that you were arrested, correct?

**A.** Yes.

**Q.** And in that, Mr. Ortega clearly mentions that he knows about Max's burnt reputation with the Odessa yard, correct?

**A.** Yes.

**Q.** And he knows about Max making way too much money and heads being turned his way, correct?

**A.** Yes.

**Q.** So in that conversation, it's clear that Mr. Ortega knows that Max Jensen's burnt reputation applies to the West Texas, New Mexico area, correct?

**A.** Yes.
**Q.** Let's now move to this deal that was set up for that day, that was supposed to happen that day, during that interview. This was actually a deal set up by Max Jensen, correct?
**A.** Yes.
**Q.** That Chris Stuart, the -- what we now know the confidential informant was supposed to deliver a load of oil, with his oil supplier named "Hugo," right?
**A.** Yes.
**Q.** And Max Jensen told you about this, correct?
**A.** Yes.
**Q.** And Max Jensen told you that the reason that Hugo wasn't going to deliver it to Odessa was because, again, that Odessa yard reputation was burnt. Nobody would deliver there, right?
**A.** Yes.
**Q.** So he was going to deliver to your yard at Seven Rivers, right?
**A.** Yes.
**Q.** And there was even a conversation with you and Max about not -- having you not look like a fed, right?
**A.** I'm not 100 percent.
MR. DICKENS: Fair enough.
So let's go ahead and -- if you would bring up Exhibit 29, Ms. Sanchez -- actually, I apologize, 28?

And, Your Honor, may I approach the witness with the transcript?

THE COURT: Sure.

MR. DICKENS: It was 29. I do apologize.

Okay. Ms. Sanchez, if we could play from the start to about 0:51.

(Audio plays.)

MR. DICKENS: And now if you can please play minute 4:26 to minute 6:09. 4:26 to 6:09.

(Audio plays.)

BY MR. DICKENS:

**Q.** Okay. Mr. Rees, you heard your voice on that recording?

**A.** Yes.

**Q.** So you were present for that conversation about not looking like a fed to Hugo, right?

**A.** Yes.

**Q.** So if Hugo is a legitimate source of oil, he doesn't care who he sells it to. So in that conversation, the three of you knew that Hugo would not be a legitimate source of oil, right?

**A.** I'm not sure.

**Q.** But, again, Hugo doesn't want any law enforcement present.

**A.** Yes.

**Q.** Don't look like a fed.

Is there a reason why somebody who lawfully owned oil would care who they sell it to?
**A.** No.
**Q.** Did Christopher Ortega ever tell you that the oil was too pure coming into that facility?
**A.** He had his concerns.
**Q.** Okay. And he, therefore, recognized that Carlos was bringing in too good of a product?
**A.** Yeah. He gave me a concern, and I just told him that Carlos showed me a contract so...
**Q.** And that's all it took for him to stop asking questions?
**A.** I don't quite remember.
**Q.** Do you remember him pestering you repeatedly about this issue?
**A.** I don't remember repeatedly, but it could have been a few times. I'm not 100 percent.
**Q.** And yet he continued to work for you?
**A.** Yes.
**Q.** He continued to gauge the tanks that Carlos brought in?
**A.** Yes.
**Q.** And continued to be there as the oil was sold?
**A.** Yes.
MR. DICKENS: Thank you, sir.
No further questions.
THE COURT: Redirect?

**REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:

**Q.** How many times do you think he questioned you about the oil being too good?

**A.** I'm not sure.

**Q.** More than one?

**A.** I don't remember, but it could be.

**Q.** But when he asked you something, did you tell him something so he would quit worrying about it?

**A.** Yes, just of what I was told.

MR. OTTAWAY: Okay. Pass the witness.

THE COURT: All right. Thank you for your testimony, sir. You're excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: You can call your next witness.

MR. OTTAWAY: Christopher Ortega.

MR. SUSLAVICH: Your Honor, can we grab our exhibit up there?

THE COURT: Yeah, take that back to the government for me. Thanks.

MR. OTTAWAY: Can Mr. Rees be excused?

THE COURT: From the government?

MR. DICKENS: No objection.

THE COURT: You're excused, sir. You can leave.

Mr. Ortega, I'm going to swear you in.

(The witness was duly sworn.)

**CHRISTOPHER ORTEGA**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:

**Q.** What is your name, please?
**A.** Christopher Ortega.
**Q.** How old are you?
**A.** 37.
**Q.** Where do you live?
**A.** Carlsbad, New Mexico.
**Q.** Where were you raised?
**A.** Pretty much all over the United States.
**Q.** Okay. Who is in your family?
**A.** Right now just me, my wife, and my two boys.
**Q.** Is your wife in the back of the courtroom?
**A.** Yes, she is.
**Q.** What is her name?
**A.** Naomi.
**Q.** How long have you all been together?
**A.** Going on six years.
**Q.** Now, you have kids from a previous marriage?
**A.** Yes, I do.
**Q.** Where do they live?
**A.** They live in Carlsbad.

**Q.** How long have they lived in Carlsbad?
**A.** Their whole lives.
**Q.** How far did you go in school?
**A.** I graduated high school.
**Q.** From where?
**A.** New Mexico Boys Ranch. I was fostered.
**Q.** You had kind of a rough upbringing, didn't you?
**A.** Yeah.
**Q.** Did you go to the military?
**A.** I did.
**Q.** How old were you?
**A.** 17 when I signed up.
**Q.** And did somebody have to sign for you to get in the military?
**A.** The state had to approve it.
**Q.** You were a ward of the state?
**A.** That is correct.
**Q.** So where did you go for your military service?
**A.** I was stationed in Fort Benning, Fort Riley, Germany, Iraq.
**Q.** How many tours did you do in Iraq?
**A.** Two.
**Q.** Did you have some problems related to your military service?
**A.** I was injured and dismissed from the military.

**Q.** How did that happen?
**A.** Caught an EFP in Iraq.
**Q.** I'm sorry, what?
**A.** An EFP, explosive force projectile. It's a bomb that goes off on the side of the road.
**Q.** And did it hurt part of your body?
**A.** It did.
**Q.** What part?
**A.** Back and right arm.
**Q.** And did they give you medical treatment for it?
**A.** Yes. Still receiving medical treatment for it.
**Q.** So you draw benefits from who?
**A.** The VA. I'm 100 percent.
**Q.** Okay. Now, when did you leave the military?
**A.** 2011, March 21st.
**Q.** Where did you go to work then?
**A.** I came back to Carlsbad. I started working on the drilling rigs for Silver Oak.
**Q.** For who?
**A.** For Silver Oak Drilling.
**Q.** Okay.
**A.** And then got offered to become a contract pumper for a man named "Tim Perry."
**Q.** How long were you a contract pumper?
**A.** I worked for Tim Perry as a contract pumper, a foreman,

and an operator for about three and a half years.
**Q.** Was that oil or gas?
**A.** When I was pumping, it was oil, but when I shifted to midstream operating, it's gas. And then when I went -- as a foreman, I was a construction foreman. I actually built the locations.
**Q.** Okay. And where did you go to work after that?
**A.** After that, I went to work for a man named Ty Dowdy, known as T and D Lube Doctors, and I went to -- I was a midstream operator.
**Q.** A what operator?
**A.** A midstream operator.
**Q.** What is a midstream operator?
**A.** Midstream operators handle the gas side of it, the pipeline, the pigging, but not so much as the oil, but just the natural gas side.
**Q.** And how long did you work for midstream?
**A.** I've been a midstream operator -- I worked for Ty for about four years and switched down to Darco, same position, same title, worked for them for about a year, and then I retired out of the oil field altogether.
**Q.** Why did you retire from the oil field?
**A.** Just wanted to move around.
**Q.** And did you move some places?
**A.** Yeah. I stayed in Carlsbad for a few years, and then I

moved to Texas for a couple of years.
**Q.** Now, when you were young, you were in a motorcycle club.
**A.** Correct.
**Q.** What was the name of it?
**A.** The Bandidos Motorcycle Club.
**Q.** Where was it located?
**A.** They're nationwide. They're worldwide pretty much. But the chapter that I was part of was the Carlsbad chapter.
**Q.** Why would you ever join that kind of thing in the first place?
**A.** With my upbringing, and then being in the military, you seek out -- I seeked out the camaraderie I still had from the military.
**Q.** Did the motorcycle club have get-togethers and do things together that you enjoyed?
**A.** I really enjoyed the riding and the parties, yes.
**Q.** Okay. Now, people have intimated that they're a criminal gang. Have you ever been convicted of any crime, anywhere?
**A.** I have a misdemeanor assault charge from years and years ago, but after that, no.
**Q.** They have said -- people have said in this trial that you hold some kind of office, or held some kind of office, in that club. Did you ever hold an office in that club?
**A.** I did.
**Q.** What kind of office-holder were you?

**A.** I held multiple offices, officer positions.
**Q.** What did you do?
**A.** My first officer position was the sergeant-at-arms, which is in charge of the security and the protection of the club. My second position was vice president. I pretty much was being groomed to take over the chapter of the -- that I was part of. And then --
**Q.** What city was that chapter in?
**A.** That was Carlsbad.
**Q.** Okay. And did there come a time when you decided to leave the club?
**A.** Yes.
**Q.** When?
**A.** I left the club in May 2025.
**Q.** Okay. Were you married by then to Naomi?
**A.** Yes, I was.
**Q.** Did she have some influence on that?
**A.** Her and my boys, yes.
**Q.** Her and who?
**A.** And my children.
**Q.** Why is that?
**A.** I joined a club to try and find something, and then I realized I couldn't change what I wanted to change. And they were making me look like something that I didn't want to become.

**Q.** So when did you first meet or hear about Max Jensen?
**A.** I moved back to Carlsbad after I left the club. And I put my resume on Indeed, and I got this phone call, I want to say it was late June. And he didn't tell me his name at first. If he did, I didn't recognize it on the -- or I didn't hear him. I have pretty hard of hearing. But he said he had a position open for a yard manager.
**Q.** Did you know what a yard manager did?
**A.** Being in the oil field, I kind of had a guess, you know. After -- the type of business he told me it was a yard for, I didn't understand. But I knew I could figure it out.
**Q.** What did you think the business was?
**A.** He told me that they were buying and selling slop oil, slop and waste oil.
**Q.** What do you think -- or what did you think slop oil was a year ago?
**A.** Trash. Like, dirty oil, oil on the ground. I -- oil that's been sucked out of containments, stuff like that.
**Q.** So he told you that he ran a business relating to slop oil?
**A.** Correct.
**Q.** And what else did he tell you on that first interview?
**A.** As far as I can remember, he just said that I -- that my resume matched what they were looking for and that he wanted me to meet his -- the owner of the company there in Carlsbad.

**Q.** Now, earlier in the trial, there have been some texts. Did you get a text from Tom Rees?
**A.** I did.
**Q.** And after that, did you all meet?
**A.** We did.
**Q.** Where did you meet?
**A.** At the Seven Rivers yard.
**Q.** What did Tom Rees tell you then?
**A.** Tom walked me around the yard, told me what he expected from the job, what he wanted me to do, explained what he's already been doing there for the tickets, and stuff, is what I mean, and just basically just went over what he's doing.
**Q.** How long did he stay around that first time? How many days?
**A.** The first time he was there -- if I remember correctly, he was there for about two weeks. And then he did leave very shortly and then came back.
**Q.** Okay. Now, when he was there, he wrote checks, correct?
**A.** Correct.
**Q.** When he was gone, he did electronic transfers?
**A.** Correct.
**Q.** And what were you supposed to earn as a paycheck for working for Tom Rees?
**A.** We agreed on 950 a week when I first started. At the end, he bumped me up to 1,000.

**Q.** Now, had you been looking for work for a while?
**A.** At that point, I probably had my resume on Indeed for about a month, a month and a half.
**Q.** Were jobs easy to find in Carlsbad?
**A.** Not good ones. Good ones are hard to find.
**Q.** Did you consider this a good job?
**A.** I considered it my foot back in the door in the oil and gas industry.
**Q.** Did you want to keep the job?
**A.** I was -- no, I didn't want to keep the job.
**Q.** Okay. Did you want to work there for a while?
**A.** I wanted to get my foot back in the door and get my name back out there until I found something better.
**Q.** Were you to earn any other kind of pay from the company?
**A.** He told me about commissions.
**Q.** What did he say about commissions?
**A.** So if he -- the way he described the company, and then the way he wanted me to find my own supply of waste oil, he said if I found my own supply of waste oil, that he would give me commission off of that oil.
**Q.** And how were you to be paid for the people that you found?
**A.** Either check or through Cash App, I think.
**Q.** How much payment?
**A.** Oh. I think he said five percent, something like that,

at first, if I can recall.
**Q.** And were you able to find one person during the time that you were there?
**A.** I did.
**Q.** How long were you there before you got arrested?
**A.** Six weeks, seven weeks.
**Q.** And how did you find this man?
**A.** I was driving around, and this old man -- I knew about this old man who had an old well on his land, so I drove out there and was talking to him. And he's just like, "I got all of this oil. I don't know what to do with it."
**Q.** And did you set up so that he could bring the oil to your yard?
**A.** Yes.
**Q.** Your yard wasn't very big, was it?
**A.** No.
**Q.** How many tanks were there?
**A.** Three frac tanks.
**Q.** Different colors?
**A.** Yes.
**Q.** What went in which colored tank?
**A.** All oil would go in -- okay. So when I first started, if I go back to the beginning, when Tom hired me, he says, "I have this guy working, Carlos. All of his oil goes in this tank."

**Q.** Okay.
**A.** Okay. "Any other oil goes in these other tanks."
**Q.** So Carlos had his own tank before you came to work?
**A.** Correct.
**Q.** And that wasn't one person that you developed, right?
**A.** No.
**Q.** When they say "marketing," that means you trying to find people, right?
**A.** Correct.
**Q.** But Carlos was already set up when you came to work?
**A.** Yes.
**Q.** Okay. And what tickets did Carlos bring you?
**A.** Carlos didn't bring me tickets. I wrote the tickets to Carlos.
**Q.** Who trained you how to do that?
**A.** Tom.
**Q.** Why did he say you needed a ticket?
**A.** He said that's how he keeps track for his records.
**Q.** So oil came in from Carlos into one tank?
**A.** Correct.
**Q.** What went in the other tanks?
**A.** Oil from -- if we had other people to bring oil, put them in them tanks.
**Q.** Did you have very many other people?
**A.** No.

**Q.** This was basically a Carlos operation, right?
**A.** Correct.
**Q.** So what happened when Carlos's tank got full?
**A.** If the tank did get full before Tom called the oil haulers to come get it, we would move the oil from -- or I would put him in a second tank.
**Q.** But Tom was in control of the oil haulers?
**A.** Correct.
**Q.** And who were they?
**A.** 9G. And there was one other one, I think, if I remember right.
**Q.** And did they write tickets when they came?
**A.** Yes.
**Q.** Who made those tickets?
**A.** They did.
**Q.** And that's some of the printed tickets that we've seen before?
**A.** Correct.
**Q.** With Hound Dog Energy and the location and things?
**A.** Correct.
**Q.** Were you involved at all in where the oil left, went after it left your yard?
**A.** No.
**Q.** Okay. How long did you work there with Tom supervising you?

**A.** A few weeks.
**Q.** Did there come a time when you started worrying about working there?
**A.** Yes.
**Q.** How long after you got there did you start worrying about it?
**A.** Probably about a month I started asking questions.
**Q.** What was concerning you? What were you worried about on the job?
**A.** Carlos. Carlos was concerning.
**Q.** Why?
**A.** He was just bringing too much, too much oil.
**Q.** Did you talk to Tom about it?
**A.** Yes, I did.
**Q.** What did Tom say?
**A.** Tom assured me. He showed me contracts that he had, paperwork and stuff that he had, and assured me that everything was fine.
**Q.** Where did Tom say that Carlos was getting all of this oil?
**A.** I don't recall that one.
**Q.** But he said it was legitimate?
**A.** He did.
**Q.** So when you asked Tom about it, he brushed you off or what?

**A.** Yes.
**Q.** Did you talk to your wife about being worried about the job?
**A.** Yes, I did.
**Q.** Did she help you with it some?
**A.** She has always told me to trust my gut.
But did she help me with the job, is that what you mean?
**Q.** Yeah. Did she come to the job with you sometimes?
**A.** Yeah. Yeah. Me and her are pretty inseparable. She comes everywhere with me.
**Q.** And how did you know when you had to be at the frac yard?
**A.** They would text me. Whoever was bringing oil would text me. Whoever was picking up oil would text me.
**Q.** And sometimes were you by yourself?
**A.** Sometimes, yes.
**Q.** And sometimes she was with you?
**A.** Correct.
**Q.** And were there times when you had to go to the soccer game, or something, when you had to leave the yard?
**A.** Yes.
**Q.** Why would you leave the yard to go to a soccer game?
**A.** My boys.
**Q.** Are they important to you?
**A.** They're very.

**Q.** So Carlos could unload himself?
**A.** There was times that Carlos did unload himself.
**Q.** How did you measure, and how did you write a ticket when Carlos had to unload himself?
**A.** I kept logs of what I had in the tank. And so if I knew the bottom gauge before he started loading, and if I went and checked the top gauge after he stopped loading, then I knew how much oil he brought or took.
**Q.** Now, there was some videos of you working around the frac tanks. Was that you in the videos that we saw?
**A.** Yes.
**Q.** And is that normal to do that job?
**A.** Yes.
**Q.** Did you ever have an agreement with Tom Rees about making money from illegal products?
**A.** No.
**Q.** Did you ever have an agreement with Max Jensen about making money from illegal products?
**A.** No.
**Q.** Did you ever have an understanding of what those guys were really up to?
**A.** No.
**Q.** When did you start, kind of, figuring it out?
**A.** About -- about five, six weeks in. And I still hadn't figured it out yet, but I was going to.

**Q.** Now, you've been working on this case for about a year, right?
**A.** Yes.
**Q.** Is it easy to look back and see that you should have drug up and left, quit the job?
**A.** Yes.
**Q.** So looking back a year down the road, when should you have quit?
**A.** The minute I started getting suspicions about Carlos.
**Q.** About how long into the job was that?
**A.** About a month.
**Q.** Did you talk to Tom about following Carlos?
**A.** I did.
**Q.** What did he say?
**A.** He told me to do it.
**Q.** Okay. Why were you going to follow Carlos?
**A.** Because I wanted to find out.
**Q.** You wanted to what?
**A.** I wanted to find out where he was getting it from.
**Q.** Okay. Did you ever -- were you ever able to follow him?
**A.** I was not.
**Q.** Was there a time when Carlos accused you of putting a tracker on his truck?
**A.** Yes.
**Q.** How did that happen?

**A.** I started asking Carlos a lot of questions, and I think he got suspicious. And so when he found the tracker, he automatically assumed it was me.
**Q.** Was he mad at you?
**A.** He was trying to be.
**Q.** Did he speak English?
**A.** He speaks pretty decent English.
**Q.** So you could communicate with Carlos?
**A.** On some points, yes. He's got a weird, like, slang.
**Q.** Now, he had other people with him all the time, right?
**A.** Correct.
**Q.** Did any of those people speak English?
**A.** They did not. Not that I'm aware of.
**Q.** Okay. Now, did Carlos have an escort truck or a pickup that followed him sometimes?
**A.** Yes, he did.
**Q.** Did you ask Tom about that?
**A.** I asked Tom why they had so many vehicles, and he says it's something about a family, that they all travel together. They stay in a truck, or something like that, if I can recall.
**Q.** Did you think that might be where the oil was coming from, a family operation?
**A.** Yes.
**Q.** When did you really start to worry about your job?

**A.** Probably when I started questioning Tom.
**Q.** Okay. Now, there was a time when this man named "Stuart Dollar" came and brought a proposal that he had a friend named Hugo. Do you remember that?
**A.** Correct.
**Q.** And he got arrested that night?
**A.** Yes.
**Q.** And we listened to the tape of it that day?
**A.** Yes.
**Q.** One time you said, "Oh, we get 1,000 barrels a day," on the tape?
**A.** Yeah.
**Q.** Now, tell me about that.
**A.** Well, it says I -- on the tape it says "3,000 barrels." But it was a -- it's like an oil field joke, just like, you know, 3,000 barrels or 4,000 barrels, just there's no way. It just --
**Q.** This is the man that he claimed that he was in a motorcycle club, also, right?
**A.** Correct.
**Q.** And he was trying to establish some kind of relationship with you?
**A.** Correct.
**Q.** What did he say about that?
**A.** He tried to lie to me about a member that he knew, that

wanted me to vouch for this other Bandido that supposably had oil.
**Q.** And how long had it been since you had left the club?
**A.** At that point -- May, June, July -- three months.
**Q.** And this man started giving you a phoney name about his friend in that old club?
**A.** Correct.
**Q.** Did you question him about it?
**A.** I asked him to verify what his real name was or what his road name was or what he even looked like.
**Q.** Now, on the exhibit that the finance man showed this morning, it showed that you got money for some valves -- or $1,850. What was that for?
**A.** There was some flowline valves, where the hoses hook up to. They were leaking. They were big wing valves. I had to replace those.
**Q.** Was this at a time when Tom was gone back to Utah?
**A.** Correct.
**Q.** And so how did you replace those valves?
**A.** I went to an oil field supply store, bought new valves, and went out and changed them.
**Q.** How did you pay?
**A.** Tom sent me the money. I paid with my own account.
**Q.** And then another one of those transfers in that exhibit that the finance man had was $550. What was that?

**A.** That was commission for that oil that I found.
**Q.** And then there was a large amount that came, like about $4,000 to you. What was that for?
**A.** That was to pay the gentleman that we had the oil from.
**Q.** Okay. Did anybody ever make an agreement with you to engage in a conspiracy?
**A.** No.
**Q.** Did you know these people's background when you went to work for them?
**A.** No.
**Q.** Did they ever disclose to you that they were running hot oil for years?
**A.** No.
**Q.** What would you have done if they had told you that?
**A.** I would have left.
**Q.** And after this man came, that claimed to be your friend, you got arrested?
**A.** Yes.
**Q.** You didn't have time to leave. You got arrested first?
**A.** I got -- I got arrested.
**Q.** Did they ask you for an interview?
**A.** Yes, they did.
**Q.** Did you agree to be interviewed?
**A.** Yes, I did.
**Q.** That night?

**A.** Yes.
**Q.** And did they ask you to look in your phone?
**A.** Yes, they did.
**Q.** Did you let them look in your phone?
**A.** Yes, I did.
**Q.** Did you answer all of their questions about your phone?
**A.** Yes, I did.
**Q.** After that, a policeman drove you down to the jail, right?
**A.** He drove me to Roswell's jail, yes.
**Q.** And that's about an hour. You talked to him the whole time?
**A.** Yes, I did.
**Q.** And that's recorded?
**A.** I believe so.
**Q.** And then when's the next time that you gave an interview or a statement to the officials?
**A.** The -- I believe the DA called me and wanted to set up a talk. Is that what you mean?
**Q.** And was there also a telephone interview before the meeting?
**A.** Yes, there was.
**Q.** So somebody interviewed you on the telephone?
**A.** Yes.
**Q.** I was there?

**A.** Yes.

**Q.** They sent us a letter, promising to do an interview; is that right?

**A.** Correct.

**Q.** And then what did you tell them in the telephone interview?

**A.** The same story.

**Q.** Was there a time when you came to the DA's -- the US Attorney's Office and gave an in-person interview?

**A.** Yes, I did.

**Q.** And did you answer all of their questions then?

**A.** Yes, I did.

**Q.** Have you done everything you can to try and explain your situation?

**A.** To the best of my ability, yes.

MR. OTTAWAY: I'll pass the witness.

THE COURT: We'll just take a ten-minute recess really quick, and then we'll do cross-exam.

(Court in recess at 10:59 a.m.
and reconvened at 11:07 a.m.)

THE COURT: Come back up to the stand, Mr. Ortega.

All right. Cross-exam.

**CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. DICKENS:

**Q.** Mr. Ortega, I appreciate you being here. If there's any

of my questions that you don't understand -- I have a nasty habit of talking too fast -- just ask that I rephrase them or slow down. Okay? It's very important that you understand all the questions. Okay, sir?

**A.** Okay.

**Q.** Okay. So when your counsel is talking to you about your past, you mention that you had a conviction for an assault or a battery; is that right?

**A.** Correct.

**Q.** You actually also have a conviction for a theft from Kansas; is that correct?

**A.** A what?

**Q.** A theft from Kansas, sir?

**A.** Oh. Yes. I forget about that one. I apologize.

**Q.** Okay. I just want to make sure. It was a theft conviction; is that right?

**A.** Yes.

**Q.** And did I hear right that you were with the Bandidos group up until just a couple months, a few months before your arrest?

**A.** Yes.

**Q.** And, in fact, you mentioned being the sergeant-at-arms for the chapter there in Carlsbad; is that right?

**A.** Correct.

**Q.** And weren't you the president out in Odessa?

**A.** No.
**Q.** Let's talk now about the -- your experience in the oil business. You recognize what's good oil and what's bad oil, right?
**A.** To the best of my ability, yes, I can.
**Q.** Okay. And, again, because you have had years of experience out in the field?
**A.** I have years of experience in the field, yes.
**Q.** And you recognize what's called slop oil or waste oil?
**A.** I thought I did.
**Q.** It's oil mixed with contaminants, such as water, dirt, silt, that sort of thing, correct?
**A.** Correct.
**Q.** And it's something that really doesn't take a whole lot of knowledge to figure out what's good oil and bad oil, right?
**A.** I've seen oil from green, pink, black, tar, all the way to crystal clear.
**Q.** And the crystal clear is the good oil, right?
**A.** Crystal clear oil is a whole different type of oil.
**Q.** So BS&W at a .0 or .1, or low, is good, right?
**A.** As far as my knowledge, yes. That's the cleanest oil.
**Q.** Okay. So you worked for Hound Dog Energy from approximately, what, June 22nd, to your arrest on August 21st?

**A.** June 22nd, yes, that sounds right.
**Q.** Okay. So let's talk about that time period, which is approximately two months. During that time period, you were the sole employee for Hound Dog Energy?
**A.** Correct.
**Q.** And during that time, Carlos brought in pure oil to Hound Dog Industries [sic], specifically to that Seven Rivers address, correct?
**A.** Carlos brought in oil, yes.
**Q.** Pure oil, sir, correct?
**A.** He brought in oil one time that had a bunch of water in it.
**Q.** Okay. One time, I guess. Every other time it was what, sir?
**A.** It was pretty clean oil.
**Q.** Pretty clean or good, clean oil?
**A.** Clean oil.
**Q.** And there were times where, in fact, when not only were you the sole employee, but you were the sole person working there. In other words, Tom Rees was not present?
**A.** Correct.
**Q.** And that was for about a month, right?
**A.** Correct.
**Q.** So a good chunk of July and most of August, because he doesn't come back until the day before the arrest, correct?

**A.** Correct.
**Q.** And so for the time, you were the one who documented every single load that Carlos brought in.
**A.** Correct.
**Q.** It was your load tickets about every single load, correct?
**A.** Correct.
**Q.** And you would agree that Carlos brought in the vast majority of the oil that went into that Seven Rivers facility, correct?
**A.** Correct.
**Q.** You're not surprised with it being referred to as about 93 percent of the oil that came in?
**A.** Repeat again?
**Q.** Certainly.
You're not surprised to hear it was about 93 percent of all the oil that came in?
**A.** He brought in 93 percent of all oil? Is that what you're asking?
**Q.** That's what I'm asking.
**A.** Correct.
**Q.** All but just a few loads, all of it was Carlos?
**A.** Correct.
**Q.** Without this one source of oil, Hound Dog Industries would not be functioning, correct?

**A.** Correct.
**Q.** And as you say, Carlos had his own tank to bring it in; is that correct?
**A.** He had his own tank -- he had his own truck that he was bringing it in. Is that what you mean?
**Q.** Sir, the tanks there, the frac tanks.
**A.** Oh.
**Q.** You said on direct he had his own tank, basically, to drop stuff in?
**A.** I was directed, yes, to put it in one tank, that he brought -- what he brought to put it in one tank.
**Q.** And only if that tank was full was it -- Carlos's load put in anything else, correct?
**A.** Correct.
**Q.** At one point, you actually talked to Tom about needing to pull the bottom of that black tank? Do you remember that?
**A.** Correct.
**Q.** That there was too much sludge in the bottom of that black tank?
**A.** Correct.
**Q.** Did you actually get a vacuum truck to pull that?
**A.** Yes, I did.
**Q.** Yeah?
**A.** The first time. There was two times that I've had to have it pulled.

**Q.** Okay. And that time, you hired a -- on behalf of Hound Dog Energy, you hired a vacuum truck to come out and pull that tank, right?
**A.** Tom handled it.
**Q.** Tom did it?
**A.** Yeah. Tom called somebody to come pick it up.
**Q.** Okay. So with Carlos's vacuum truck in the yard, Tom called some other vacuum truck to pull the bottom of that dirty tank, right?
**A.** Correct.
**Q.** Because Chris's truck was only for -- I'm sorry, Carlos's truck was only for clean oil, right?
**A.** As far as I know.
**Q.** And this is something you witnessed, correct?
**A.** I witnessed Carlos bring oil to the yard. I don't know what he did with the truck outside that.
**Q.** You witnessed that other vacuum truck take out the bottom, correct?
**A.** Oh, correct.
**Q.** And you know, because as you worked there, Hound Dog Energy did nothing to purify the oil from Carlos?
**A.** Correct.
**Q.** Hound Dog did nothing to remove water, to remove sediment. All it did was hold the oil for sometimes a couple of hours, no more than a few days, before that oil was sold,

correct?
**A.** Correct.
**Q.** All of Carlos's oil was sold to 9G, correct?
**A.** Correct.
**Q.** Or Caribou sometimes called, right?
**A.** Well, there was one other, but, yeah.
**Q.** And all of that oil was shipped across state lines to Texas, correct?
**A.** That's what the tickets say. I don't know where it went.
**Q.** But that's also what -- you talked to the drivers, and they told you they were going down to places in Texas, correct?
**A.** That is what I was told. I do not know exactly where they went.
**Q.** So you know that thousands of barrels of pure oil was being brought in by Carlos, correct?
**A.** Correct.
**Q.** You knew that Hound Dog Energy was paying $35 per barrel to Carlos for that oil?
**A.** Correct.
**Q.** You knew that Hound -- sorry, that 9G was being paid $55 to $65 a barrel, correct?
**A.** Correct.
**Q.** And, thus, Hound Dog Energy was being paid $20, or more, to simply hold the oil for a few hours, or at most a few

days, before selling it, correct?
**A.** Correct.
**Q.** Let's talk about Carlos. You thought Carlos and his crew were sketchy, correct?
**A.** Correct.
**Q.** You knew that they had an escort vehicle, that white pickup truck, that drove with them into the yard and out to the field, correct?
**A.** Correct.
**Q.** And you knew that they were armed, correct?
**A.** Correct.
**Q.** So this vacuum truck would have an armed escort every time it went out?
**A.** Correct.
**Q.** You were suspicious of his source of oil, correct?
**A.** Correct.
**Q.** Meaning that you had a belief that the oil might not be legitimate, correct?
**A.** Correct.
**Q.** You thought they might be, in your words, pulling up to a frac job or talking to well watchers, correct?
**A.** Correct.
**Q.** And they might be getting their thousands of barrels of pure crude oil from these sources?
**A.** Correct.

**Q.** Carlos even told you one time, "I wish I could find a pumper."
**A.** Correct.
**Q.** You told us before that you thought that these frac jobs that they were pulling up to, or you told your counsel, or a well watcher might be a family member, right?
**A.** Correct.
**Q.** And yet Carlos told you, "I wish I could find a pumper," right?
**A.** Correct.
**Q.** Meaning the family member was not the well watcher or at the frac job?
**A.** I don't know that.
**Q.** But it would be inconsistent with wanting to find a pumper, if his relative is a pumper?
**A.** Or if he's just trying to expand his business.
**Q.** Well, how many barrels is he bringing in per day, Mr. Ortega?
**A.** Carlos didn't work every day.
**Q.** I understand that. Sometimes his truck was broken down. But when he was running, how many barrels would he bring in a day?
**A.** Carlos would bring anywhere between one to three loads a day.
**Q.** Now, even though you knew Carlos was sketchy, Carlos had

an armed escort, Carlos had a suspicious source of oil, you trusted him to have access to the yard that you were running, correct?
**A.** Correct.
**Q.** You left him there and drove away. We saw that in the video, right?
**A.** Correct.
**Q.** While he was still there, correct?
**A.** Correct.
**Q.** And did nothing to even lock the gate, correct?
**A.** Correct.
**Q.** You talked to your counsel about, "Well, I would know how much oil was there beforehand, so I would know how much he would drop off." And that's how you would make sure that you knew how much Carlos would drop off. Do you remember that?
**A.** Yes.
**Q.** Mr. Ortega, either you trusted Carlos, or Carlos trusted you in this arrangement, right?
**A.** You could see it that way, yes.
**Q.** Okay. And you now are convinced that Carlos was stealing oil, right?
**A.** Yes, I am convinced that Carlos now is stealing oil.
**Q.** Okay. So this thief would trust you to get the gauges right and not rip him off, right?
**A.** Correct.

**Q.** You talk about you became suspicious as time went on in this case; is that right?
**A.** Correct.
**Q.** And you became suspicious because of the sketchiness of Carlos's -- Carlos and his crew, right?
**A.** Correct.
**Q.** Along with the fact that they brought in a significant amount of oil that could not be explained by waste or slop oil, correct?
**A.** Correct.
MR. DICKENS: Ms. Sanchez, if you would bring up Exhibit 46. And if you could focus just on the chart area. We'll start off at the top.
BY MR. DICKENS:
**Q.** Okay. Do you remember the agent talking about looking at your cell phone and getting the load tickets off your cell phone?
**A.** Yes.
**Q.** And based on that, she was able to create this chart; is that right?
**A.** Correct.
**Q.** So looking at this chart, the dates don't seem to line up. But that could be because of -- no offense, sir -- sloppy hand writing or her inability to understand your hand writing. But it is an order of the ticket numbers; is that

right?

**A.** It appears to be, yes.

**Q.** So even though the second entry says June 2nd of 2025, if these are from your cell phone and you didn't start until June 22nd, all of these had to be after the June 22nd date, right?

**A.** Correct.

**Q.** So as we look through this, and we see Chris -- I'm sorry -- we see Carlos being credited with bringing in hundreds of barrels of what we now know to be pure crude oil, stolen straight from the pipeline, when did you start becoming suspicious that this wasn't slop oil? Would it have been in this early time period, around the end of June/the beginning July, when he was bringing in load after load of hundreds of barrels of pure crude oil?

**A.** No, about a month -- about a month after I started.

**Q.** Okay. Well, let's keep looking at this. Let's go down to -- let's go down to July 22nd. That would have been about a month in.

So July 22nd, you credit him with bringing in 134. The very next day, it's 136. The very next day after that, it's 131. Three days in a row of 130-plus barrels of pure crude oil. Did you become suspicious on those dates?

**A.** Yes.

**Q.** Okay. And did you stop working at Hound Dog Energy?

**A.** I can't hear you.
**Q.** Did you stop working at Hound Dog Energy on those dates?
**A.** No.
**Q.** You continued to process the oil in and out of the Seven Rivers facility, correct?
**A.** After I expressed my concerns with Tom.
**Q.** Okay. And Tom said, "Trust me. Write the tickets, and it saves our ass"?
**A.** He showed me contracts that he had with Carlos. I was seeing paperwork with my own eyes. I've told you all of that before.
**Q.** Okay. And what you told the investigators, also, was you said, "Write the tickets. That saves our ass." Right?
**A.** That is exactly. He says, "Keep up with the paperwork. Write the tickets. It saves our ass." He says, "It covers our ass," as he's showing me paperwork.
**Q.** So as he's telling you, as you're expressing your concern that it's stolen a month into this, he's telling you, "Write the tickets." It saves your ass, meaning, if it's stolen, we've documented how we got it, right?
**A.** Correct. But if you're on an oil field location, you write a JSA to save your ass, too, if anybody gets hurt.
**Q.** Okay. Well, we're not talking about hurt. We're talking about stolen oil.
**A.** I'm saying paperwork, in general, keeps a good track of

what's going on.
**Q.** Okay. So he's saying the paperwork, the tickets, will protect us if this oil is stolen.
**A.** "The paperwork will protect us," is what he is telling me, yes.
**Q.** Protect you from what, sir?
**A.** I don't know. I've never worked in that type of business before.
**Q.** Sir, you're confronting him. You're saying, "This isn't" -- "this isn't legitimate oil." You're saying, "I'm concerned. I'm concerned."
He says, "Write the tickets. It protects you." Protects you from what?
**A.** Because he's showing me paperwork that he states that he already knows where Carlos is getting the oil and that it's legitimate.
**Q.** Fine. But he's not telling you, "Rely on this paperwork." He's telling you, "Write the tickets. That saves our ass." How do the tickets save your ass, sir?
**A.** It's documenting every load that he's bringing in and where it's coming from.
**Q.** Okay. Thank you.
Let's keep going on this. So we know now that this time period, the 22nd, 24th, 25th, that's concerning.
Let's now move to the middle section here. It goes

the July 29th, 31st, on into the 8th. We see, again, multiple loads per day of stolen oil. You've expressed your concern to Tom, but they keep bringing in more loads of pure oil. Do you express your concern to Tom again?

**A.** Yes, I do.

**Q.** And he tells you to continue to write the tickets.

**A.** Correct.

MR. DICKENS: If we could move down a little bit, Ms. Sanchez.

BY MR. DICKENS:

**Q.** Okay. Here, on August -- so now we've moved into the next month. August 11th, 12th, and 13th, my math serves me right, we have eight loads of oil coming in from Carlos, all over 130, meaning we have -- again, math; that's why I became an attorney -- that's about 1,000 barrels of oil in three days.

And again, with your concerns over this oil and its source, you still accept that oil, write the tickets. And when the oil haulers come, you sign the tickets, and you let them take the oil, right, sir?

**A.** Correct.

**Q.** Even though you have very serious concerns, right?

**A.** Correct.

**Q.** In fact, you would even agree that, at that time, you probably had -- you knew of a high probability that, in fact,

this was probably stolen oil, right?
**A.** No. I didn't know where it was coming from.
**Q.** Well, it's not slop oil, right?
**A.** I don't know that. I've never worked -- I've told you all that. I've never worked with the buying and selling of oil. Even as a pumper, I'm not in charge -- as a pumper -- when I was a pumper, I wasn't in charge of buying and selling of oil.
**Q.** Sir, even in your interview, you repeatedly told the agents, "This ain't from slop."
**A.** I know that, and I told -- what I'm trying to say is --
Repeat your question.
**Q.** At the time, within three days, Carlos alone has brought in 1,000 barrels of clean oil.
**A.** Yes.
**Q.** You, at that point -- having expressed these concerns, you have, at that point, a knowledge of a high probability that this is probably illegally or illicit oil, correct?
**A.** Yes.
**Q.** And yet you continued to process the oil; is that right?
**A.** With my concerns, yes.
MR. DICKENS: Thank you, Ms. Sanchez. That's fine.
BY MR. DICKENS:
**Q.** Now, you would agree that you knew that Tom Rees knew very little about the business, right?

**A.** Yes.
**Q.** And it became very clear that he was relying on Max Jensen for information?
**A.** Yes.
**Q.** In fact, I think you even said one time that, basically, "Tom does everything that Max tells him to do," right?
**A.** Yes.
**Q.** And you knew that, in fact, Max Jensen had been arrested for oil thefts, right?
**A.** No. I knew he had something to do with barges, like I stated before.
**Q.** Okay. So barges of what, sir?
**A.** I didn't get the story. So barges of oil. Yes, I knew something about oil and something about barges on the ocean, going from México to Houston, something like that.
**Q.** And again, knowing that the person who initially interviewed you, the person who is basically the brains behind the yard, and you know of your suspicions, do you do any research on Max Jensen?
**A.** No.
**Q.** You decide, again, just better not to ask questions, right?
**A.** Yes.
**Q.** But you knew that Max had yards in Hobbs/Odessa area?
**A.** Correct.

**Q.** And we heard you talk about those yards having a burnt reputation, correct?
**A.** Correct.
**Q.** And part of that was because Max made too much money, too fast, right?
**A.** I thought it was connection to the -- to him in general, but, yes, correct.
**Q.** But, again, we know that Mexican barges of oil aren't going into Odessa, right?
**A.** Correct. But when I found out he owned them yards, too.
**Q.** I apologize, we talked over each other, sir. Can you answer that again?
**A.** I said I figured when -- if he owned them barges and owned them yards, too, it's all got to be somehow connected.
**Q.** So sort of -- sort of had a bad reputation everywhere?
**A.** Correct.
**Q.** And you knew that Max was taking an active interest in the business, because you actually talked to Max one time about the business, right?
**A.** I talked to Max?
**Q.** Yes, sir.
**A.** I only talked to Max twice, when he hired me, and on a three-way call.
**Q.** And on that three-way call, Max told you your numbers are low, right?

**A.** Correct.
**Q.** And that you needed to get your numbers up, correct?
**A.** Correct.
**Q.** So he's taking an active interest in the business, right?
**A.** Correct.
**Q.** And in fact, he was supposed to be paid profit from what went through that yard?
**A.** I don't know that.
**Q.** In the interview, did you tell them that Tom told you that he was paying Max part of his proceeds? If you don't remember, sir, that's fine.
**A.** No, I remember that, yes.
**Q.** Okay. So again, you knew that Max was getting proceeds from the yard?
**A.** Yes.
**Q.** Let's talk about this marketing that you were encouraged to do. You say you went out to simply talk to vacuum truck drivers. If they had oil, deliver it to the yard, correct?
**A.** Correct.
**Q.** And you would leave them one of Tom's cards?
**A.** Correct.
**Q.** Did the business do any other type of advertising?
**A.** Outside of that, Tom told me to go to competitors' yards. He would give me a map of where they were.
**Q.** Okay.

**A.** And he wanted me to go talk to the drivers that were delivering at the competitors' yards.
**Q.** Did you all put a sign up on the side of the road?
**A.** We did not have a sign, no.
**Q.** When you went out to these -- I think the expression used was "man camps" where all the vacuum truck drivers stayed. Did you all leave flyers there?
**A.** I didn't go. I met, one time, with some truckers by the side of the road, by a food truck.
**Q.** So no other public marketing?
**A.** No.
**Q.** This was word of mouth, nothing else?
**A.** Just Tom's business card.
MR. DICKENS: One second, please, Your Honor.
(Counsel confers.)
MR. DICKENS: Thank you, Your Honor. No further questions.
THE COURT: Redirect?
MR. OTTAWAY: No.
THE COURT: All right. Thank you, sir. You can step down.
The defense can call its next witness.
MR. OTTAWAY: I'm sorry, what?
THE COURT: You can call your next witness.
MR. OTTAWAY: Naomi better anyone.

THE COURT: Watch your step.

(The witness was duly sworn.)

**NAOMI BERNIN**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. OTTAWAY:

**Q.** What is your name, please?
**A.** Naomi Bernin.
**Q.** How old are you?
**A.** I'm 23.
**Q.** How long have you and Chris been together?
**A.** Going on six years.
**Q.** Why did you decide to move back to Carlsbad?
**A.** We wanted to be with his two boys.
**Q.** Are you close with his boys?
**A.** Yes.
**Q.** Were you happy when he got the job working for Tom Rees?
**A.** Yes.
**Q.** What's the first you heard about it?
**A.** He showed me the Indeed listing whenever he got called by Max.
**Q.** Okay. And he started going to work pretty soon?
**A.** Pretty quickly after he had the interview and went to the yard with Tom.
**Q.** And did you go to the yard sometimes?

**A.** Yes.
**Q.** Why would you be with him?
**A.** We were on our way out to the river, on our way to go do something, so I would go with him.
**Q.** How did he know when to go to the yard?
**A.** He would get messages.
**Q.** On his phone?
**A.** Yes, sir.
**Q.** And you'd have to stop whatever you were doing and go to the yard?
**A.** Most of the time, yes.
**Q.** Now, the day that everybody got arrested, you were at the yard?
**A.** Yes, sir.
**Q.** Where were you, and where was everybody else?
**A.** I was in the truck, and they were all outside chitchatting.
**Q.** What truck?
**A.** Our truck, our personal truck, our Ford F150.
**Q.** So you were sitting in the truck, and who was standing outside?
**A.** It was Tom, the other gentleman, and my husband, Chris.
**Q.** Did you hear what everybody said?
**A.** No.
**Q.** Did you see when Tom and the other gentleman walked off

by themselves?
**A.** Yes. My husband came and sat in the truck with me.
**Q.** And how long was it before they came back?
**A.** Um, if I remember correctly, maybe about ten minutes. But I can't recall for sure.
**Q.** Was there a time when Mr. Ortega got worried about the job?
**A.** Yes.
**Q.** When was that?
MR. DICKENS: Your Honor, I'm going to object to hearsay.
THE COURT: What's your response?
MR. OTTAWAY: I'm not offering it for the truth. I'm offering it for when, the time period, when he started getting worried. I'll rephrase it.
THE COURT: Well, you can get the time. The time frame is okay. But as far as hearsay goes, what Mr. Ortega told her, I want you to think about your response to a hearsay objection to that.
So I'll overrule it as to time frame.
You can answer.
THE WITNESS: Okay. About a month after he started, so that would be the end of July, roughly.
MR. OTTAWAY: And I'll pass the witness.
THE COURT: Okay. Well, cross-exam?

MR. DICKENS: Thank you, Your Honor. The government has no questions.

THE COURT: Thank you, ma'am. You can go back, and sit in your seat.

Anymore witnesses from the defense?

MR. OTTAWAY: No.

THE COURT: Any rebuttal from the government?

MR. DICKENS: No, Your Honor. Thank you.

THE COURT: Okay. So both sides rest, then, from the government and defense?

MR. OTTAWAY: Yes.

THE COURT: All right. Then I was going --

Do you have something, Mr. Dickens?

**MOTION FOR DIRECTED VERDICT**

MR. DICKENS: Your Honor, at the close of the government's case, there was no motion for directed verdict. I know this is a bench trial. I think we, kind of, unfortunately, skipped through some of those -- some of those steps that we probably need to make a record of.

THE COURT: Okay. I'll presume that the defense has proved for a directed verdict then.

Do you want to respond, Mr. Dickens?

MR. DICKENS: Your Honor, only that I believe there is sufficient evidence at this point, taken in the light most favorable to the government to convicted on all counts.

THE COURT: Tell me about -- just so I understand, how about the August 21st? It's Count 9. It's the third count in this case. What's the evidence about what -- that's the day of the arrest, right?

MR. DICKENS: That's right.

THE COURT: What's the evidence of the moving the stolen oil on that date?

MR. DICKENS: Yes, Your Honor. There are some 9G tickets from that date, indicating pickups from that date.

THE COURT: Okay. All right.

Any response from the defense? I mean, I presumed you moved for directed verdict. I've heard the government's argument. Do you have anything that you want to say back?

MR. OTTAWAY: No, just the motion for directed verdict.

THE COURT: All right. I'm going to deny the motion for directed verdict and find that the trier of fact could reasonably return a verdict of guilty as to all counts, just to make the record clear on that. And I'll adopt the same reasoning -- I'll make this ruling as if it had been made after the government's case-in-chief and had been made again now because the defense put on evidence.

As far as submitting closing arguments and findings of fact and conclusions of law, I was thinking of making that due in one week. It doesn't seem to be -- I mean, it's kind

of a complex case, but I think one week is reasonable.

Also, my clerk, who's on this, is almost gone, and I want to have him do the work on it.

Does one week work for the government?

MR. DICKENS: We'll make it work, Your Honor.

THE COURT: How about from defense?

MR. OTTAWAY: Yes.

THE COURT: All right. Then written closing arguments and findings of facts and conclusions of law are due August 28th, by 5:00 p.m., so we can get that done.

Anything else I can do for the government?

MR. DICKENS: No, Your Honor. Thank you.

THE COURT: From defense?

MR. OTTAWAY: No.

THE COURT: All right. Thank you all for your work on this case. You're all excused.

(Court in recess at 11:36 a.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of New Mexico, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 22nd day of August, 2026.

/s/ RACHEL M. LOPEZ

_______________________________
Rachel M. Lopez, CRR
Official Court Reporter